**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**
*Roberts, et al. v. A.H.D. Houston, Inc., et al.*
Case No. 4:21-cv-2101

# EXHIBIT A

Crystal Cowart
2/17/2022                                        1 (1)

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
 2                            HOUSTON DIVISION

 3     GRACE ROBERTS, ON BEHALF OF      §
       HERSELF AND ALL OTHERS           §
 4     SIMILARLY SITUATED,              §
                                        §
 5         PLAINTIFF,                    §
                                        §  CIVIL ACTION
 6     VS.                              §
                                        §  NO.: 4:21-cv-02101
 7     A.H.D. HOUSTON, INC., D/B/A      §
       CENTERFOLDS HOUSTON, ET AL.,     §
 8                                      §
           DEFENDANTS.                  §

 9

10     ****************************************************************

11                          ORAL DEPOSITION OF

12                            CRYSTAL COWART

13                          February 17, 2022

14                          (Reported Remotely)

15     ****************************************************************

16

17         ORAL DEPOSITION OF CRYSTAL COWART, produced as a witness

18     at the instance of the Plaintiff, and duly sworn, was taken in

19     the above-styled and numbered cause on the 17th day of

20     February, 2022, from 10:09 a.m. to 3:54 p.m., before Anna Mar,

21     CSR in and for the State of Texas, reported by stenographic and

22     computer-aided transcription, pursuant to the Federal Rules of

23     Civil Procedure and the provisions stated on the record or

24     attached hereto.

25
```

**Page 2**

                    A P P E A R A N C E S

FOR THE PLAINTIFF:
(Appearing remotely)

    MR. JERRY MASON
    HODGES & FOTY, LLP
    4409 Montrose Boulevard, Suite 200
    Houston, Texas 77006
    T: (713) 523-0001
    E: jmason@hftrialfirm.com

FOR THE DEFENDANTS A.H.D. HOUSTON, INC., D/B/A CENTERFOLDS
HOUSTON, ET AL.:
(Appearing remotely)

    MR. WILLIAM X. KING
    WALLACE & ALLEN, LLP
    440 Louisiana, Suite 1500
    Houston, Texas 77002
    T: (713) 227-1744
    E: wking@wallaceallen.com

**Page 3**

                    I N D E X

                                                    PAGE

Appearances.........................................    2

CRYSTAL COWART

    Examination by Mr. Mason.......................    5

    Examination by Mr. King........................  176

Changes and Signature.............................  184

Reporter's Certificate............................  186

                    E X H I B I T S

EXHIBIT NO.     DESCRIPTION                         PAGE

Exhibit 1       A.H.D. Houston, Inc. d/b/a
                Centerfolds policies for
                Grace Roberts
                CENTERFOLDS_000014-000020............   58

**Page 4**

                    P R O C E E D I N G S

            (The reading of Federal Rule 30(b)(5)(A) into
the record was waived by all parties present.)

            THE REPORTER:  We are on the record.  Today's
date is February 17th, 2022.  The time is 10:09 a.m.  This is
the oral deposition of Crystal Cowart.  The witness is located
in Houston, Texas.

            My name is Anna Mar, CSR No. 11083.  I will be
administering the oath and reporting the deposition remotely by
stenographic means from San Antonio, Texas, representing
Compass Reporting Group.

            Would counsel please state their appearances on
the record.

            MR. MASON:  Jerry Mason of Hodges & Foty for the
plaintiffs.

            MR. KING:  Will King, Wallace & Allen, for
defendants.

            THE REPORTER:  Okay.  Ms. Cowart, if you would
please raise your right hand, I will swear you in.

            (Witness sworn.)

            THE REPORTER:  Thank you so much.

            Counsel, you may proceed.

            MR. MASON:  Okay.  Thank you.

                    CRYSTAL COWART,

having been first duly sworn, testified as follows:

**Page 5**

                    EXAMINATION

BY MR. KING:

    Q.    We'll cover some of the background, but if you would,
please go ahead and state your full name for the record.

    A.    Crystal Cowart, C-o-w-a-r-t.

    Q.    Thank you.

            My name is Jerry Mason, as I just said.  I am
representing the plaintiffs in this lawsuit, and, of course, we
are adverse.  I'm sure you're aware that we are suing the club,
which you are a representative of.

            Have you ever been deposed before?

    A.    I have.

    Q.    Okay.  More than once?

    A.    Yes.

    Q.    Okay.  What kind of matters were you deposed for?

    A.    Similar to this case.

    Q.    Okay.

    A.    FLSA claims.

    Q.    FLSA claims.

            And about how many times would you say you have
been deposed?

    A.    Three or four.

    Q.    Okay.  Have you ever testified at trial?

    A.    One time.

    Q.    So as you probably know -- you're kind of familiar

Crystal Cowart
2/17/2022                                    3 (6 - 9)

Page 6

1  with the process it sounds like -- this is pretty much like
2  testifying at trial.  You have been sworn in.  You're under
3  oath, and when I ask you questions -- your lawyer is present, I
4  see -- he may object to some of my questions.
5                Generally, you would still have to answer unless
6  he instructs you not to answer.  Of course, if he does instruct
7  you not to answer, I won't expect you to.  What you say today
8  could be used in trial if this case does go to trial.
9                And so I assume that trial was also an FLSA
10 case?
11     A.   No.
12     Q.   Oh, it was not?  Okay.  'Cause you said your
13 depositions were FLSA so I just assumed.  When it got to -- the
14 one that got to trial, was -- so what -- what kind of matter
15 was that?
16     A.   It was a nuisance hearing.
17     Q.   Nuisance, okay.
18     Q.   And that was for the -- the club, A.H.D.?
19     A.   Sorry, no, a different entity that we
20     Q.   Oh, okay.  For different -- so, who is your actual
21 employer?  What -- what's the name of the company that you work
22 for?
23     A.   A.H.D. Houston, Inc.
24     Q.   Oh, okay.  So it was A.H.D. Houston, but it was
25 something other than the Centerfolds?

Page 7

1     A.   For the nuisance hearing?
2     Q.   Yeah, the nuisan- -- the nuisance hearing.
3     A.   No.  It was a different entity unrelated to -- well,
4  not Centerfolds.
5     Q.   Okay.  But that's -- that's what I was trying to get
6  to.
7     A.   I provide administrative services to several of the
8  companies that are owned by the same gentleman.
9     Q.   Okay.  So more than just A.H.D.?
10    A.   Yes.
11    Q.   Okay.  Okay.  All right.  When -- do you recall
12 the -- the dates of when you provided depositions for the FLSA
13 cases, approximately?
14    A.   I don't know the exact dates, but all of the
15 depositions were last year in 2021.
16    Q.   Okay.  Were they all separate cases or were you
17 deplo- -- deposed more than once for the same case?
18    A.   I think they were all separate cases.  I'm trying to
19 think.  Yeah, they were all separate.
20    Q.   Okay.  Were those -- you mentioned they were FLSA.
21 Were they similar to this one?  Were they lawsuits brought by
22 dancers for wage-an-hour claims?
23    A.   Yes.
24    Q.   Okay.  And, now, I know there's probably some
25 confidentiality issues with those, but could you tell me how

Page 8

1  those ended?  Did they end in a settlement?  Or did it go to
2  trial or...
3     A.   To my knowledge, those cases are still active.
4     Q.   Still active, okay.
5                And were you deposed in the same capacity that
6  you are being deposed now, as a representative of A.H.D.?
7     A.   I was deposed in the same capacity as a corporate
8  representative, but two of the depositions were not A.H.D.
9  related.
10    Q.   Okay.  So those were -- the other entities owned by
11 the same people that you're referring to?
12    A.   Yes.
13    Q.   Other corporations owned by the same group basically?
14                Okay.  So, again, you seem to be kind of
15 familiar with the process, but I'll just kind of go over some
16 of the basic rules just to -- just to lay the groundwork,
17 refresh your memory, kind of ease us in a little bit so you
18 don't have to be too stressed right at the beginning.
19                So, obviously, I'm gonna ask you questions,
20 which you will be instructed to answer.  Your duty is to answer
21 those questions as best you can.
22                Do you understand that?
23    A.   Yes.
24    Q.   As I mentioned, you have been sworn in so this
25 is essentially the same as giving testimony in court.  It could

Page 9

1  be used at trial.  If you do not a- -- understand any of the
2  questions I ask, feel free to ask me to clarify or to repeat
3  the question.  If you don't say anything, I'm going to assume
4  that you understood the question; is that fair?
5     A.   Okay.  Fair.
6     Q.   And it kind of helps a little bit that we're on
7  video, but, generally, your answers do need to be verbal and
8  clear.
9     A.   Yeah.
10    Q.   The court reporter has trouble with, you know, head
11 nodding or head shaking, you know, or uh-huh or huh-uh.
12 Sometimes it's not clear when it's written down in the
13 record.  Uh-huh or huh-uh can look the exact same thing.
14    A.   I mean, understood.  I'm not gonna shake my head.
15 Understood.
16    Q.   Thank you.  Perfect.  If you do need a question
17 repeated or rephrased, feel free to ask.  If you need a break,
18 just ask.  You know, we can take a break at any time.  This is
19 not a -- race.  You don't have to, you know, be grilled for
20 the whole time.  If -- you know, if you need some water or go
21 to the bathroom or just need to, you know, take a minute for
22 yourself, feel free.  All that I ask is if there's already a
23 question already on the table that you answer that question and
24 then we can take a break after that.
25    A.   Okay.

Crystal Cowart
2/17/2022                                          4 (10 - 13)

Page 10

1   Q.  Fair enough?

2   A.  Fair enough.

3   Q.  Okay.  Great.  If anything comes up that interferes

4   with your ability to answer a question, please let me know.

5   A.  Okay.

6   Q.  And you will agree to give us a full -- answers to

7   the questions here today; is that right?

8   A.  Yes.  Correct.

9   Q.  Okay.  If at any time during the deposition, you

10  realize that one of the answers that you have given is

11  incorrect or incomplete, feel free to speak up, and we can

12  correct that on the record here today.

13  A.  Okay.

14  Q.  Okay.  Otherwise, you know, I'm going to rely on this

15  testimony that you give here today.  You should get a copy of

16  this and be able to review it afterwards if there's any

17  problems, but, otherwise, it's gen- -- generally going to be

18  assumed that your answers are correct to the best of your

19  knowledge.

20  A.  Okay.

21  Q.  Okay.  Are you on any medication or anything else

22  that would hinder your ability to recall information or to give

23  accurate answers today?

24  A.  No.

25  Q.  Okay.  Is there anything else that might prevent you

Page 11

1   from giving full and complete testimony here today?

2   A.  No.

3   Q.  Okay.  Perfect.

4   A.  I do want to clarify something.  Earlier, you asked

5   me -- the three depositions.  I said FLSA for all three, but --

6   Q.  Uh-huh.

7   A.  -- it just clicked.  One of them was not FLSA.  It

8   was a company, a third-party company, used images without

9   consent forms.  So I can't remember what that type of case was

10  called, but one of the three was not FLSA.

11  Q.  Okay.  Something entirely different, so basically two

12  FLSA cases you've been deposed for?

13  A.  Yes.

14  Q.  Thank you.

15      Okay.  What is your address?  Pers- --

16  A.  My home address?

17  Q.  Yes.

18  A.  ███████████████████████████

19  Q.  ████████████████████████

20  A.  ██████████████

21  Q.  Okay.

22  A.  ████.

23  Q.  Okay.  And how long have you lived there?

24  A.  This is the beginning of my third year, so two years

25  and two months.

Page 12

1   Q.  Okay.  And before that, where did you live?

2   A.  Before that, I had an apartment.

3       Do you want that address?

4   Q.  Yes, please.

5   A.  ████████████████████████████████████████

6   ███████████████████████████████████████

7   ██████████████████████

8   Q.  Okay.  Thank you.

9       Do you have a business entity yourself, or are

10  you strictly an employee?

11  A.  I'm an employee.

12  Q.  Okay.  What is your date of birth?

13  A.  November 7th, 1983.

14  Q.  Could I get the -- just the last four digits of your

15  social security number?

16  A.  ████.

17  Q.  Okay.  And your driver's license number?

18  A.  ██████.

19  Q.  Thank you.

20      Did you do anything to prepare for this

21  deposition today?

22  A.  Yes.

23  Q.  Okay.  And I'm not going to ask you to tell me about

24  anything you've said to your attorney or anything your attorney

25  said to you.  That information is privileged, but did you meet

Page 13

1   with your attorney to prepare for this --

2   A.  I did.

3   Q.  -- on video or -- okay.

4       Okay.  And was that Will King?

5   A.  It was.

6   Q.  Approximately how long did you meet for?

7   A.  About an hour.

8   Q.  Did you -- strike that for a moment.

9       Was anyone else present when you were meeting

10  with your attorney?

11  A.  Yes, our other attorney, Casey Wallace.

12  Q.  Okay.  Anyone who was -- let me rephrase that.

13      Was anyone else present who was not an attorney?

14  A.  No, sir.  Just the three of us.

15  Q.  Okay.  Did you review records to prepare for this?

16  A.  By records -- what type of records do you mean?

17  Q.  Specifically the club's or manager's responses to our

18  interroga- -- I mean to our discovery questions including the

19  interrogatories, requests for product, or request for

20  admissions?

21  A.  I've reviewed all of those.

22  Q.  Okay.  And the documents, the -- that Centerfolds has

23  produced as part of its production?

24  A.  Yes.

25  Q.  The Bates-labeled documents?

Crystal Cowart
2/17/2022
5 (14 - 17)

**Page 14**

1    A.   Yes, sir.

2    Q.   Okay.  Any other documents that you reviewed to

3  prepare?

4    A.   I reviewed your deposition notice and made sure that

5  I was familiar with a response to each of the 25 -- I think it

6  was 25 points you put on there.

7    Q.   Okay.  Okay.  So we'll get to some more of the

8  softball questions for a while.  So where were you born?  Where

9  did -- where'd you -- well, I'll just stay with that.

10               Where were you born?

11   A.   Mobile, Alabama.

12   Q.   Did you grow up there?

13   A.   No.  We moved to Houston when I was six.

14   Q.   Have you lived in Houston since then?

15   A.   Yes.

16   Q.   Are you married?

17   A.   No.

18   Q.   Okay.  Have you ever been married?

19   A.   No.

20               MR. MASON:  I apologize.  I swear I turned off

21  my phone before -- before we started today.  Maybe I guess I

22  didn't turn it off, but I thought I did.  The ironic thing is I

23  don't usually get that many phone calls so...

24               THE WITNESS:  But, of course, when you're

25  busy...

**Page 15**

1               MR. MASON:  Exactly.  Exactly.  It's always when

2  you don't want it, and it's almost always spam calls.  So okay,

3  I think that did it.  A little more clear.  Sorry about that.

4               THE WITNESS:  No problem.

5    Q.   (BY MR. MASON)  Do you have any children?

6    A.   No.  Unless you count my cat.

7    Q.   Oh, well, kind of.  I have a cat, too, so I -- I --

8    A.   See, you know.  You understand.

9    Q.   Yeah, absolutely.

10               Okay.  Where did you go to high school?

11   A.   High School for the Performing and Visual Arts.

12   Q.   Oh, okay.  Yeah, I'm -- I'm familiar with it.  At

13  least, I've heard of it.

14   A.   Oh, good.

15   Q.   What -- what was your performing and visual art that

16  you were going for?

17   A.   Well, growing up, I did musical theater with Theatre

18  Under The Stars for most of my youth, and that was just kind of

19  a rite of passage, so to speak, in the theater world.  As -- as

20  a young performer, you essentially made it if you auditioned

21  and got into any department at the High School for Performing

22  and Visual Arts.  Mine, I was lucky to get in for theater for

23  acting.

24   Q.   Wow.

25   A.   Yeah.

**Page 16**

1    Q.   That's awesome.

2    A.   Thank you.

3    Q.   Did you do some theater work after high school?

4    A.   I did a little bit in college with the University of

5  Houston Downtown, their theater department.

6    Q.   Uh-huh.

7    A.   But that's about it as an adult.

8    Q.   Okay.  Yeah, I actually did some acting myself when I

9  was younger, before I became a lawyer.

10   A.   Did you?

11   Q.   Yeah.  Yeah.  I -- I was -- I didn't, like, have any

12  formal training, but, you know, I just kind of auditioned

13  for -- for theater and got a role and was -- I did a bunch of

14  plays and had an agent for a while and everything but --

15   A.   Wow.

16   Q.   -- enough about me.  I just thought --

17   A.   That's fine.

18   Q.   --- that was -- that was very interesting that you --

19  that you did some theater there.

20   A.   So you know the love.  You -- you know the --

21   Q.   I -- I -- I do.  If only, you know, there was money

22  in it, right?

23   A.   Hence why I can no longer do it.

24   Q.   Right.  Right.  At some point you gotta get serious

25  and pay the bills.

**Page 17**

1    A.   Uh-huh.

2    Q.   Okay.  Did you go to college?

3               You mentioned college, I think.

4    A.   Yes, sir.  I went to Houston Community College where

5  I obtained my associate's degree in paralegal sciences.  And

6  then I went over to University of Houston Downtown, where I

7  obtained my bachelor's degree in business administration.

8    Q.   So you have an associate's in paralegal sciences.

9               Did you ever do any work as a paralegal?

10   A.   For one year.  I went and did a little bit of

11  personal injury work.

12   Q.   Okay.  Did you not like it or...

13   A.   Well, we did -- I was working for Rob Ammons, and we

14  did primarily the catastrophic injuries and the death cases for

15  the product defects.

16   Q.   Uh-huh.

17   A.   So it came to a point where I was having nightmares

18  because I would see the -- the video from the -- the police

19  cams.

20   Q.   Uh-huh.

21   A.   And it was just -- some of it was just so shocking

22  and -- and just hard to separate yourself from that.  I

23  couldn't consistently do that longer term.

24   Q.   Right, right.  Well, I understand.  It's -- it can be

25  a lot of negativity -- a lot of, you know, ugliness

Crystal Cowart
2/17/2022                                    6 (18 - 21)

Page 18

1 unfortunately.

2   A.   Uh-huh.

3   Q.   Okay.  What year did you get your bachelor's degree?

4 What year did you graduate?

5   A.   December 2019.

6   Q.   Okay.  So not that long ago?

7   A.   No.

8   Q.   Were you ever -- and I apologize for asking this, but

9 I have to do it.

10          Were you ever suspended or disciplined in school

11 for cheating or anything like that?

12   A.   No.  No, I'm -- I'm not a cheater.  I was

13 suspended -- I don't even know if you would call it a

14 suspension, technically.  I was doing theater.  I was in the

15 sixth grade.  We had a run of Oliver, and we were doing it at

16 the main stage at ha- -- the music hall at the time.  And they

17 would not let me out of class to do the student matinees that

18 we had the performance for.

19          So they told my mother that if I didn't come to

20 class, I would be put in in-school suspension.  So she told

21 them that I had more important things I needed to be doing with

22 my theater than sitting in in-school suspension so they could

23 go ahead and give me a seven-day suspension and I could stay

24 home.  So I don't know if you count that as being suspended but

25 that's it.

Page 19

1   Q.   Okay.  But it was -- it was for a good cause.

2   A.   It was a good cause.

3   Q.   Okay.  Fair enough.

4          Tell me about your employment history.  How long

5 have you worked for A.H.D.?

6   A.   I have provided administrative services for A.H.D.

7 for approximately 15 years now.

8   Q.   Okay.  I should have asked this.  So sorry, let me go

9 back for a second.

10          When did you get your associate's degree in the

11 paralegal studies?

12   A.   2016.

13   Q.   What are your duties for A.H.D.?

14   A.   I process all of the independent contractor

15 agreements.  When I say "process," I mean intake all of the

16 completed agreements.  I have to run a criminal background

17 check per the City of Houston to ensure that the individual

18 being contracted doesn't have certain cases -- certain

19 convictions against them.

20          Other than that, I verify that they have the

21 proper documents, such as identification or driver's license

22 and social security or EIN.  Once I verify the paperwork is

23 complete, that's about it.  And then in the event that there's

24 any type of litigation or anything like that, obviously, I'm

25 the one that will step in.

Page 20

1   Q.   Okay.  Do you ever --

2   A.   In addition to -- one more.  In addition to that,

3 anytime there is a change that needs to be made in the

4 independent contractor agreements or the license and access

5 agreements, I'm the person, the corporate representative, that

6 assists counsel in drafting the documents.

7   Q.   Okay.  So whenever there is a change to the

8 independent contractor agreement, you consult with counsel on

9 those changes?

10   A.   Absolutely.

11   Q.   Okay.  And who is that counsel?  Is that Casey

12 Wallace?

13   A.   Yes.

14   Q.   Okay.  Has that been the attorney that you have

15 consulted with for the entire time that you've worked for

16 A.H.D.?

17   A.   No.  We have one other attorney -- well, Mr. Wallace

18 is our general counsel so he's my go-to.  If I have a question,

19 I go to him.  But we do have another attorney.  Her name is

20 Lauren Serper.  She's also somebody that I might go to for

21 secondary advice or something like that.  And, obviously,

22 Mr. King here.

23   Q.   Right.  Yeah --

24   A.   Of course.  Let us not forget him.

25   Q.   Of course.  No disrespect to Mr. King.

Page 21

1          MR. KING:  Just chillin'.

2   Q.   (BY MR. MASON)  But, you know, I know Casey Wallace,

3 I guess, is the -- the partner -- the -- the firm so I -- when

4 I refer to Casey Wallace, I assume it's gonna be the firm

5 and --

6   A.   Okay.

7   Q.   -- whatever associates or partners work with him.

8          You referred to Casey Wallace as your general

9 counsel.  Is he outside counsel, or does he have a role within

10 the firm -- I mean, within A.H.D.?

11   A.   He's outside counsel.  Like, he doesn't physically

12 have an office with us or anything like that.  But I guess I

13 call him general counsel because he's my go-to.

14   Q.   Gotcha.  Just wanted to clarify.

15          But he's not on the payroll, correct?

16   A.   No, sir.

17   Q.   Okay.  Do you ever interview dancers yourself?

18   A.   I have on occasion.

19   Q.   Who normally does the interviews?

20   A.   Are you asking with respect to prospective dancers?

21   Q.   Yes, sorry.

22   A.   Customarily, the management.

23          Now, I will say this to clarify my previous

24 answer.  When I said I have interviewed dancers before --

25   Q.   Uh-huh.

Crystal Cowart
2/17/2022                                      7 (22 - 25)

**Page 22**

1      A.   -- I have not interviewed them in my capacity as a
2  corporate representative or an administrator for A.H.D.  I have
3  interviewed them in a previous capacity that I worked for the
4  c- -- different -- one of our entities as a hostess.  Obviously
5  in that scenar- -- those scenarios, I was on site and able to
6  physically have a conversation with the individuals that were
7  seeking to dance.
8      Q.   Okay.  So you were working as a hostess?
9      A.   Yes, sir.
10      Q.   Is that common to have hostesses interview
11  prospective dancers?
12      A.   No.  Because I am who I am in the company, and I've
13  been -- my longevity with the companies, I would be an
14  exception to the rule.
15      Q.   I see.
16           Have you ever interviewed any other prospective
17  employees such as waitresses, bartenders, security people,
18  anything like that?
19      A.   I have -- again, in my capacity as a hostess, I did
20  interview prospective hostess applicants.
21           MR. MASON:  Everything good, Will?
22           MR. KING:  Sorry about that.  I'm all good.
23           MR. MASON:  Okay.
24      Q.   (BY MR. MASON)  All right.  Do you ever handle any
25  money for A.H.D.?

**Page 23**

1      A.   I have once for one week.
2      Q.   Are you familiar with the income and expenses of the
3  club?
4      A.   To an extent.  I don't have detailed information, but
5  I know the -- I know that our response in one of our responses
6  to you guys stated that -- I'm trying to think of the exact
7  language off the top of my head -- stated that we gross
8  annually in excess of 500,000.
9      Q.   Okay.  So is your knowledge limited to what you did
10  to prepare for the deposition?
11      A.   Yes.
12      Q.   Okay.  Do you have any role in the marketing for the
13  club?
14      A.   No.
15      Q.   They seem to be related but just to be clear.
16           What about advertisement?
17      A.   No.
18      Q.   Do you -- other than having occasionally interviewed
19  a dancer, have -- do you have any role in human resources for
20  the club?
21      A.   In the event that an employee or dancer has a
22  grievance of any type that they're not comfortable with
23  discussing with management for whatever reason, if they wanted
24  to request that I come on site and speak with them personally
25  about whatever the matter is, I can always come do that.  But

**Page 24**

1  other than that, not much.
2      Q.   Okay.  But you're not the primary person that they
3  would go -- that dancers would go to for grievances?
4      A.   I think before me, they would go to the manager on
5  duty.  But, again, if it's a matter that they're not
6  comfortable going to management with, I'm always accessible.
7      Q.   I see.  Okay.
8           Do the dancers come to you sometimes to complain
9  about the managers themselves?
10      A.   I've had one instance -- I'm trying to think of how
11  many years ago -- several years ago where the dancer was -- she
12  was annoyed essentially by the manager, and it was some small
13  something.  Can't remember exactly what it was, but anyway, she
14  was annoyed by the manager so I went over and I discussed it
15  with her, found out her full issue, and then I went and spoke
16  with the manager, and basically helped mediate the situation
17  and everything was fine.
18      Q.   Okay.  So a dancer has never complained to you that,
19  for instance, a manager was requiring them to pay tips and that
20  that wasn't in their agreement?
21      A.   No.
22      Q.   Okay.  And a dancer has never complained to you
23  about, say, sexual harassment from a manager?
24      A.   No.
25      Q.   Okay.  Is there someone else at the company that a

**Page 25**

1  dancer would go to if they had a complaint about, say, sexual
2  harassment?
3      A.   No.  I would be the individual that would be called
4  over for that.  Because I'm not on site physically every day,
5  the girls might go to a manager.  But obviously they're not
6  gonna go to the manager that they're accusing of sexual
7  harassment, you know.
8      Q.   Right.
9      A.   So they're gonna go to a different manager probably,
10  right, but at any rate, my management teams know that in that
11  kind of scenario, you need to contact me directly.  Number one,
12  because I'm a female and they're a female and there's a comfort
13  level between us.  We can communicate especially about
14  sensitive matters like that --
15      Q.   Uh-huh.
16      A.   -- in a different way.
17           But, number two, because I am the corporate
18  representative.  And if that is happening or were to have even
19  been thought of to happen on site or by my management or
20  anything, it would need to be addressed and handled immediately
21  because I'm not going to allow my girls to work in a scenario
22  where they feel uncomfortable or threatened.
23      Q.   Do you have the authority to fire managers?
24      A.   Depending on the nature of the complaint.  Let's say,
25  hypothetically speaking, somebody contacted me and said I've

Crystal Cowart
2/17/2022                                          8 (26 - 29)

Page 26

1 been sexually harassed by Billy Bob, and I did my investigation
2 and I found that Billy Bob had in fact done it, I would
3 immediately terminate him.  And that would be it.  There would
4 be no conversation from any other parties.  He would be done.
5    Q.   What about complaints from customers?  Do you ever
6 handle complaints from customers?
7    A.   On occasion.  I don't handle it -- again, not on site
8 physically, so if it's a general complaint from a customer
9 while he's visiting the facility, obviously I'm not there to
10 address that complaint.  But on the back end, we occasionally
11 get complaints from the customers through their credit card
12 service in the form of a -- a credit card dispute.  At which
13 point I have to identify the issue stated by the customer, and
14 obviously give a company response to that and send over the
15 supporting documents related to his transaction.
16    Q.   So do you handle all of the credit card disputes or
17 only some of them that go down -- what, say, managers can
18 handle?
19    A.   I handle all credit card disputes that come in from a
20 banking institution or from our credit card processing company.
21 In addition, rarely but on occasion, there are instances where
22 a customer will contact a manager on property and let them know
23 that they're dissatisfied for whatever reason, at which point
24 the manager will contact me.  I'll provide them with the
25 documents, and I'll help them mediate to a -- a closure.

Page 27

1    Q.   Okay.  Does your -- do your duties involve compliance
2 with local ordinances?
3    A.   Yes.
4    Q.   Do your duties involve compliance with wage loss?
5    A.   To the extent that we educate the management team who
6 are on site.  For example, with respect to FLSA, we have
7 meetings in which Mr. Wallace joins me, and we meet with the
8 managers, and he preaches that the company and the managers
9 have -- I'm sorry, that the companies and the managers are not
10 to interfere with the dancers' degree of control, relative
11 investment, permanency of relationship, or opportunity for
12 profit and loss.  Other than that, I don't have any involvement
13 in -- in the wage.
14    Q.   Okay.  So basically your role is mostly to prevent
15 the managers from violating or -- violating the club's policies
16 and laws as far as you know them?
17    A.   Correct.
18    Q.   Do you have any role in discipling -- disciplining
19 dancers who don't follow club policies?
20    A.   No.  But if a dancer were to be disciplined by a
21 manager, for example, and that dancer felt that her -- the
22 disciplinary action that was applied to her was unfair or
23 inaccurate, again, she would be able to contact me, and I would
24 then help mediate the situation if at all possible.
25    Q.   Has that ever happened?

Page 28

1    A.   No.
2    Q.   Do you have the authority to determine whether the
3 club classifies dancers as independent contractors or employees
4 or, I believe, in the case of the club, you call them
5 lessees -- lease holders?
6    A.   The determination of their status, so to speak,
7 comes from counsel.
8    Q.   So obviously you follow counsel's advice as far as
9 how to classify your dancers, correct?
10    A.   Yes.
11    Q.   Do you basically -- do you suggest we would prefer
12 them not to be employees?  Is that legal or did the -- let me
13 rephrase that.
14         Did the idea for classifying as independent
15 contract- or strike that.
16         Would you consider them independent contractors?
17         MR. KING:   Objection.  Form.
18    A.   I do consider them -- yes.
19    Q.   (BY MR. MASON)  Okay.  Did --
20    A.   Are you aware that we give any prospective dancer
21 that comes in -- they're given two options.  They can either
22 perform as an independent contractor or they can perform as an
23 employed dancer.  So they have two choices when they walk in.
24 I've never had anyone request to be an employed dancer, but
25 they do have that option.

Page 29

1    Q.   Okay.  I was going to -- to get to that.  I wasn't
2 sure but I had gotten that impression.
3         Bear with me for just a moment here.
4         So you said no -- none of the dancers have ever
5 chosen to be employed dancers?
6    A.   I have never had anyone -- I would be the individual
7 that was contacted in the event that a dancer said, yes, I'd
8 actually like to be an employed dancer.
9         The manager could contact me.  I would come on
10 site.  I would sit down with the prospective employed dancer
11 and go over the agreement with her and discuss what type of
12 schedule would work best for her.  She -- you know, she may
13 have children, things like that, where she can't be there at
14 the certain time.  But I've never had that -- I've never had
15 that opportunity to go over and do that yet.
16    Q.   What terms do you offer an employed dancer as far as
17 pay structure?
18    A.   Well, again, I've never offered it because nobody's
19 ever asked for it, but it is my understanding that we would pay
20 them $7.25 per hour.  And more in detail than that, I don't
21 know because, again, I haven't had to ask Mr. Wallace the
22 specifics because I've never had anybody actually want to do
23 it.
24    Q.   Okay.  Do you know what terms would be related to
25 their tips for the -- the -- the money from the customers?  If

Crystal Cowart
2/17/2022                                              9 (30 - 33)

Page 30

1  they are an employed dancer, would they get to keep all the
2  money from the customers?
3      A.   I don't know.
4      Q.   What information do you provide to the dancers so
5  that they can make that decision about whether to be an
6  employee or a independent contractor?
7      A.   The -- not the cover page but the -- the -- when you
8  open the license and access agreement as a prospective, the
9  very first page has language on it informing you that you have
10 an option to either be an independent contractor or an employed
11 dancer.  And I can't remember verbatim what it says, but it --
12 it indicates to let management know if they're seeking to be an
13 employed dancer so that I can contact...
14     Q.   Okay.  You mentioned a schedule earlier.  So I take
15 it that one of the terms, if they were an employed dancer,
16 would be that they would have to work a set schedule set by the
17 club?
18     A.   It would be a schedule -- and, again, I -- this is an
19 assumption -- it would be a schedule that I set with the dancer
20 because, again, the -- dancer may not be able to come to
21 wor- -- if I tell her come on Sunday afternoon; perhaps she has
22 another engagement on Sundays and can't.  So obviously it would
23 be a discussion, and then we would come to an agreement on what
24 schedule worked best for her.
25     Q.   Okay.  So you would work with the dancer, but once

Page 31

1  you agreed on a schedule, they would be expected to follow that
2  schedule?
3      A.   Correct.
4      Q.   Okay.  So for the -- you said you've worked for the
5  club for 15 years?
6      A.   For A.H.D., yes.  I've provided administrative
7  services for that long.
8      Q.   Okay.  Had -- for that entire time, have they -- has
9  the club had the same policy as far as classifying or giving
10 the option to classify dancers as independent contractors
11 versus employees?
12     A.   Yes.  However, throughout that time, we have updated
13 the independent contractor agreement.  As the rulings and laws
14 and -- and various stipulations change, we -- we update it
15 to -- to be appropriate.
16     Q.   Okay.  And does the club update these agreements
17 every year?
18     A.   We don't have a specific timeframe.  It's
19 historically proven that whenever Mr. Wallace finds a change to
20 be substantial enough that we need to amend or update the
21 agreement, he'll contact me and tell me, you've got to come to
22 my office; it's time to redo the agreements, and we go from
23 there.
24     Q.   So basically Mr. Wallace keeps up to date on the law
25 and if anything in the law changes that he feels would require

Page 32

1  an updated independent contract agreement, he'll contact you
2  and say, hey, we need to update this?
3      A.   Yes.
4      Q.   Okay.  My understanding is that Ali Davari and Hassan
5  Davari are owners of the club; is that correct?
6      A.   Technically -- technically, no.  Technically, A.H.D.
7  Houston, Inc., owns Centerfolds.
8      Q.   But Ali Davari is the, I believe, president or
9  director of A.H.D.?
10     A.   Let me break it down as I understand the corporate
11 structure.
12     Q.   Okay.
13     A.   A.H.D. Houston, Inc., owns Centerfolds.
14     Q.   Okay.
15     A.   Then D. Texas Investments owns 100 percent of A.H.D.
16 Houston, Inc., and Hassan and Ali are president and vice
17 president of D. Texas Investments.
18     Q.   All right.  Do -- does Ali Davari have any role in
19 the day-to-day management of the club?
20     A.   No.
21     Q.   Okay.  What about Hassan Davari?
22     A.   No.
23     Q.   Who do you report to?
24     A.   I'm gonna give you the answer that I give in every
25 deposition, and you're gonna laugh.  But I'm gonna gi- -- it's

Page 33

1  the truth.
2      Q.   Okay.
3      A.   I don't report to anyone.  I've been with the various
4  companies all of my adult life so at this point, I -- I'm --
5  I'm the boss of me.
6      Q.   Okay.  If the -- well, let's say if you wanted to
7  change the policy of the club as far as classifying dancers as
8  independent contractors, do you have that authority?
9      A.   I would contact Mr. Wallace and make sure that
10 whatever idea I had come up or wanted to come up with was in
11 the best interest of the company based on his legal knowledge.
12     Q.   Okay.  So, yeah, I understand that you -- you follow
13 his advice, but since he's not employed by the club, the
14 decision would ultimately have to be with someone who works at
15 the club, which I assume is you?
16     A.   Yes.
17     Q.   Okay.  Do you ever communicate directly with the
18 entertainers?
19     A.   With respect to what kind of communication?
20     Q.   Well, other than -- you know, we mentioned that you
21 might handle disputes or something like that.
22          Do you ever give them updates from the club, the
23 policies from the club, you know, how a company would
24 communicate to its employees -- hey, we have this new policy
25 or, let's say, you know, the club has to shut down for COVID or

Crystal Cowart
2/17/2022                        10 (34 - 37)

Page 34

1   something like that.

2           Would the communication come from you to -- to

3   to let people know?

4     **A.**   Yes.

5     **Q.**   Okay.

6     **A.**   Uh-huh, yes.

7     **Q.**   And how would you generally do that?  By e-mail or...

8     **A.**   No, I -- with the dancers, it's hard because their

9   e-mails change and their phone numbers change.  So I found, in

10  my experience, it's better to post notices on property so I

11  would go there and physically -- let's hypothetically say we

12  shut down for COVID again.

13          I would go over there like I did the last time,

14  tell everybody who's there we're having to shut down for COVID.

15  Please let everyone that you know know that we're gonna be

16  closed down for a little while.  And then I would put up

17  notices throughout the club, but obviously if we close,

18  nobody's gonna see the notices, per se.

19          But in those scenarios -- and then there's the

20  scenarios of, like, when I go to reiterate the fact that we

21  have the company policy of no mandatory tip sharing.  I post

22  notices all over the building, but then I go periodically once

23  every few months or so to make sure that the notices are still

24  visible and haven't gotten makeup or lipstick or whatever all

25  over them.  But that's about it.

Page 35

1     **Q.**   Okay.  Are there other exotic dance clubs that the --

2   that A.H.D. operates or is it just Centerfolds?

3     **A.**   A.H.D. only operates Centerfolds.

4     **Q.**   Okay.  How is your contact information provided to

5   the dancers if they needed to contact you for, say -- you know,

6   they wanted to complain about a manager or something like that?

7   How do they know that you're the person to contact?

8     **A.**   My phone number is posted at the front desk, and in

9   addition to that, I make sure that all of the hostesses, both

10  a.m. and p.m., have my phone number so that -- because I've --

11  in my experience, the hostess is usually the -- the center of

12  everything because she's at the front door.

13          So we're -- we hear or we're privy to things

14  that the dancers say that perhaps management wouldn't be privy

15  to.  So if -- you know, a girl may go to the hostess and say,

16  yeah, this manager is really getting on my nerves, I wish I

17  could complain to somebody about it.  She'll say, oh, let me

18  give you Brook's number, and -- that's my -- my work name.  And

19  they'll give her my number and she'll give me a call.

20    **Q.**   Okay.  Does anyone contact the dancers to find out if

21  they're coming in on a particular day?

22    **A.**   No.  They don't have a schedule.

23    **Q.**   Okay.  No, I understand they don't have a schedule,

24  but, I guess, the question is more about how do you make sure

25  there are enough dancers there to -- to run the club?

Page 36

1     **A.**   Oh.  Sometimes we don't have enough dancers to run

2   the club.  Sometimes, especially right after COVID, there were

3   occasions where we opened the building, but we had not one

4   dancer sign in.

5     **Q.**   So you just have to basically hope that dancers want

6   to show up?

7     **A.**   Fingers crossed that they're gonna show up.

8     **Q.**   Okay.

9     **A.**   Now, when I was a hostess, obviously, if I saw that

10  there were no girls there, I would text the girls that I was

11  friends with and be like, hey, girl, there's nobody here, if

12  you want to come to work.

13          But with respect to a manager or myself

14  requiring -- saying, hey, there's nobody here, you need to come

15  to work.  That's totally different.  We don't do that to the

16  girls.

17    **Q.**   Okay.  Does anyone currently contact them to ask them

18  to come in if you don't have enough...

19    **A.**   Not to my knowledge.  But I would assume that the

20  managers probably do like I did as a hostess and text the girls

21  that they're friends with or that they have good relationships

22  with and say, hey, I don't have any dancers, if you want to

23  come in and make some money.

24    **Q.**   Okay.  But that's up to their discretion?

25    **A.**   Absolutely.

Page 37

1     **Q.**   Who would you say actually runs the club on a

2   day-to-day basis?

3     **A.**   The management.

4     **Q.**   Okay.  And when you say the -- the management, is

5   there one particular manager in charge of the others or are

6   they relatively equal?

7     **A.**   Technically, nobody -- no manager is above any other

8   manager.  With that being said, I personally prefer to deal

9   with Thomas Venza because he's very thorough and he's very good

10  about taking my information and making sure that the other

11  managers understand and do in fact comply with the requests

12  that I'm making or the policies that I've put in place.

13    **Q.**   Let me go back for a minute to, I guess, the Davaris

14  or D. Texas Investments.

15          Does anyone contact you or do you meet with

16  anyone that would say, hey, we -- we didn't make enough profit

17  last year; we need to increase our profits, or, you know, maybe

18  we want to expand or something like that?  Does anyone with

19  D. Texas Investments, like, meet with you about the club and

20  profabil- -- profitability, etcetera?

21    **A.**   No.

22    **Q.**   Okay.  So the Davaris never complained to you, hey,

23  this isn't going well; we need to change something?

24    **A.**   In all my time with them, I have honestly never heard

25  them complain about our businesses not making money.

Crystal Cowart
2/17/2022                                    11 (38 - 41)

Page 38

1    Q.   Okay.  Do you speak with them on any regular basis?
2    A.   Yeah.  Yes.  Well, hold on.  I speak with Ali Davari
3    on a regular basis.  99 percent of the time, it is not about
4    business.  Because I've worked for him my whole life, he's more
5    like a father figure to me.  So when I say I speak with him on
6    a regular basis -- just to be clear, I speak with -- I speak
7    with Daddy David on a regular basis.
8              But as far as business-wise, again, I could do
9    this job in my sleep so I don't really need to -- to ask
10   permission or -- or run things by him at this point.
11   Q.   Okay.  So most of your interaction with him is
12   social?
13   A.   Correct.
14   Q.   Okay.  Let me ask about other people who are involved
15   in the management of the club.
16             Is Christer- -- Christopher Malusa a manager?
17   A.   He was but he is not currently.
18   Q.   He no longer works for the club?
19   A.   He no longer works for A.H.D.
20   Q.   Okay.  That -- that was a very specific answer.
21             Does Christopher Malusa have any role with
22   Centerfolds still?
23   A.   No.
24   Q.   Okay.  What about Kurt Ramirez?  Is he -- is he or
25   was he a manager?

Page 39

1    A.   He was until about a year ago.
2    Q.   You mentioned Thomas Venza.  Is he still --
3    A.   Uh-huh.
4    Q.   -- a manager?
5    A.   He is.
6    Q.   In the club's interrogatory answers, Jerry Gibbins --
7    is he a manager?
8    A.   Yes.
9    Q.   By the way, were you the one who provided the
10   responers -- responses to those questions on behalf of A.H.D.?
11   A.   All the docume- -- all of the responses we've turned
12   over?
13   Q.   Yes.  I mean, were you the one --
14   A.   I consult -- I'm the one that Casey and Ben consult
15   with for corporate -- for our corporate response.
16   Q.   What about the -- pardon me if I get this wrong --
17   Muhammad Mianroudi -- is he a mana- --
18   A.   You got it right.  That's impressive.
19   Q.   Thank you.
20   A.   He was a manager for A.H.D., but he is no longer a
21   manager at A.H.D.
22   Q.   What about -- I'm totally gonna butcher this, but --
23   Inninwe Dakomo?
24   A.   I call him Gerard, and Gerard still works there.
25   Q.   Okay.  So that is the infamous Gerard.  Okay.  'Cause

Page 40

1    I've seen the name Gerard on the -- the documents, but I didn't
2    realize that was the same person as Inninwe DeLuca [sic]?
3    A.   Yeah, that -- that -- that name that I can't
4    pronounce either -- that's why I call him Gerard.
5    Q.   Gotcha.  Okay.
6    A.   And he is still employed?
7    A.   Yes, sir.
8    Q.   Are there any other managers who currently work for
9    A.H.D.?
10   A.   One.  His name is Orland, O-r-l-a-n-d --
11   Q.   Uh-huh.
12   A.   -- Kadic, K-a-d-i-c.
13   Q.   Okay.  Would you say that the -- there's a high
14   turnover for managers?
15   A.   No.
16   Q.   No?  They usually work for long periods of time?
17   A.   Yes.
18   Q.   Okay.  I was just kind of curious because of all the
19   names I mentioned, most of them were no longer there.
20             Was there a big turnover around the time of
21   COVID?
22   A.   There was -- when we closed down for COVID --
23   obviously, when we reopened, Kurt Ramirez -- he came back for
24   maybe three weeks after we reopened after COVID.
25   Q.   Uh-huh.

Page 41

1    A.   And then he got an offer from one of our competitors
2    so he went to work for our competitor.
3    Q.   Okay.
4    A.   The others, while they don't work for A.H.D., they
5    still are within the corporation with our entities.
6    Q.   Oh, okay.  Okay.  So they -- they work -- they still
7    work with you but for -- not related to Centerfolds?
8    A.   Correct.
9    Q.   Okay.  How are managers paid by Centerfolds?
10   A.   Hourly.
11   Q.   Okay.  Is there any bonus or incentive pay?
12   A.   I don't know.  I'd have to ask Thomas Venza what
13   their stipulation for after our return from COVID because it's
14   my understanding things may have changed for their bonus
15   structure after COVID.  But prior to COVID, some -- not all of
16   the managers that we've listed -- at least it's my
17   understanding that some of them were receiving a commission on
18   the alcohol.  But if -- if that's correct, I think the only one
19   that has been there long enough to fall under that would have
20   been Thomas Venza.
21   Q.   Okay.  So you say they have per- -- paid hourly, and
22   they were managers.  I assume they're exempt from overtime
23   or -- or are they paid overtime?
24   A.   No, they would be paid overtime.
25   Q.   Okay.  Is it common for a manager to work overtime?

Crystal Cowart
2/17/2022                          12 (42 - 45)

Page 42

1    A.   Not really, no, because we have so many.

2         Wait.  You asked me earlier all the managers.  I

3    had Orland Kadic.  There's one other one we didn't list.

4    Christopher McLean, M-c-L-e-a-n, and he does still work there.

5    Q.   Thank you for that.

6    A.   Uh-huh.

7    Q.   So based on what we've said, I assume the managers do

8    not decide how the dancers are paid or -- well, they're not

9    paid, but, I mean, the -- the managers do not make that

10   decision whether they're independent contractors and are not

11   paid a salary, correct?

12   A.   No.

13   Q.   Okay.  So have you ever had a conversation with Ali

14   Davari or Hassan Davari about whether to classify dancers as

15   contractors or employees?

16   A.   No.

17   Q.   Was that policy to classify them -- to give them an

18   option to be classified as independent contractors or

19   employees, was that already in place when you started working

20   for A.H.D.?

21   A.   No.  That policy actually -- that was the -- I want

22   to say the 2020 version that we ins- -- issued, and that was as

23   a result of the various litigation that we've experienced.

24        And Mr. Wallace and I talked about it one day

25   and I said, Casey, why -- if the issue that we're facing in all

Page 43

1    of the -- in these hearings is that they say they don't want to

2    be independent contractors; they wanted to be employee.  Why

3    don't we just give them a choice?

4    Q.   Uh-huh.

5    A.   And he was like, well, it's not really that simple.

6    You would have to go and sit down -- we've gotta make sure that

7    it's done correctly.  You'd have to sit down with them.

8         I said, okay.  Then let's give them a choice.

9    At least that'll give me one more leg to stand on.  If we get a

10   lawsuit, at least I can say they had a choice.  Whether they

11   chose to do it or not, doesn't matter.

12        But other than that, no.

13   Q.   Okay.  So prior to 2020, were all of the dancers

14   uniformly classified as independent contractors?

15   A.   Yes.

16   Q.   Okay.  And was that the case before you started

17   working there?

18   A.   Before I started working here?

19   Q.   Yeah.  I mean, I -- I realize you may not necessarily

20   know, but I assume you'd have some idea what the policy was.

21   A.   Well, I can tell you my mom is a dancer or was a

22   dancer for most of my life growing up.

23   Q.   Okay.

24   A.   And based on my personal experience, prior to me

25   joining the industry, so to speak, it was always my

Page 44

1    understanding that she didn't have a boss.  She could come to

2    my theater performances, she could come to school plays, she

3    could do the things that other parents didn't get to do because

4    she had the luxury of not having to be at work at a certain

5    time and not having to stay a certain amount of hours.  So from

6    that perspective, I guess, the industry, they've always

7    considered themselves independent contractors.

8    Q.   Okay.  But that's -- that's the industry.

9         Did your mom work at Centerfolds?

10   A.   She worked for the Davaris my whole life.

11   Q.   Oh, okay.  Okay.  And I guess that's why you call him

12   Daddy Davari?

13   A.   Daddy D, exactly.

14   Q.   Okay.  This is kind of a side, but now I'm curious.

15        Does your mom still work or...

16   A.   She does as a matter of fact.  She just turned 70 in

17   December, and she is a waitress at one of our other companies.

18   Q.   Okay.  Who came up with the house fee structure?

19   A.   House fees in general or the current structure?

20   Q.   The current structure.

21        I believe you provided in your answers to our

22   interrogatories a structure that shows that, for instance,

23   Monday through Friday 11:00 a.m. to 12:00 p.m. there's no fee;

24   starting at 12:01, $10, etcetera.

25        Who -- who came up with that?

Page 45

1    A.   I came up with the fees and then -- this is a while

2    back, but I vaguely remember running through my proposed fees

3    with Thomas Venza just to make sure that I was not aiming too

4    high or too low, per se.  But I felt like it was a good

5    bargaining tool, so to speak, considering we don't have

6    schedules and we can't make the girls come to work.

7    Q.   Uh-huh.

8    A.   Those times where we offer no fee is my only idea to

9    get the girls to want to come in, you know.

10   Q.   Okay.  Just out of curiosity, how long has Thomas

11   Venza been working for A.H.D.?

12   A.   As long as I've been around.

13   Q.   Okay.  And so the idea of these house fees is

14   essentially that the dancer is paying money to lease the -- the

15   club for her use; is that correct?

16   A.   Yes.

17   Q.   Okay.  And was that also your idea, or was that

18   basically -- the general idea already in place?

19   A.   The general idea was in place long before I came on

20   board.

21   Q.   I guess that's just sort of a standard industry

22   practice, correct?  Seems like most of the clubs have something

23   similar?

24   A.   As far as I know it, yes.

25   Q.   Okay.  If you wanted to -- change that policy --

Crystal Cowart
2/17/2022                                    13 (46 - 49)

Page 46

1  to change the fees, do you have that authority?
2       A.   Yes.
3       Q.   So what does a prospective dancer have to do to -- to
4  work at Centerfolds?  Does she have to fill out an application?
5       A.   Yes.
6       Q.   Okay.
7       A.   Well, she would -- let me just describe start to
8  finish.
9       Q.   Okay.
10      A.   She walks in.  She lets the hostess know, hi, I'm
11 here.  I'd like to become a dancer.
12           The hostess will then call the manager on duty
13 up.  The manager on duty will come up and speak with the
14 prospective dancer and ask her, do you have have a valid
15 government-issued identification card or driver's license with
16 you, and do you have your social security card or an EIN number
17 with you?
18           Pending they have the documents that they
19 need -- now I say that and then there are occasions that I've
20 had dancers contracted by a manager without the appropriate
21 documents.  But generally speaking, once we've confirmed you
22 have the documents you're supposed to have for us to be able to
23 confirm your age and your eligibility to be able to work in the
24 U.S., then you would fill out the license and access agreement,
25 which on the second page after the cover page gives you the

Page 47

1  notification that you have the option of being an independent
2  contractor or an employed dancer.  And once they make that
3  decision, they go from there.
4       Q.   Okay.  And is that process the same process for all
5  dancers?
6       A.   Yes.
7       Q.   Okay.  And I noticed that you provided a -- a
8  checklist.  Let me share it on my screen, but I assume you're
9  familiar with it?
10      A.   Oh, I can see it.  I saw what you just picked up,
11 yeah.
12      Q.   Okay.  Yeah.
13      A.   It reminds me that's from in-- when I was learning
14 all of the multiple steps and I had to remind myself of what I
15 needed.  I had to have the checklist.
16      Q.   Okay.  And so that checklist is the same for all of
17 the dancers who are hired?
18      A.   Yes.
19      Q.   Okay.  And as you just mentioned, the purpose of the
20 checklist is to make sure that you don't forget anything.  That
21 you go through the same process for everybody, right?
22      A.   Correct.
23      Q.   Who ultimately makes the decision whether to hire the
24 dancer?
25      A.   The manager on duty.

Page 48

1       Q.   Okay.  And when you say "the manager on duty," you
2  may -- do you only have one manager working at -- at a time?
3       A.   Occasionally, they may have two managers on the
4  floor.  So in that scenario, the hostess would call whichever
5  manager was available.  All managers have the authority to
6  hire.  So whomever is available will come speak to the girl.
7       Q.   So the managers have the discretion who to hire and
8  not hire, correct?
9       A.   Yes.
10      Q.   Do you ever, I guess, overrule a manager's decision
11 to hire somebody?
12      A.   Only in the event that when the license and access
13 agreement gets to me --
14      Q.   Uh-huh.
15      A.   -- and I have to run the criminal record, there are
16 certain charges with convictions that force me to have to
17 override the manager and force me to have to say this
18 individual cannot dance at any of our companies for a certain
19 amount of time.
20      Q.   What kind of charges would those be?  I assume, like,
21 prostitution?
22      A.   Prostitution and the sell, use, or distribution of
23 illegal controlled substances.  If you have a conviction for
24 either of those in the last five years, and that would -- I'm
25 sorry -- yes, in the last five years, the date in whi- -- like,

Page 49

1  I would have to say if she -- for example, if she got charged
2  and convicted on January 1st, 2021 -- was the day the final
3  judgment came out.
4           From that day, for the next five years, she is
5  not allowed to dance at any of the -- what the City of Houston
6  calls "Sweet 16 Clubs," which are 16 clubs that joined in an
7  agreement with the City of Houston for certain stipulations;
8  one of which is:  We will make sure we are not contracting or
9  employing anyone with prostitution or drug convictions.
10      Q.   Okay.  So that's based on an agreement you have with
11 the City?
12      A.   Yes.
13      Q.   It's not necessarily a law that applies to everyone?
14      A.   I guess it doesn't apply to non-Sweet 16 Clubs.  I
15 think it's just the 16 entities that joined into the agreement
16 with the City of Houston.  That was one of the stipulations for
17 the clubs that joined the agreement to be able to operate as
18 sexually oriented businesses.
19      Q.   Okay.  So -- and you mentioned, I believe, drug
20 possession or drug use.
21           That would disqualify a dancer?
22      A.   Use, possession, or dis- -- I want to say it's use,
23 possession, or distribution, or it might be manufacturing.  I
24 can't remember what the exact words are, but if you have a
25 conviction for controlled substance, same -- same rule apply.

Crystal Cowart
2/17/2022                                    14 (50 - 53)

Page 50

1  You can't work anywhere -- any of the Sweet 16 for five years.

2       Q.   But other than, say, a dancer doesn't pass the

3  background check, you don't overrule the manager's decision

4  based on, say, a dancer's looks, correct?

5       A.   Oh, no.

6       Q.   Okay.

7       A.   No.  You'll learn, sir, everyone appeals to somebody.

8       Q.   Fair enough.  I don't mean to be discriminatory.

9  That's -- but, you know, I would assume that that -- that's

10 generally a -- one of the major factors in -- in hiring

11 dancers, correct, is looks.  I mean, you say, I guess, they

12 hire dancers of all types, all, you know...

13      A.   They do and in one of my other depositions, the

14 attorney said -- we were having the same line of questioning

15 and the attorney says, so you mean to tell me if I came in

16 there and I was a female and I was dressed like Gene Simmons

17 from KISS, you would let me dance that way?

18           I said, that's your choice.  You might not make

19 a whole lot of money that way, but, again, your choice.

20           And that's legitimately -- like, everybody

21 appeals to somebody.  My preference as far as looks may not be

22 the same as yours.  So for me to say, I don't find this girl

23 attractive, she shouldn't be here would not be fair to my

24 customers.

25      Q.   Okay.  So your policy is basically let anyone who

Page 51

1  wants to work there, work as long as they meet the req- -- you

2  know, background requirements and stuff, and then whether they

3  make money or not is up to them?

4       A.   Their full opportunity for profit and loss.

5       Q.   Do the managers have the dancers audition to, you

6  know, show that they can dance basically, have some rhythm, or

7  anything like that?

8       A.   Some of these girls don't dance.  Some of these girls

9  will decide that they want to go on stage, and they'll

10 literally lean up against the pole and not do anything.  So --

11 my mom, for example, in all the years she danced, I think I saw

12 her give a physical dance twice working in the same place with

13 her.  Other than that, she would get paid to sit around and be

14 a therapist almost.  So by calling them dancers, it doesn't

15 necessarily mean they have to have rhythm.

16      Q.   Okay.  Is there an interview process?

17      A.   Not really.  Except with respect to do you have your

18 ID or your driver's license with you?  Do you have your social

19 security or EIN?  And they'll ask them.  Now, granted, how many

20 times is somebody gonna be honest about this answer?  I don't

21 know, but we always -- or the management will ask, do you have

22 any convictions for prostitution or drugs?  No- -- again, I

23 say, nobody's gonna say, oh, yes, I do.

24           They always say no, of course not.

25           Then I find out later, but that's usually it.

Page 52

1       Q.   Okay.  Do you ask or does -- pardon me.

2           Do the managers ask the applicants to provide

3  references?

4       A.   No.

5       Q.   Do they ask about prior experience?

6       A.   We might passively just say, oh, where have you

7  worked?

8           But to have ex- -- to have worked somewhere or

9  not have worked somewhere is not going to make or break her

10 chances of being able to dance for us.

11      Q.   Okay.

12           Okay.  Sorry about that.  I just wanted to

13 double-check something.  You do a criminal background check.

14 We already talked about that.  I'm not gonna asked that again.

15           How do the managers explain the compensation or

16 lack of compensation to the dancers?

17      A.   I've never heard a manager give that speech

18 personally.  Like, as in I've never stood next to him and --

19 and verbatim listened to it, but, I mean, it's pretty common in

20 the industry that the girls know their money comes directly

21 from the customer.

22      Q.   Okay.  So -- but do you impress upon the managers

23 that they should at least make sure the dancers understand how

24 they're getting paid, or is that just kind of left up to the

25 managers?

Page 53

1       A.   I've never had the conversation.  So I'd say left up

2  to the managers to have that conversation.

3       Q.   Okay.  So I assume you don't ha- -- you haven't

4  provided them any kind of script to follow when...

5       A.   No.

6       Q.   Okay.  What is the -- what is A.H.D.'s policy as far

7  as the dancers paying tips to employees, such as managers,

8  waitresses, hostess?

9       A.   As a whole, or anybody, at A.H.D. Houston, Inc. -- be

10 that an employee, be that a dancer, be that valet -- we have no

11 mandatory tip-sharing arrangement with or amongst employees and

12 dancers.  Any tip that you give to anyone is voluntary and at

13 your sole discretion.  And if anybody ever pressures them for

14 money, they come straight to me.  I've never had it happen, but

15 they would come straight to me, and I would immediately address

16 the situation because we are adamant, there is no mandatory

17 tip-sharing arrangement.

18      Q.   Okay.  So you said that no dancer has ever complained

19 to you that a manager's asking them for tips?

20      A.   No.

21      Q.   If a manager had told a dancer, hey, if you tip me, I

22 will send you good customers.

23           Is that something the club allows or

24 discourages?

25      A.   I mean, again, I'm gonna relate this back to my mom

Crystal Cowart
2/17/2022                        15 (54 - 57)

Page 54

1 in working in the Davari industry.  I know that her theory on
2 it is she tells the managers, hey, if you take me to a
3 customer -- that was as a dancer and as a waitress still -- if
4 you take me to a customer, I'll give you half.
5              Because in her opinion, half of something is
6 better than all of nothing.  So -- but other than that, I've
7 never heard a manager go and say, hey, if I take you to this
8 customer, I want some money for it.
9     Q.    Okay.  Do the managers have the authority to fire
10 dancers?
11    A.    Yes.
12    Q.    Okay.  Would a manager have the authority -- if a
13 dancer failed to tip him when the manager felt like he was owed
14 a tip, would the manager have the authority to fire that
15 dancer?
16    A.    No.  And if he tried, that would be one of those
17 scenarios I really would hope the girl called me.
18    Q.    Does the club as a whole try to treat all the dancers
19 fairly?
20    A.    Absolutely.
21    Q.    Okay.  So no special treatment for some girls?
22    A.    Not even special treatment for my own mother
23 unfortunately.
24    Q.    Fair enough.
25              So they're all -- all treated the same, all

Page 55

1 equal?
2    A.    Yes.
3    Q.    Now, we've said that the managers basically aren't
4 supposed to discriminate against a girl based on their
5 appearance.
6              Are there other factors that they do take into
7 account as far as you know?
8    A.    Other than having the proper identification and
9 eligibility to work in the United States, no.
10    Q.    Okay.  On average, how many dancers would you say get
11 hired, say, per month?
12    A.    That's tough.  Is this month a convection month?  A
13 Super Bowl month?  Or just a regular month?
14    Q.    Well, let's say just a regular month.
15    A.    Regular month, maybe 25 to 50.
16    Q.    That sounds like quite a bit.
17              How many dancers do you have working for you at
18 any given time?
19    A.    On a daily basis -- depending on the day of the week,
20 on the slower days, maybe 50.  On the busier weeknights --
21 weekend nights, maybe a hundred.  We have no maximum amount of
22 dancers that can work.  200 girls show up, we'll let 200 girls
23 stay.
24    Q.    Okay.  But that's -- you're talking about the number
25 that would show up on a given night.

Page 56

1    A.    Uh-huh.
2    Q.    How many dancers are actively on, you know, eligible
3 to dance for you, you know, that have signed an agreement and
4 could work if they chose to?
5    A.    I don't know the exact number but thousands.
6    Q.    Okay.  So let's talk specifically about the
7 plaintiffs in this case.  The main plaintiff is Grace Roberts.
8              Are you familiar with her, at least in a general
9 sense, as a dancer for the club?
10    A.    Yes.
11    Q.    Okay.  Was she hired by Nick Meril [sic]?
12    A.    Nick Merkl, yes.
13    Q.    Merkl, okay.  I got the hard names wrong and then I
14 mess up on these, right.  I guess I wrote that down wrong.
15    A.    Mr. Merkl has since passed away so he's no longer
16 with us.
17    Q.    Okay.  Yeah, I must have been looking for the
18 signatures.
19    A.    You probably saw on the cover sheet of her license
20 and access agreement 'cause I usually note the hiring manager
21 on there.
22    Q.    Right.  Yeah, I -- I saw his name, but I -- I
23 completely got the spelling wrong somehow.  I --
24    A.    I think it's M-e-r-k-l.
25    Q.    Okay.  Yeah, I just saw that so -- and then Lilibeth

Page 57

1 Gomez.
2              She was hired by Gerard --
3    A.    Yes.
4    Q.    -- is that correct?  Okay.
5    A.    Honestly, I may be misspeaking on that.  I did not
6 review Gomez's records for this deposition so --
7    Q.    Okay.  Tha- --
8    A.    -- I believe if you say so, but I haven't looked at
9 it.
10    Q.    Yeah, that's -- that's what it says on his -- on her
11 packet.
12    A.    Okay.
13    Q.    I can share the screen if you care, but -- in fact,
14 let me do that just to practice, if nothing else.  I -- I
15 really haven't had to use the Zoom very much so just in case it
16 comes up, I want to make sure I'm doing this correct.  Well, I
17 know it's gonna come up later so I'm gonna have to.
18              Okay.  So you're now seeing --
19    A.    Yes.
20    Q.    -- Centerfolds dancer -- dancer ID No. 80583 --
21    A.    Uh-huh.
22    Q.    -- dance name, Gina, and --
23    A.    Go on back up.
24    Q.    -- down here at the bottom, it says contracted by
25 Ger- -- Gerard?

Crystal Cowart
2/17/2022                                    16 (58 - 61)

---

Page 58

1                    (Exhibit No. 1 marked.)

2      A.   Yes.

3      Q.   (BY MR. MASON)  Okay.  Okay.  Good.  I did that

4  right.  Just making sure.

5           All right.  So you actually went through the, I

6  believe, at least most of the factors that courts consider in

7  deciding whether someone is an independent contractor or a

8  dancer.  So I'm taking it you're -- you're familiar with these

9  factors -- generally, five or six factors such as control --

10     A.   Yes.

11     Q.   You know, degree of control exercised by the alleged

12 employer, extent to the relative investment, the degree to

13 which the worker's opportunity for profit or loss is determined

14 by the --

15     A.   Yes.

16     Q.   -- alleged employer, skill and initiative required in

17 performing the jobs and the per- -- permanency of a

18 relationship, and whether the work is integral to the

19 (Zoom lag).

20          So it's -- it's -- so I assume you learned about

21 all this through your interactions with Mr. Wallace or Mr. King

22 in the -- that firm?

23     A.   I had a little bit of knowledge from my paralegal

24 courses.  But by far, nothing as in depth as I understand it to

25 be now, which I did gain all of that information from Will and

---

Page 59

1  Casey.

2      Q.   Okay.  Yeah, I would be surprised if they had -- if

3  they covered that in a paralegal class.  'Cause in three years

4  of law school, we didn't cover that.  I mean, I guess if you'd

5  taken a specific class on employment but you know...

6      A.   Yeah.  I was gonna say I think it was my employment

7  law course or something like that.

8      Q.   Okay.  So let's -- let's talk about a little bit

9  about the club's policies.  And, again, I'm going to share my

10 screen here.  I have -- well, I guess I'll start at the top.

11 I'm not gonna go through all of these policies, but I will at

12 least show the top to at least, you know, establish that we're

13 talking about the -- the same document here.

14     A.   Okay.

15     Q.   Okay.  So now you should be seeing this A.H.D.

16 Houston, Inc., d/b/a Centerfolds policies regarding dancer

17 contact -- conduct, correct?

18     A.   Yeah.  Yes.

19     Q.   Okay.  And this -- as you can see, this is documents

20 provided through your counsel in discover.  This is

21 Centerfolds 14.

22          In general, these policies apply equally to all

23 of the dancers for Centerfolds?

24     A.   Yes.

25     Q.   Okay.  And I -- I do realize that the -- the policies

---

Page 60

1  change from time to time, so we're just talking about whatever

2  policy is in effect at that time.

3      A.   Okay.

4      Q.   And Centerfolds requires all of its dancers when they

5  first start working to -- to read and acknowledge that they

6  will comply with these policies; is that correct?

7      A.   Yes.

8      Q.   Does Centerfolds keep a written file on each of its

9  dancers?

10     A.   I have a file that contains their license and access

11 agreement or the multiple license and access agreements

12 depending on how long they've -- they been with us.

13     Q.   Right.  Like the packets that you --

14     A.   Yeah.

15     Q.   -- provided us in discovery?

16     A.   Uh-huh.  Yes.

17     Q.   And is that the standard practice of Centerfolds?

18     A.   Yes.

19     Q.   Does Centerfolds expect the dancers to comply with

20 all of these policies regarding their conduct?

21     A.   Yes.

22     Q.   If a dancer violates any of these policies, can

23 Centerfolds terminate the dancers?

24     A.   Yes.  Centerfolds has a zero tolerance policy with

25 respect to violations of the law.

---

Page 61

1      Q.   Okay.  And even some of the policies that are not

2  violations of the law -- now, maybe this infraction isn't

3  being fired, but the managers have the authority to fire a

4  dancer if they violate some of the other policies, correct?

5      A.   What other policies?

6      Q.   So I'm talking about -- more about the -- the general

7  policies, for instance, No. 6 here:  Horseplay is not permitted

8  on the premises.  And that's not a law.  That's merely --

9      A.   Right.

10     Q.   -- a policy, correct?

11     A.   Correct.

12     Q.   Okay.  And those policies are enforced for the

13 dancers, correct?

14     A.   Yes.

15     Q.   Okay.  Is it generally the managers who enforce these

16 policies?

17     A.   Yes.

18     Q.   And they -- they generally try to make sure that the

19 dancers comply with all of the policies in the -- in this

20 agreement, correct?

21     A.   Yes.

22     Q.   So just in general, why does Centerfolds have written

23 rules of conduct for the dancers?  Like, you know, horseplay

24 and phone calls and stuff like that.  What's the purpose of

25 having such policies?

---

Crystal Cowart
2/17/2022                            17 (62 - 65)

---

Page 62

1    A.   Well, the horseplay, obviously, for their safety.

2    Q.   Uh-huh.

3    A.   They start playing around, especi--- I don't know if

4  you've seen their shoes, but some of them wear shoes that are

5  like stilts.  And the last thing I need is a girl playing

6  around and -- as I call it -- having a blowout where she falls

7  off her show and breaks her ankle.  We have to be very -- you

8  know, for their safety, you gotta be careful.

9         The phone calls?  I don't know why that's in

10 there because we all use our phones.  Personal property, that's

11 just a general cover -- you know, cover us; to make sure if

12 they're leaving their stuff out and it gets stolen -- nothing

13 crazy -- they don't come to us with their issues.

14        Personal business should not be conducted on

15 premises?  I mean --

16   Q.   I'll ask about some of these, not all of these --

17   A.   Okay.

18   Q.   -- individually, but we'll -- we'll go through

19 them -- through some of them individually.

20        MR. KING:  I'm sorry.  But could I --

21        MR. MASON:  Sure.

22        MR. KING:  Oh, there's the Bates.  Is this

23 the -- sorry.

24        MR. MASON:  Yeah.  Yeah.  So we're on

25 Centerfolds 15 to 16 is -- is what we're on now.

---

Page 63

1         MR. KING:  Which agreement is that?

2         MR. MASON:  This is Grace Roberts' agreement,

3  I'm pretty sure.

4         MR. KING:  Oh.  Oh, is this --

5         MR. MASON:  Hard to tell, but I think those are

6  Grace's initials.  But, yeah, that's -- these are the ones that

7  were signed or initialed by Grace.

8         MR. KING:  Oh.  Oh, I got it.  These are the

9  ones signed in 2014.  Okay, sorry.

10        THE WITNESS:  Wait, '14?  Okay, that's why I'm

11 li -- I'm sitting here making mental notes.  I'm like, I don't

12 like this, I don't like that.  We've already -- we've already

13 made these corrections.  Okay.

14        MR. MASON:  Oh, okay.  So these -- some of these

15 are no longer policies --

16        THE WITNESS:  Applicable, right.

17        MR. MASON:  Okay.  Okay.  Sorry for the

18 confusion there.  I just -- you know...

19        THE WITNESS:  No, perfect.

20   Q.   (BY MR. MASON)  Just for a second, let's go back to

21 that horseplay.

22        Is -- is that a problem?  You know, have you

23 had -- do the dancers like to play around a lot?

24   A.   No more or less than anybody else, I suppose.  I

25 think -- and it's just off the top of my head.  I'd have to

---

Page 64

1  look at the current license and access agreement, but I believe

2  we removed that from the current agreement.

3    Q.   Okay.  And I apologize.  I've mostly gone through --

4  I guess this is the -- older agreement just because it was

5  basically towards the front of the policies that you provided.

6  But, yeah, you can see this is -- Grace Roberts signed in

7  February of 20- --

8    A.   '14.

9    Q.   -- -14, and then, I guess, that's --

10   A.   Nick.

11   Q.   -- Nick Merkl.

12   A.   Yeah.

13   Q.   Well -- yeah, I guess it's -- I separated out the

14 policies.  I guess I could go through the larger reduction, but

15 frankly, I've geared a lot of my questions towards these -- the

16 policies that I saw.  So let's -- let's just kind of go through

17 them, and you could tell me --

18   A.   What date is that?  Nope, still '14.

19   Q.   Yeah, that looked like -- that looks like it's still

20 '14.  I was gonna say I don't know that there was another set.

21 That's what I was looking for.  Are -- are --

22   A.   '19.

23   Q.   Are you saying --

24   A.   That's closer.  Now you're into her 2019 agreement.

25   Q.   Okay.

---

Page 65

1    A.   So that's closer.  We still have yet another

2  agreement that has been issued since this 2019, but it should

3  be a more accurate representation.

4    Q.   Okay.

5    A.   You're almost there.

6    Q.   What I'd --

7    A.   Keep going.

8    Q.   -- like to -- I'm sorry?

9    A.   I said you're almost there.

10   Q.   Okay.

11   A.   Keep going.

12   Q.   I assume that you provided copies of the agreements

13 that were in effect when the plaintiffs working for you and

14 that's -- that's why we have the 2014 and whatever year this

15 is.

16   A.   Correct.  I provided all records relating to the

17 plaintiff.

18   Q.   All right.  I -- I guess we don't have the current

19 policies of the club because I -- I don't think I got a

20 separate -- I -- I got any other documents that have different

21 policies that are current.

22   A.   I don't believe you would have because I think -- if

23 my notes were correct, Ms. Roberts only worked through January

24 2020, I believe.

25   Q.   That sounds about right.  I want to say it was

---

Crystal Cowart
2/17/2022                                    18 (66 - 69)

Page 66

1 February -- March, maybe, 2020, but, yeah, that -- that sounds
2 about right.  So I guess these are more current policies.
3 Let's see if -- I mean, some of these are still, or at least
4 were still in effect, it looks like, when -- when this was
5 signed.  Let me -- or -- okay, so yeah, this was 2019.
6      A.   Yes.
7      Q.   That was pretty close to the end of when she worked
8 there.  'Cause we're saying she left maybe February or so of --
9      A.   Uh-huh.
10      Q.   -- 2020.  So this was just a few months before that.
11      A.   And she -- this would be the last agreement I have on
12 her because --
13      Q.   Okay.
14      A.   -- when we reopened after the pandemic in 2020, Casey
15 and I issued updated license and access agreements.
16      Q.   Uh-huh.
17      A.   So it was this version and then we have one more
18 version that she has not filled out because she hasn't returned
19 to dance.
20      Q.   All right.  Well, in any case, I -- I do want to go
21 over some of these older policies, and they did apply to the
22 plaintiff's -- you know, at the time when she worked there so I
23 didn't want to -- let me just go to the other document 'cause
24 that's -- that has too many pages in it.
25           Okay.  So, yeah -- and we briefly touched on

Page 67

1 personal phone calls, No. 7 here.  Now, this was -- if -- this
2 was in 2014.  So that was several years ago, but it was still
3 while you were working in your current role for the club,
4 correct?
5      A.   Correct.
6      Q.   So I assume you did have input on these policies; is
7 that right?
8      A.   This is the 2014 packet.  I know this packet was
9 created by Mr. Wallace, and he turned it over to us -- over to
10 me, and I issued it, and we used it.  But I can't remember
11 specifically the conversation that he and I had, but I assume
12 that my response was the same while I'm reading this:  This is
13 a problem.  This is a problem.  This shouldn't be in here.
14           Phone call -- like, why would we put policies
15 that we're not en- -- enforcing?  Like personal phone calls; I
16 have my phone on my hand all the time.  So how am I going to
17 tell a dancer she can't have her phone when I have mine in my
18 hand?  Those types of things.  But, yes, I would have had some
19 type of input, but probably not as much and certainly not as --
20 as strong of statements as I would have -- would make today if
21 I were reading this agreement.
22      Q.   Okay.  So let's talk about a couple of the things you
23 said.
24           So Mr. Wallace is the one who came up with these
25 policies; is that right?

Page 68

1      A.   Yes.
2      Q.   Okay.  But I assume these policies, as you say, were
3 obviously provided to the dancers, right?
4      A.   Yes.
5      Q.   And I assume they were also provided to the managers?
6      A.   Yes.
7      Q.   Okay.  So even though you may have felt that these --
8 some of those policies were too strong, I would have to assume
9 that the managers still believe that these were the actual
10 policies in effect of the club, correct?
11           MR. KING:  Objection.  Form.
12      A.   Can I answer that?
13           MR. KING:  Yeah, go ahead --
14      A.   Am I allowed to --
15           MR. KING:  -- and answer.
16      A.   Okay.  I mean, technically yes.  Technically, these
17 policies as they're written here were the policies that my
18 management thought were the policies at that time.  But -- I
19 don't know.  I keep going back to the cell phone thing.  I
20 know -- I know they'd never enforced the no cell phones.  I
21 know they haven't.
22      Q.   (BY MR. MASON)  Okay.
23      A.   Other things they do -- they do enforce --
24      Q.   Like the no horseplay.  I mean, I assume --
25      A.   Well, horseplay -- I mean, as long as we're not

Page 69

1 acting crazy and looking like we're gonna hurt ourselves or
2 someone else, they're gonna let us have fun, but they're not
3 gonna let us do anything that's gonna cause injury or anything
4 like that.
5      Q.   Okay.
6      A.   And the personal property is something that they
7 would have enforced.  No alcohol under 21, definitely.
8      Q.   Right.  Yeah, I'm not as worried about the ones that
9 are, you know, complying with the law.
10      Q.   Okay.
11      Q.   But, for instance, No. 9:  Personal business should
12 not be conducted while on the premises.
13           So if a dancer, you know, had to make a doctor's
14 appointment while she was on duty, would she be allowed to, you
15 know, call up the doctor's office and make an appointment?
16      A.   Of course.
17           MR. KING:  Objection.  Form.
18      A.   Oh, sorry.  Yes, of course.
19      Q.   (BY MR. MASON)  If a dancer had to arrange to pick up
20 her child from school or something like that, would she be
21 allowed to do that?
22      A.   100 percent.
23      Q.   Because essentially, the way the club has set up the
24 relationship -- when the dancers are dancing for customers,
25 that is part of their business.  That's the club's position,

Crystal Cowart
2/17/2022                                    19 (70 - 73)

Page 70

1  correct?  That is personal business, essentially, for the
2  dancer?
3      A.    I like how you put that.  Would it be personal,
4  though, because it's still her business?  So I don't know if I
5  would consider of a personal nature, per se, but obviously she
6  has to conduct her business on premise.
7      Q.    Okay.  Yeah, and that's kind of what I was getting
8  down to is how can you -- if the dancers are independent, how
9  can you limit their actions?
10     A.    Exactly.  No, and I'm betting No. 9 was one of the
11 first things we removed when we updated this.
12     Q.    What about No. 11:  It's against company policy for
13 dancers to date other dancers or employees?
14     A.    Now, that's not just for dancers.  That applies to
15 all of us -- employees, anybody.  We're not supposed to be
16 dating each other because in my experience, when things are
17 good, things are good, but when things go bad, they go bad.
18 And they tend to bring it to work with them, and that just --
19 it -- it causes a mess.  Nobody -- they can't focus on what
20 they're there to do because they're too busy arguing and
21 fighting amongst each other.
22     Q.    Okay.  And I can understand why a company would have
23 that policy towards its employees, but if the dancers are
24 independent contractors, what do you care who they date?
25     A.    Because, well, to date -- if they were gonna date

Page 71

1  other dancers, I guess, technically that wouldn't be something
2  we could stop.  But as far as the employees go, there's -- I
3  got a -- I have a list of reasons why a dancer and employee
4  shouldn't date for tons of reasons.
5      Q.    So do you enforce that policy against the dancers or
6  only against employees?
7          MR. KING:  Objection.  Form.
8      A.    I have never seen in my years that empol-- that
9  policy enforced against a dancer.  I have seen it enforced
10 amongst employees -- myself included -- but I can't think of
11 one instance where I've seen a dancer involved in anything.
12     Q.    (BY MR. MASON)  Okay.  Has an employee ever been
13 disciplined for dating a dancer?
14     A.    No, we don't -- usually they're not -- the dancers
15 aren't involved in those kind of things.  Like, usually if it's
16 an issue, it's an employee dating another employee kind of
17 thing.
18     Q.    Okay.  But hypothetically, if you found out one of
19 the dancers was dating one of the employees, would the club
20 intervene?
21          MR. KING:  Objection.  Form.
22     A.    That's tough.  It would intervene if -- if it became
23 an issue.  If it was a safety issue or something like that for
24 the dancer, and it was brought to the company's attention, we
25 might -- would choose to intervene.  But other than that, I'm

Page 72

1  sure people date each other and we don't find out.
2      Q.    (BY MR. MASON)  Okay.  And if it did become a
3  problem, would you potentially terminate the employee or tell
4  them to discontinue the relationship?
5      A.    In that scenario, I would sit down with e- -- with --
6  separately, one, with the dancer; get her point of view on the
7  situation then sit with the employee; get their point of view
8  on the situation.  Then I would figure out, for myself, what
9  the proper procedure would be.
10                Would it be to transfer the employee to a
11 different business so that the dancer could continue to dance
12 at Centerfolds or, you know, there may be a solution other than
13 you're fired, go away.  And that's usually what we try to do.
14 We usually try to find a different solution.
15     Q.    Okay.  Well, would you tell the dancer that she could
16 no longer work at the club?
17          MR. KING:  Objection.  Form.
18     A.    No.  Again, in that scenario, I would sit down with
19 everybody and we would try to find a balance.  If y'all can't
20 work together and get along and be professional then we need to
21 find a solution to the problem.  Help me find a solution.
22     Q.    (BY MR. MASON)  Okay.  Let's say hypothetically you
23 couldn't find a solution and it became a problem.  Let's --
24 let's focus on the -- the employee for a moment.
25     A.    In that scenario, I would transfer the employee.

Page 73

1      Q.    Okay.  Would you do anything to the dancer?
2      A.    No.
3      Q.    Okay.  Let's talk about No. 12 for a second:
4  Significant others, boyfriends, husbands, girlfriends, or wives
5  of dancers are not permitted to enter the club while a dancer
6  is on duty.
7                What's the reason for that policy?
8      A.    That is actually not just a policy with respect to
9  sexually oriented businesses.  In my experience, that also
10 applies to restaurants and regular bars as well.  A lot of the
11 reason is because the nature of being in the service industry
12 is a bit flirty.  You have to make sure that your customer is
13 taken care of and they're happy.
14                So can you image if a boyfriend was in there and
15 all of a sudden he saw his girlfriend giving a dance to a
16 customer and he got upset and lost his mind and went over and
17 physically assaulted the guy or something like that.  Like, we
18 have to make sure that the dancers are protected, the customers
19 are protected, the employees, everyone is protected.  And
20 that's just a way to circumvent any potential issues.
21     Q.    So you're saying that policy's primarily to prevent
22 the significant others from getting jealous?
23     A.    For -- to present -- to prevent them from being in
24 the building and doing -- I guess, out of jealous or anger or
25 whatever the case may be -- doing something that would

Crystal Cowart
2/17/2022                                    20 (74 - 77)

Page 74

1   physically injury the dancer or the customer or even the
2   boyfriend or girlfriend themselves.  We don't want anyone
3   getting hurt.
4   Q.   Okay.  No. 14:  Direct all customer complaints to a
5   manager on duty.
6       What kind of complaints typically arise that
7   would require a manager?
8   A.   Not too many.  Most of the -- minor issues, the
9   dancer can mediate the -- to a solution with the customer
10  herself.  But there were occurrences where the customer may
11  say, for example, I want to go upstairs, let's go to the VIP,
12  I'll pay you $10 million for an hour, and the girl goes and
13  then the guy doesn't want to pay.  And the girl can't get to a
14  solution herself with the customer, so then she'll bring in a
15  manager to try to help mediate the situation.
16  Q.   Okay.  So you do allow dancers to try and work it out
17  on their own before they involve a manager?
18  A.   Yes.
19  Q.   What is a manager authorized to do in a situation
20  like you just described?
21  A.   In that scenario, we always attempt to fully support
22  the dancer to the best of our ability.  He would go in.  He
23  would try to mediate, obviously hearing both sides of the
24  situation from both parties, and then try to mediate the
25  scenario.  And obviously, we couldn't -- if she agreed to

Page 75

1   $10 million for the hour and he's saying he doesn't want to pay
2   her 10 million anymore, it would not be the place of the
3   manager to speak on negotiating or decreasing her money.
4       The manager would have to go to the girl and
5   say, okay, look, this guy is adamant he is not gonna pay you
6   this.  What, if anything, do you want to do about it?
7       And get the feedback from the dancer on how she
8   wants the situation handled, and then go it -- go in and handle
9   it.  We -- the manager on duty in that scenario is essentially
10  there to support the dancer in making sure that her transaction
11  is successful and she gets what she wants for her transaction
12  but that she's also safe while doing it.  We don't want to put
13  her in a position to have to negotiate with an angry customer
14  once it gets to that level.
15  Q.   Okay.  Let's say, hypothetically, a little bit more
16  reasonable amount.  The customer had agreed to pay the dancer
17  $200, and the dancer spent her time with the customer.  Now the
18  customer doesn't want to pay anything.
19      Does the manager force the customer to pay
20  something or a agreed-upon rate, or does he just tell the
21  dancer, you're out of luck?
22  A.   He would go and he would try to negotiate with the
23  customer.  We would start with, sir, you owe her the $200 that
24  you guys agreed upon.  And we would go from there.  If the guy
25  turned out to be adamant:  I am not paying her; I refuse to pay

Page 76

1   her.
2       Then we would have to go back to the dancer and
3   ask the dancer, okay, look, what do you -- what do you want us
4   to do in this scenario?  Do you want us to go back and
5   negotiate a lower amount for you?  If so, what amount are you
6   willing to accept?
7       Or sometimes, in my experience, I've seen the
8   guys not want to pay and jump up and run as fast as they can
9   out the door and down the street.  In which scenario, we can't
10  really do anything because the man has ran away down the road.
11  Q.   Okay.  Let's say the customer absolutely refuses to
12  pay anything.
13      Would the manager ask the customer to leave?
14  A.   Yes.
15  Q.   Okay.  Now, let's say the dancer is trying to take
16  care of the situation on her own.  She's trying to negotiate
17  with the customer, but it gets kind of heated.  You know, they
18  started arguing with each other.
19      Does the manager intervene?
20  A.   If we saw it getting heated?
21  Q.   Yes.
22  A.   Yes.  We -- well, we would intervene to the extent
23  that we would go there and make sure that the girl is safe.
24  Q.   So let's look for just a moment at policy No. 17.  I
25  realize maybe this is not in effect any longer, but at least at

Page 77

1   the time it was.  All dancers are directed to be polite and use
2   good manners and common courtesy to each other and the
3   customers at all times.
4       In that situation we were just talking about
5   where the dancer and the customer are having a dispute over
6   payment, and it gets heated, and maybe the dancer yells at the
7   customer, has the dancer violated this policy to where she
8   would be disciplined by the club?
9   A.   No, she's not gonna -- unless she punches the
10  customer in the face or something like that.  If she yells at
11  him, that's -- we're not gonna reprimand her for that.  That's
12  being involved in the heat of the moment, and we all make
13  mistakes.
14  Q.   Now, No. 16 says:  All lockers and personal belongs
15  are the subject to search by management at any time.
16      What's the purpose of that policy?
17  A.   Well, that goes back to our agreement with the City
18  of Houston.  Part of that is to make sure that we don't have
19  any drugs or illegal substances on property.  So we have to
20  make sure that we search all the girls to ensure that they're
21  not being in any illegal drugs or alcohol, for example, because
22  TABC requires that all alcohol on a TABC-licensed property be
23  stamped.  So that would be a detriment to us if we had
24  unstamped alcohol in somebody's bag.
25  Q.   Okay.  Does Centerfolds actually search lockers and

Crystal Cowart
2/17/2022                                              21 (78 - 81)

Page 78

1  personal belongings?

2     A.   Yeah.  Yes.

3     Q.   Is that something that happens frequently?

4     A.   I wouldn't say frequently.  I know they search the

5  bags on a regular basis.  But once we've searched their bag, in

6  theory, if you search the bag, there shouldn't be anything in

7  the locker because there was nothing in the bag that went in

8  the locker, you know.

9     Q.   So do you search the bag when they come into the

10  club, basically, before they go --

11    A.   Yes.  Uh-huh.

12    Q.   Is that -- every day a dancer shows up their bag gets

13  searched automatically?

14    A.   It should be, yes.

15            MR. MASON:  Can we go off the record for just a

16  minute?

17            MR. KING:  Sure.

18            (Discussion off record.)

19    Q.   (BY MR. MASON)  So what would happen if Centerfolds

20  found something prohibited in a search?

21    A.   You gotta take that back to your car.

22    Q.   What if it were drugs?  Would you --

23    A.   Honestly --

24    Q.   -- call the police or just tell them --

25    A.   No, I'm not gonna call the police on anybody.  Number

Page 79

1  one, if it's a prescription and it's a valid prescription with

2  her name on it, obviously for medical reasons I can't ask that

3  she not have her medication if she needs it.  So in that

4  scenario, obviously, she would be able to have her -- her

5  medication with her.

6            In the scenario where you found someone that did

7  not have a prescription, but they had some type of substance --

8  I'm not a police officer.  I don't know how to identify exactly

9  what the substance is to know if it's drugs or not, but if I

10  have a question in my mind about it, take it back to your car.

11  I don't need it on property.  I don't need it in the building.

12  It doesn't need to be with you.  Take it back to your and we'll

13  go -- we'll just continue our day.

14            So that's usually my process.  I'm not gonna

15  call the police on anyone.  That's terrible.

16    Q.   Okay.  Would you fire or suspend the dancer if it

17  were --

18    A.   No.

19    Q.   -- drugs?

20    A.   No.

21    Q.   Okay.

22    A.   Well, is she selling them?  If she's trying to sell

23  them in the building, that's different.  If she's a drug

24  dealer, she's got to go.  But if it was just in her bag and she

25  forgot she had it on her, obviously, sweetie, take it to your

Page 80

1  car.  You know you can't have that here.

2     A.   Okay.  So if it's just, like, a joint in her purse,

3  they just --

4     A.   They put that outside.  Yeah, you know you can't have

5  that in here.

6     Q.   So obviously Centerfolds provides lockers for the

7  dancers, correct?

8     A.   Yes.

9     Q.   How many lockers does Centerfolds have?

10    A.   I don't know the exact number but a couple hundred.

11    Q.   Okay.

12    A.   Plenty that I would be confident in telling you that

13  when we have a -- a full house of dancers.  At our -- our

14  highest number of daily dancers, they have somewhere to secure

15  and keep their personal belongings.

16    Q.   Gotcha.  So basically at least a locker for every

17  dancers who's in the --

18    A.   Absolutely.

19    Q.   But I assume they're sort of first come, first serve.

20  They're not, like, assigned to particular dancers.

21    A.   Some girls have a locker that they have used for ten

22  years, and that is their space, and if they had to leave that

23  locker, it would totally mess up their whole vibe.  And I'm not

24  gonna mess up anybody's vibe.  You keep your locker if that's

25  where you're comfortable.  But then there are other girls that

Page 81

1  take their stuff with them every day, and they don't want to

2  have a particular locker.  They just come in, put their stuff

3  in, and put their lock on.  So it's really a matter of

4  preference for the dancer.

5     Q.   Okay.  But, I mean, if you have, say, a thousand

6  dancers total and 50 to a hundred coming and going any given

7  night, I assume there's not enough for each person to have

8  their own permanent locker.

9     A.   Correct.  But out of that thousand that I spoke about

10  earlier, a lot of those girls might work a shift or two and

11  never return.  So our consistent dancers that are there on a

12  regular basis are usually the ones that have a locker that they

13  leave their stuff in and don't take it out 'cause they know

14  they're gonna be there on a regular basis.  The girls that are

15  coming and going and working at other establishments are

16  probably gonna be less likely to want to have a specific

17  locker.  They'll just want some safe place to put their stuff

18  in when they're there.

19    Q.   Okay.  So those dancers who may show up for a shift

20  or two and then never come back, are they kind of periodically

21  purged off the rolls, or are they typ- -- basically eligible to

22  come back at any time?

23    A.   Oh, they can come back whenever they like.  The only

24  catch would be if in the interim while you're gone I issue a

25  new license and -- an updated license and access agreement in

Crystal Cowart
2/17/2022                                    22 (82 - 85)

Page 82

1  the time that you've been gone, when you return, you will be
2  required to read and complete the most recent license and
3  access agreement so that you understand the policies that
4  relate to your working relationship with Centerfolds at that
5  time.
6     Q.   Okay.  Do you have any notices in the locker room
7  about them being subject to search?
8     A.   I don't think so, actually.
9     Q.   Okay.  Let's move on.  I'm close to getting finished
10 with this so...
11    A.   You're good.
12    Q.   No. 19:  Dancers are prohibited from sitting or
13 standing on the stage for any period of time.
14         What -- what's that about?
15    A.   Your guess is as good as mine.  I have -- well,
16 personally, I've seen the girls sit down on the stage while
17 they're doing their set, while they're up there performing or
18 whatever.  They sit down, they throw their legs around and --
19 and do that whole thing.  And standing -- like I said earlier,
20 some of the girls don't have rhythm and they choose just to go
21 out and stand up and look good against the poll.  So I'm not a
22 hundred percent sure why that was in there, but I'm pretty sure
23 it's gone now.
24    Q.   Okay.  Yeah, I kind of assumed that that wouldn't
25 apply to a dancer doing her set, but maybe it applied to

Page 83

1  dancers who weren't currently doing their set.  You don't want
2  other dancers kind of sitting around and taking up states --
3  stage space while another girl was trying to do her set; is
4  that right?
5     A.   Not necessarily, because you would be amazed at how
6  many times one girl will be on stage, and then a couple of
7  other girls will see that she's on stage and she looks like
8  she's having fun so they go hop on stage with her and then we
9  have four girls on stage and then everybody's happy.
10         So they're not -- I guess, if I had to translate
11 this, I would think, you're right with respect to it not
12 applying to the set.  I think for safety, maybe, we would say,
13 don't sit or stand on the stage so that you don't get hurt
14 perhaps.  But other than that, I don't see any reason why we
15 would have that in there.
16    Q.   Okay.  So other -- other dancers who are not called
17 to stage can hop on stage --
18    A.   Oh, yeah.  Yes.
19    Q.   -- with other dancers up there?
20    A.   Uh-huh.  The only people that can't hop on stage are
21 customers.  If a female customer gets up there, we've got to
22 get her back down.
23    Q.   Okay.  Have you ever had a situation where a dancer
24 was on stage doing her set and other dancers came up there and
25 then the original dancer who was doing her set was, like, hey,

Page 84

1  wait, you know, get off the stage.  I'm -- I'm doing my set.
2  Now you're, like, upstaging me.
3     A.   Oh.  No.  I -- generally, the dancers -- honestly, as
4  surprising as this may sound -- there is a general
5  understanding and a respect amongst the dancers.  You would
6  never go over and interrupt someone's set while they're on
7  stage.  Unless -- if it's one of your girlfriends or somebody
8  that you know or, you know, you're friends with or you're cool
9  with and you see they're up on stage and you go over and kind
10 of give them the look and they give you the look back and then
11 you know it's okay to get on stage.  But you would never go and
12 just interrupt someone's set.  That would just -- yeah, that
13 would be rude.
14    Q.   Okay.  No. 20 says:  Do not eat, drink, chew gum, or
15 smoke while on stage or while doing a table dance.
16         Is that -- I see from your look that you're kind
17 of confused by that.  Is that policy not enforced?
18    A.   Well, smoking is not allowed in the  City of Houston
19 inside -- period.  So they better not be smoking while they're
20 on stage because we'll get in a lot of trouble for that.
21 Chewing gum?  Drinking and eating on stage?  I guess you could
22 choke would be the only concern there, and I think that's gone
23 from the packet now, too.
24    Q.   Okay.  So if a dancer kind of had an act where, you
25 know, she felt like it was sexy to chew gum or something like

Page 85

1  that, would that be permitted?
2     A.   Yeah.  I mean, if -- if that's her thing and that's
3  what she wants to do, I'd let her do it.  As long as she's
4  not doing flips and tricks and stuff like that that's gonna
5  make her choke.  That would be my only concern -- would be her
6  safety up there.
7     Q.   Okay.  What about food?  Let's say a dancer wanted to
8  incorporate food in her routine.  Like, you know, maybe she
9  wants to suck on a lollipop or eat a --
10    A.   That would be cute.  Yeah.  No, that would be fine.
11    Q.   Okay.  So if it's some kind of prop, they have
12 discretion over, you know, using props in their act or
13 whatever?
14    A.   Oh --
15    Q.   As long as it's not dangerous?
16    A.   As long as -- we had one lady come in from Vegas one
17 time and she did a whole show, and she had these giant feather
18 fans that she brought out.  I was like, wow, that's impressive.
19    Q.   Okay.  What -- what about something like a snake,
20 assuming nonpoisonous snake or something like that?  I mean,
21 I've seen those sort of things where, you know, dancers like to
22 have snakes slipped around their neck or something.
23         Would that be allowed?
24    A.   It would give me nightmares, but yes, it would be
25 allowed.

Crystal Cowart
2/17/2022                                    23 (86 - 89)

Page 86

1   **Q.**   No. 24 says:  Do not borrow money or clothes from any

2   employee, dancer, or customer.

3                    Is that a rule that's enforced?

4   **A.**   No.  And it is a rule that is no longer in our

5   agreement.

6   **Q.**   Okay.  No. 7:  Have proper, valid, or acceptable ID

7   on you while on the premises.

8                    What's the reason for that?

9   **A.**   Occasionally, we will have a visit from the Houston

10  Vice Division --

11  **Q.**   Uh-huh.

12  **A.**   -- or TABC.  And they may come in and they may choose

13  to verify the age of some of the individuals inside the

14  building, at which point, we need to make sure that they have

15  proper identification with them to be able to do that.

16                   That being said, in the event that a dancer

17  comes in -- a dancer that has previously been contracted and

18  provided us with her valid documents so that we have been able

19  to verify that she is of legal age to perform dancing -- if

20  that individual who's produced the documents in the past came

21  in and she said, listen, I -- I forget my ID at home today.  I

22  left it in my other purse.  Are you gonna let me -- are you

23  gonna let me dance?

24                   Obviously, we know that she's of age.  We're

25  going to let her dance with con- -- you know, in confidence,

Page 87

1   but it's better for them to have it on their -- on their

2   person, if at all possible.

3   **Q.**   Okay.  Almost done.  No. 32:  Dancers are prohibited

4   from soliciting drinks from customers?

5   **A.**   Uh-huh.  That's a TABC law.  None of us are allowed

6   to solicit alcohol.

7   **Q.**   I did not realize that.  So a dancer can't say, hey,

8   would you buy me a drink?

9   **A.**   No.  A dancer can say, can you buy me a soda.

10  **Q.**   Uh-huh.

11  **A.**   But if it involves alcohol, and we -- ask any of us,

12  be it a dancer or an employee.  If we were to ask a customer,

13  hey, will you buy me a drink?

14                   That's solicitation, and we could get in trouble

15  with TABC for that.

16  **Q.**   But if the customer offers -- offers on his own

17  choice to -- to buy a dancer a drink, is that permitted?

18  **A.**   Absolutely.

19  **Q.**   Okay.  Okay.  Let's skip all this.  Okay.  And I just

20  want to talk about this at the end for a second here.

21                   It says:  Any dancer who violates these policies

22  will be subject to immediate termination of their license to

23  perform at -- perform entertainment services at Centerfolds.

24  Inner- -- any manager who knowingly low-- knowingly allows

25  any dancer to violate these policies will be subject to

Page 88

1   suspension or termination.

2                    So that sounds like these rules are pretty

3   serious, right?

4   **A.**   I think when we used the word "subject," I think we

5   used it like when you use the word "may."  It -- it could be --

6   you could be subject to immediate termination, but I don't

7   think -- I mean, the words read the way the words read.

8   **Q.**   Right.  So there's a lot of discretion involved, and

9   maybe some of these policies weren't --

10  **A.**   Like, I'm not gonna fire a girl for chewing gum.  I'm

11  not gonna fire a girl for having a lollipop on stage.  That

12  type of thing.  Those -- those silly things.  That would

13  just -- that would be wrong to take away somebody's ability to

14  generate income for something so --

15  **Q.**   Okay.  But according to these policies, that

16  theoretically could happen?

17  **A.**   Could --

18       MR. KING:  Objection.  Form.

19  **A.**   -- yes.

20  **Q.**   (BY MR. MASON)  When it says that they're -- dancers

21  "subject to immediate termination of their license to perform

22  at the club."  That basically means they're fired, right?

23  They -- they can't --

24  **A.**   Yes.

25  **Q.**   -- work for the club?  Okay.

Page 89

1   **A.**   Yeah.

2   **A.**   And then it is further the policy of Centerfolds that

3   no dancer may leave the premises after beginning her shift and

4   then return to the club to continue working.

5                    Is that policy enforced?

6   **A.**   Yes and no.  Yes, to the extent that we have to make

7   sure that she's not going out to meet a customer at a hotel or

8   something and then gonna come back to work, or she's not going

9   out to meet her drug dealer and then come back to work.

10                   But if the girl comes to us and says, hey, my

11  daughter's sick.  I've got to go.  I've got to pick her up from

12  school, take her home to the babysitter, and then I'll be right

13  back.

14                   That's a scenario where we're gonna take her at

15  her word, and hope that she's not going to really see her drug

16  dealer, and we're gonna allow her to leave and come back.  But

17  if I see the group of guys walking out and they're looking over

18  their shoulder at the girl, waiting for her to walk out with

19  them, and she says, oh, I've got an emergency.  I have to go.

20                   I might say, babe, you do realize prostitution's

21  illegal, and this is not a good idea, right?  So that's really

22  the -- as it --

23  **Q.**   So it sou- -- sorry.

24  **A.**   No, I was --

25  **Q.**   I was just gonna --

Crystal Cowart
2/17/2022
24 (90 - 93)

Page 90

1   A.   -- just finishing the sentence.

2   Q.   Not a problem.  I keep jumping in while -- sorry

3   about that to the court reporter.

4        But that's sort of a judgment call?

5   A.   Absolutely.

6   Q.   Okay.  That's all I think I had with this.  I just

7   had a couple more questions in this section.

8        Does Centerfolds strive to have a minimum number

9   of dancers at all times?  I mean, I know you said earlier that

10  sometimes you don't have people show up, but do you at least

11  make some effort to make sure there's some dancers there?

12  A.   No.  We deal with whatever -- with what we get.

13  Q.   Okay.  So on any given day, you have no idea who will

14  or won't show up?

15  A.   No -- yeah, exactly.  I might walk in on a Friday and

16  there be no dancers, and I've got customers and nobody to dance

17  for them, but that's just the cards we were dealt for that day.

18  Q.   So what do you do?  I mean, I assume you can't

19  just --

20  A.   That's when you call people and start begging.  You

21  call the dancers that you know and literally do the hey, girl,

22  are you busy today?  Is there any way you want to come work?

23  There's people here but there's no dancers.  I don't want you

24  to miss money, any chance you cou- -- you want to come in?

25       That's what you got to do.  'Cause you can't

Page 91

1   tell them you have to so you just gotta resort to begging.

2   Q.   Okay.  Would you give them an incentive, like, maybe,

3   waiving the house fee?

4   A.   Yes.

5   Q.   Okay.

6        MR. MASON:  All right.  I think that's fine for

7   now if -- can we go off the record?

8        THE REPORTER:  Okay.  And before we go off the

9   record, I just wanted to make sure:  Was that exhibit just for,

10  like, showing, or were we going to admit it officially into the

11  record?

12       MR. MASON:  Yes.  I apologize.  Yeah, I did want

13  to admit this one into the record as Exhibit 1.

14       THE REPORTER:  Okay.  Perfect.

15       MR. MASON:  So I guess I need to provide you a

16  copy.

17       THE REPORTER:  Okay.  Did you want to just go

18  off the record, and I could provide you with the e-mail to send

19  it at the end?

20       MR. MASON:  Yeah.  Yeah, that's fine.

21       (Break taken; 12:46 p.m. to 1:17 p.m.)

22  Q.   (BY MR. MASON)  All right.  So let's talk little

23  bit about the house fees we mentioned a little bit earlier.

24       So Centerfolds contends that dancers pay a house

25  fee to lease space at the club in order to perform; is that

Page 92

1   right?

2   A.   Yes.

3   Q.   Okay.  The later a dancer arrives on a particular

4   day, the higher the fees are; is that correct?

5   A.   Correct.

6   Q.   Okay.  In other words, the less time a dancer has

7   available to earn money, the more she pays, right?

8   A.   I mean, technically, yes.  Yes.  That wasn't the

9   reasoning behind it, but, yes, you're right.

10  Q.   Sure.  So what is the reasoning behind the house fees

11  at Centerfolds?

12  A.   Well, it all goes back to the fact we can't require

13  the girls to come in so we try to incentivize them by giving

14  the -- low floor fees and then having it increase

15  throughout the day as -- as more girls want to come in, I guess

16  would be the best way to put it.  When we have, for example, 50

17  girls that are gonna want to work that night then you can

18  charge them the full floor fee versus in the morning when you

19  have no dancers and you're desperately in need of one or two,

20  incentivize them with a lower floor fee so that maybe they'll

21  want to come in.

22  Q.   Okay.  So I understand the -- the reason for the

23  policy, but as a result, essentially the longer a dancer leases

24  the space -- in other words, the longer she has to -- to

25  perform -- if she comes in at noon, she has until 2:00 or

Page 93

1   3:00 a.m.  Whereas if she comes in at 10:00 p.m., she only has

2   a few hours.

3        The less they pay for the house fees is on a

4   per-hour basis?

5   A.   The girl that came in earlier, yes.

6   Q.   So, for example, if a dancer pays a $30 house

7   fee and works a six-hour shift, they're basically paying $5 an

8   hour for the fees to work there?

9   A.   Yes.

10  Q.   But if a dancer comes in early, say, for ten hours on

11  that same $30 house fee, they're only paying $3 per hour?

12  A.   Yes.

13  Q.   Okay.  So as I mentioned earlier, the longer they

14  have that lease space available, the less they pay,

15  essentially?

16  A.   Essentially, yes.

17  Q.   Okay.  And then in the shorter time frame they have

18  to lease the space, the more they pay?

19  A.   Yes.

20  Q.   Okay.  So before this lease space concept existed,

21  would clubs charge more money to dancers who showed up late?

22  A.   At least as far as the Davari companies have always

23  gone, yes, the later you come in the higher the floor fee is

24  going to be.

25  Q.   Okay.  As a general rule for the industry, not just

Crystal Cowart
2/17/2022                                    25 (94 - 97)

Page 94

1  Centerfolds, can entertainers make more money from customers
2  early in the evening or later in the evening?
3            MR. KING:  Objection.  Form.
4       A.   Realistically, I've seen girls that only like to come
5  in for two hours in the morning, and they seem to make a good
6  living -- you know, something that they're pleased with.  And
7  then there are girls that only like to work at night.  You
8  know, they'll work a couple hours at night.  I don't think
9  being there in the daytime or the nighttime at any specific
10 time is going to make or break your ability to make money.
11      Q.   (BY MR. MASON)  Do you generally have more customers
12 at your club at night than during the day?
13      A.   Early in the morning, there's obviously not many
14 customers around 11:00, but as the day goes on -- 2:00 or
15 3:00 in the afternoon, they'll get a decent crowd.  Sometimes
16 if it's a slow night, the -- that happy hour crowd might
17 actually be larger than some total of night shift customers.
18      Q.   Okay.  You mentioned a -- a happy hour crowd.
19           Do you actually have a happy hour?
20      A.   No, I apologize.  I just -- there's no specific happy
21 hour during pricing or anything to my knowledge.  That's just
22 what I consider that 5:00 to 8:00 period.
23      Q.   Okay.  So yeah, that -- that's really, I guess, what
24 I was gonna get to.  What -- what time frame you're talking
25 about.  5:00 to 8:00 p.m., you said.  Okay.

Page 95

1       A.   Uh-huh.
2       Q.   Do you -- have you noticed any difference in the type
3  of customers that show up, say, in the early afternoon versus
4  in the evening after 8:00 p.m.?
5       A.   Mainly in the early afternoon, you get the gentlemen
6  from the surrounding office building who are on their lunch
7  break and they come for the buffet or the menu, either/or.  And
8  at nighttime, generally, we get a lot of -- in this area --
9  'cause we're in The Galleria area -- we get a lot of the
10 traveling businessmen who come in.  So you still get
11 businessmen day and night.  It's just a matter of whether
12 they're here in town on business or if they work in the area
13 and they're coming in for the afternoon lunch.
14      Q.   Okay.  Do they tend to get as many lap dances in the
15 afternoon if they're coming in for lunch as opposed to the
16 night?
17      A.   Yes.  Actually, from what I understand -- I've never
18 been a dancer, but my best friend is a dancer currently, and
19 she prefers to work the afternoon.  She said because they come
20 in and because they only have a certain amount of time during a
21 lunch break or how they've escaped from the office or whatever
22 their reason for being able to be out is.  They only have a
23 limited amount of time.
24           So they come in with a purpose, they get their
25 dances, they eat their food, and then they leave.  So it's a

Page 96

1  higher turnover kind of a thing.  She can get to more customers
2  in however many hours she works at that rate versus at night,
3  they come in and they're there for the long haul.  They're
4  there to -- to stay and party and hang out for hours.
5       Q.   Okay.  I'm a little surprised, but I -- I don't know
6  the -- the industry that well.  But, yeah, a little surprised
7  if somebody comes in for -- for lunch and eats food that
8  they're gonna get a few dances before they go back to work.
9       A.   Hey, legs and eggs, sir.  You never know.
10      Q.   Okay.  I did not know that.
11           Okay.  So basically you're saying that there's
12 really no preference for the girls to -- in general to come in
13 in the night as opposed to the day?
14      A.   Not as far as their ability to make money.  Some
15 girls prefer -- like, my mom was always a night shift dancer
16 because she wanted to be at home to get me from school and
17 stuff.  My best friend is a day shift dancer because she has
18 her preference on how quickly she makes money.  Some of the
19 girls I've worked with only work at night and some of them only
20 come in at 12:00 a.m. because they only want to work two hours.
21 Like, and they -- they all see- -- they've worked for quite a
22 while so obviously whatever they're doing is working for them.
23      Q.   Okay.  So do you tend to have as -- and the noise is
24 coming up, I apologize.  I don't know if y'all can hear that.
25      A.   That's fine.

Page 97

1       Q.   Do you tend to have as many dancers during the day as
2  you do at night?
3       A.   Not in the early morning hours.  But by about one,
4  two o'clock afternoon, we'll get a decent number of girls.
5  Sometimes anywhere from 50 to 60 girls and you may only get an
6  additional 50 girls for night shift.  So it's a pretty even
7  consistent split usually.
8       Q.   Okay.  But the way you phrased that, you said "you
9  may only get an additional 50 girls."  It seems to
10 imply that you would expect more at night?
11      A.   We hope for more.  We always hope -- every time we
12 open those doors, we hope a ton of dancers come to work for day
13 and night.  And on a convention night, for example, if it's
14 like the OTC oil convention -- that's our biggest convention of
15 the year so, obviously, on those days, you're gonna have more
16 dancers that want to come work because they know the -- the oil
17 money is in town.
18      Q.   So -- but the -- Centerfolds needs dancers to be
19 there.  Even customers who show up at, you know, 11 o'clock or
20 noon or something like that, you want to have dancers there?
21      A.   Ideally.
22      Q.   And Centerfolds' businesses, like other gentlemen's
23 clubs, is really about providing ladies who are dancing in
24 various states of undress for -- for the men, correct -- or for
25 the customer.  I apologize.

Crystal Cowart
2/17/2022                    26 (98 - 101)

Page 98

1            MR. KING:  Objection.  Form.
2       A.   Are you saying that's our sole method of business?
3  I'm confused.
4       Q.   (BY MR. MASON)  I didn't say necessarily your sole
5  method of business, but it is the main service you are offering
6  to the customers, right, is dancers?
7       A.   The answer's as long -- along with the full bar and
8  our full food menu.
9       Q.   Okay.  But wouldn't you agree that the main
10 attraction that you're offering is the dancers?
11           MR. KING:  Objection.  Form.
12      A.   Yes.
13      Q.   (BY MR. MASON)  'Cause, I mean, some people may come
14 for the food or drinks, but if you didn't have any dancers, you
15 wouldn't be a strip club.  You would be just a bar or a
16 restaurant.
17      A.   Correct.
18      Q.   Okay.  Let's talk a little bit about the rates that
19 the entertainers charge.
20           Generally, lap dances are $20 for each lap
21 dance; is that correct?
22      A.   We don't have any set prices.  Like, Centerfolds
23 doesn't set the price.  The girl can charge $10, $5, $20.  Some
24 girls will do three for a hundred.  It just depends on their
25 preference.

Page 99

1       Q.   Okay.  Is $20 the typical going rate?
2       A.   The industry standard has always been lap dances are
3  $20, but as time has gone on, what I've seen is the girls have
4  actually increased.  Most of the girls you run into are gonna
5  require probably a two-dance minimum.  They're not gonna take
6  their clothes off for $20 these days.
7       Q.   So there's no mandatory minimum charge?
8       A.   No.
9       Q.   You said if a dancer wanted to charge $5 for a dance,
10 the club would allow that?
11      A.   Yeah, she could give away free dances if she wanted
12 to.
13      Q.   Okay.  And that was gonna be my next question.  Okay.
14           And no one at the club -- the managers don't
15 tell the dancers that they should charge $20 for a dance?
16      A.   No.
17      Q.   What about if a customer wants to pay the dancer with
18 a credit card?
19      A.   Now, with a credit card, we charge.  For every $20
20 that you charge on your credit card, you as the customer, would
21 pay an additional $5 fee for the use of the credit card
22 processing system.
23      Q.   Okay.  So $5 for every 20?
24      A.   Uh-huh.
25      Q.   Okay.  Is there any charge to the dancer?

Page 100

1       A.   No.
2       Q.   Okay.  So let me just make sure I understand this.  A
3  customer comes in, he get a dance -- gets a dance from a
4  dancer.  He puts it on his credit card.  It's -- he's char- --
5  assuming the dancer is charging a $20 rate, the customer will
6  pay $25.  $5 of that money goes to the club for a fee, but the
7  dancer gets to keep the $20?
8       A.   Correct.  She retains her full agreed amount.  And
9  that would also apply in scenarios where the dancer wasn't
10 giving physical dances, but she had an agreement with the
11 customer to -- I'll sit with you for this much time for X
12 amount of dollars.  He would still incur that 20 percent credit
13 card processing fee, but she would retain all of the funds that
14 were directly owed to her for herself.
15      Q.   Okay.  So just to clarify 'cause you just said
16 20 percent which on 20 --
17      A.   Isn't it 20?  Isn't it 5?
18      Q.   That would be 25 percent, I believe.
19      A.   Okay.  I apologize.  25 percent.
20      Q.   So is -- is that different if it's a different
21 amount?  You know, let's say it's a -- she charges a hundred
22 dollars for her time, sitting with a customer, and they -- and
23 puts it on the credit card, the fee would be $25?
24      A.   Correct.
25      Q.   Okay.  Does the club have a minimum price for dances

Page 101

1  charged on a credit card?
2       A.   No.
3       Q.   So if a dancer wanted to charge $2 for a dance, and
4  the customer wants to put it on his credit card, he'd be
5  allowed to do so and he'd just pay the 25 percent fee?
6       A.   Yes.
7       Q.   Okay.  What about the VIP?  Is there a set price for
8  time in the VIP room?
9       A.   No.
10      Q.   Okay.  So if a dancer said -- their understanding is
11 that a half hour in the VIP room is equivalent of 15 dances or
12 $300 an hour, and the VIP room is equivalent to 25 dances or
13 $500.  That's not set by the club?
14      A.   That's not set by the club.  The dancers amongst
15 themselves will generally kind of implement their floor base
16 'cause they -- and quote, I've had girls tell me, I can't have
17 girls coming in there and lowering the real estate.  So you get
18 a girl that's willing to go upstairs that's willing to go
19 upstairs and spend an hour for a hundred dollars.
20           That affects the other dancers who are charging
21 $500 to go upstairs to hang out for an hour.  So it's kind of
22 an unspoken thing amongst the dancers that they have, you know,
23 at least charged the -- usually it is $300 for a half hour and
24 $500 for the whole hour.  But that's not a company policy.
25      Q.   Okay.  What would happen in the -- that situation if

Compass Reporting Group
(844) 817-1080

Crystal Cowart
2/17/2022                           27 (102 - 105)

Page 102

1 a dancer complained, hey, I'm trying to make money here but

2 this other girl's practically giving away her time?

3     A.    Nothing we could do about it, unfortunately.  She's

4 her own business.  If she wants to give away her time, that's

5 her choice.  And that's what I'd have to tell the girl.  As

6 much as I hate that you're not making any money and she's

7 lowering the real estate, unfortunately, you know I can't do

8 anything about it.

9     Q.    Oh, okay.  So for the VIP room, the credit card

10 charge is the same, basically 25 percent?

11     A.    Yes.

12     Q.    Well, I had a bunch of questions, but we kind of

13 covered it already.

14     A.    Sorry.  I kee- -- I keep giving you information more

15 than you're asking, I know, but...

16     Q.    Yeah.  That's okay.  I'm not sure your lawyer

17 appreciates that.

18     A.    I was just --

19     Q.    It's fine with me.

20     A.    I was thinking, like, Will's gonna beat me later, but

21 I'll make it easier on you.

22     Q.    Okay.  Okay.  Yeah, we talked about this.  And -- and

23 some of it was my stuff 'cause I brought it up, but I didn't

24 really want to go into that detail.

25          So there is no set schedule for any dancer; is

Page 103

1 that correct?

2     A.    Correct.

3     Q.    They're free to come and go whenever they want,

4 essentially?

5     A.    Yes.  We do ask if -- once you've signed in, if

6 you're gonna leave -- I don't care if you're leaving 10

7 minutes, 10 hours -- that makes no difference to us.  You can

8 come and go as you choose, but just let us know if you're

9 leaving.  That way -- going back to what I said about Vice

10 earlier.  If Vice comes in and they want to see the list of all

11 in -- all dancers working, I need to be able to -- to know,

12 okay, yes, you're seeing these many girls, but if you're

13 looking for Trixy Jo, she's already gone.  So that I can

14 communicate to them who is and is not in the building.  But

15 other than that, they're free to go.  Just let me know, hey,

16 we're leaving.

17     Q.    Okay.  So you need to know who's there.

18          Does anyone cross the name off the list when a

19 dancer leaves?

20     A.    No.

21     Q.    So how do you keep up with who's there and not there?

22     A.    Again, because we don't control them, it's one of

23 those where we take all the precautions we can to protect

24 ourselves when Vice comes in.  So in that scenario if Vice were

25 to come in, and they start looking for a specific girl, and I

Page 104

1 can't find her in the building, I'm gonna -- you know, we're

2 gonna go to the managers and we're gonna say, hey, where's

3 Trixy Jo?  Was she -- you know, one may not know.  Gerard may

4 not know where she is, but she may have told Thomas before she

5 left.  Somebody's going to know that she left the building so

6 that we can communicate to them, unfortunately, I can't produce

7 this girl right now.  She -- she left earlier.

8     Q.    So you rely on, basically, what the managers remember

9 about who's left?

10     A.    Yes.

11     Q.    Are there different shifts at the club?

12     A.    Technically, no.  We, amongst ourselves, call it day

13 shift and night shift.  But -- like, there's no particular --

14 if you're hired for day shift or you're hired for night shift.

15 If you get hired as a dancer, you can work any time.

16     Q.    Okay.  So a dancer can work whenever, but on the

17 sign-in sheets that you provided, there's an a.m. and a p.m.

18          Do you split it up that way?

19     A.    I believe the hostess -- when the hostess -- 'cause

20 we'll have one hostess that comes in from 11:00 a.m. to

21 7:00 p.m., and then the next hostess comes in at 7:00 p.m.  So

22 I think for purposes of the hostesses keeping track of who

23 they've signed in and what floor fees that the individual

24 hostess is responsible for, I think they put a line on the

25 paper.

Page 105

1          So that -- for example, if I'm the hostess for

2 11:00 to 7:00, I'm obviously gonna turn all of the money that I

3 collect before I go home 'cause I don't want to leave it and

4 have something happen to it with the next person, you know.  So

5 you'll turn it in, but the night -- the next hostess that comes

6 on is gonna need to know who all is there in case Vice comes

7 in.

8          So you have to leave the sheet you've been

9 signing it -- the girls in with the hostess, but you don't want

10 to leave the money.  So you put the money, you turn it in, you

11 leave the sheet with the night shift hostess, she makes that

12 line so that when her envelope of money gets turned in, there's

13 an understanding of where the first hostess' money stopped and

14 hers began.  That way she's not short whatever money the -- the

15 first hostess collected.

16     Q.    Okay.  So let me make sure I understand that

17 correctly.  When the dancers come in --

18     A.    Uh-huh.

19     Q.    -- they pay the -- the house fee to the hostess --

20     A.    Yes.

21     Q.    -- who keeps that money until the end of the

22 hostess's shift --

23     A.    Correct.

24     Q.    -- and then the hostess will turn that in; all the

25 the money that she collected during her shift?

Crystal Cowart
2/17/2022                    28 (106 - 109)

Page 106

1   A.   Correct.

2   Q.   Okay.

3   A.   But the actual piece of paper that we're writing the
4   girls down on as they come in will remain at the front door
5   with the next hostess so that she can continue her list.

6   Q.   Okay.  So you -- you keep the same piece of paper?

7   A.   Right.  That way -- again, because you may have a
8   girl that got there at 11:00 a.m., but she's gonna work -- you
9   know, she plans on staying till 2:00.  I need to ha- -- to know
10  that that individual was in the building -- in the -- you know,
11  at some point.  If Vice comes in looking for her, I need be
12  able to produce the full list of individuals that have been in
13  the building or could still be in the building.

14  Q.   Okay.  And I -- I believe I -- I'm not sure that it
15  makes any difference, really.  That's just not the impression
16  that I got from looking at the sheets here.  Let me show you
17  the sign-in sheets for -- for Grace Roberts that you produced.

18       This particular document is Centerfolds 000130.
19  This is a sign-in sheet for -- for Grace Roberts, who went by
20  the stage name of Reagan.  A little hard to read there, but --

21  A.   Uh-huh.

22  Q.   -- I do believe that's her.  And you'll notice it's
23  marked in the -- in the top corner, a.m.

24  A.   Uh-huh.  That's your a.m. hostess.

25  Q.   Okay.  So -- but that makes it seem like this sheet

Page 107

1   is just for the dancers that came in for the a.m.  It seems
2   like there would be a separate sheet for the p.m.

3   A.   It may be the next one.  Let's see what the next one
4   looks like.

5   Q.   I go down -- so this is another day, it looks like,
6   and --

7   A.   Okay.  It's --

8   Q.   -- I'll go --

9   A.   -- another day.

10  Q.   -- back to the top.

11  A.   Oh, okay.  I see what y'all did.

12  Q.   See, this -- the first one is for December 6th of
13  2018, and --

14  A.   And the next one's --

15  Q.   -- it looks like -- for December 11th of 2018.  This
16  is also an a.m. sheet.

17       THE WITNESS:  Will, did y'all produce only the
18  days in which Ms. Roberts appears on the sign in-sheets?  It
19  looks to me like that's what --

20       MR. KING:  I'm not sure.  But, yeah, probably.

21  Q.   (BY MR. MASON)  Yes.  I -- I -- I believe that's the
22  case, too.

23  A.   So I --

24  Q.   We don't have any sign-in sheets for other -- for any
25  days other than the ones Grace Roberts worked.

Page 108

1   A.   Okay.  So you're only seeing a partial representation
2   of the full day then.  You're seeing when she came on the
3   sign-in sheets.  But then the next sheet -- I thi- -- and I
4   don't want to touch any-- -- I know I'm not allowed to touch my
5   computer so I'm not trying to look at the papers myself.  But
6   if memory serves me correctly, like, for that first sheet we
7   looked at, you'll see another sheet.  That first one looks like
8   it went till 3:00 p.m. probably.  'Cause she signed in at 2:55.

9   Yeah, so that --

10  Q.   Right.

11  A.   -- probably went till 3:00.  And then the hostess
12  probably put all that money away and put her sheet in there
13  with it.  And then I bet you she started a new sheet at 3:00
14  that carried over till 7:00, and then she gave that one to the
15  ni- -- so I must have misspoke.  It's from 11:00 to 3:00, one
16  sheet.  At three o'clock they start the new sheet that
17  carries over to the next hostess that comes in for the p.m.
18  shift.

19  Q.   Okay.  That's what I wanted to clar- -- clarify
20  'cause that's what it looked like to me.  Obviously, there --
21  there didn't seem to be any night sign-ins on those first
22  couple of sheets and then if I look at, say, this one from
23  November 1st of 2019, this is a p.m. sheet.

24  A.   Uh-huh.

25  Q.   You can see she's, like, the third person to sign in.

Page 109

1   She signed in at 4:00.

2   A.   At 4:00, so that --

3   Q.   But --

4   A.   So that one started at 3:00, I bet.

5   Q.   Okay.  Yeah, 'cause this seems to go from 3:00
6   through the rest of the -- the evening.  So, yeah, it looks
7   like -- at least at that time, these sheets for Grace Roberts
8   was a separate sheet for the morning sign-in and a different
9   sheet for the evening sign-in?

10  A.   Yes.

11  Q.   Okay.  And since we have touched on it a little bit,
12  I did kind of want to ask about that because -- and as you can
13  see here, the -- there's 22 sign-in sheets all together.

14  A.   Uh-huh.

15  Q.   And these are all of the sheets produced by A.H.D. in
16  the discovery.

17  A.   Okay.

18  Q.   As I mentioned, these only -- only relate to Grace
19  Roberts.

20  A.   Uh-huh.

21  Q.   None of these sheets are for the plaintiff, Lilibeth
22  Gomez.  And there are no sheets that were for a day that Grace
23  Roberts didn't work.  And, again, there's -- there's only 22
24  sheets so is the club saying that in the couple of years that
25  Grace Roberts worked there, she only worked 22 nights -- or

Crystal Cowart
2/17/2022                                    29 (110 - 113)

Page 110

22 --

2    A.    Correct.

3    Q.    -- days?

4    A.    Correct.

5              Do you want to know my process for this?  I can

6 tell you my process.

7    Q.    Sure.

8    A.    Okay.  So obviously, handwritten sheets are not

9 opportune for your administrative staff to keep track for

10 potential litigation like this scenario.  So what I have to do

11 is when these sheets are completed by the hostess, they come to

12 my office, and I have to physically sit and hand enter this

13 into an Excel sheet; so that when I get a claim, I can look in

14 the Excel sheet by her dance name and number -- by any dance

15 name she's ever used and her ID number -- and confirm what days

16 I show that she works.  Then I go into these handwritten

17 sign-in sheets and I physically, with my eyes, to double-check

18 and make sure that I'm not missing anything, re-review all of

19 the sign-in sheets with my eyeballs to make sure I don't see

20 her dance name or number anywhere that I missed.

21    Q.    Okay.  So these are, I believe, the copies of the

22 physical --

23    A.    Uh-huh.

24    Q.    -- dance sheets, right?

25    A.    They are.

Page 111

1    Q.    And you're saying that you also keep the information

2 in an Excel spreadsheet?

3    A.    I have an Excel sheet with her specific days worked.

4 I reviewed that last night, and I, in fact, showed 22 days that

5 she appeared on the sign-in sheets from December 2018 to

6 January 2020, I believe.

7    Q.    Okay.  So just to clarify, are you saying that that

8 Excel spreadsheet was just something you prepared for

9 litigation, or is it something you keep for dancers all the

10 time?

11    A.    No, I prepared this for the litigation.  I go through

12 with my eyes, and I make sure to catch every time she appears

13 on the sheets, and then I type it in for the litigation so that

14 we have an accurate representation.  And I can say with

15 confidence that I take the task extremely seriously because I

16 know -- I know what rides on these kinds of things so I do take

17 my time and I do my due diligence to make sure that I'm giving

18 you guys accurate information to the best of my ability.  So I

19 am confident that she only worked 22 times in the time frame

20 that she was with us.

21    Q.    Okay.  And -- so normally if a dancer is not suing,

22 the only records you would have for that dancer is the physical

23 time sheets?

24    A.    Yes.  And if she gets paid anytime on credit card

25 from a customer, I will have her -- the physical dance -- the

Page 112

1 money voucher, so to speak, where the customer signs so that we

2 have that -- his signature on file in case we have a dispute.

3 So I would have that record as well.

4    Q.    Okay.  How long do you keep these physical records

5 for?

6    A.    About two years.

7    Q.    Is there a process that you go t- -- go through

8 periodically to say, okay, these sheets are more than two years

9 old: we're gonna get rid of them?

10    A.    Yeah, my process is whenever I can swing calling the

11 shred truck to come, I do.  And then I will shred the oldest

12 documents first, obviously, and retain the ones that are less

13 than two years old.

14    Q.    Okay.  How do you store these sheets?  Some type of

15 filing cabinet --

16    A.    In a --

17    Q.    Is there a filing cabinet in the office of the club?

18    A.    No, they come to my office, which is not physically

19 on site with the club.  And I put them in a file folder by

20 month in chronological order from the month and then I put it

21 in a big old box and they come back out if I get notification

22 of a lawsuit.

23    Q.    Okay.  Do these sheets sometimes get lost?

24    A.    No.  That would imply that I lost them.  No, sir.

25    Q.    Not necessarily you, maybe the -- the hostess lost

Page 113

1 them before she gave them to you or something or...

2    A.    No, we're pretty -- we're pretty anal about these

3 sheets for a lot of reasons, one of which being the fact that

4 the hostess's -- the fees collected by the hostess have to --

5 the physical amount of money turned in has to match the amount

6 that she wrote in the fee column.  So we're very, very adamant.

7 Especially as a former hostess, I -- I know this:  That you --

8 your -- your form goes with your money because you don't want

9 to ever be accused of being short money.  You want to be able

10 to explain yourself always.

11    Q.    Okay.  And as I mentioned, you haven't produced any

12 sheets at all for Lilibeth Gomez?

13    A.    But I have it on my list.  Mr. King told me last

14 night I better do it quickly.  So I'm doing it for you.

15    Q.    Okay.  So that -- yeah, that's what I was getting to.

16 You're not contending that Lilibeth Gomez never danced at the

17 club?

18    A.    I would have to go back in and look before I speak on

19 that.  I wouldn't be comfortable answering that right now

20 because I have not done the full research that I explain that I

21 do.  But once I physically go through all these sheets, I'll be

22 able to confidently tell you whether or not I think she worked.

23    Q.    Okay.  Well -- and I wouldn't expect you to know

24 necessarily everything about them, but you can't say for sure

25 right now whether there's even one sheet for her?

Crystal Cowart
2/17/2022                                    30 (114 - 117)

Page 114

1    A.   I have not reviewed -- because we were talking about
2  Grace Roberts, I did not take the time last night to go into
3  any of the things for Ms. Gomez.  But Mr. King told me
4  yesterday that I needed to go in and do this research and get
5  it to him ASAP.
6    Q.   Okay.  Because, yeah, we did request these in
7  discovery for both of them a while back.  This is not just
8  something for the deposition.  We'd asked the club to turn over
9  all of their records for both Roberts and Gomez when we sent
10 our discovery request, which was -- I don't know offhand now,
11 but I want to say at least November of last year, if not before
12 that.
13   A.   I mean, if you want to approve me to look in my file
14 real quick, I can tell you what date I have her agreement for.
15   Q.   That -- that's all right.  I don't think we need to
16 do that.  I'm not sure your lawyer would necessarily want you
17 to do that on the spot right now.  But, yes, I -- I would ask
18 that you supplement your records that you produce with --
19 anything that you have for Ms. Gomez as well.
20   A.   100 percent.  And --
21        MR. KING:  We'll (Zoom lag).
22   A.   -- that would be done ASAP.
23        MR. MASON:  Okay.
24        I'm sorry, I didn't hear what you said, Will.
25        MR. KING:  I said we'll supplement.

Page 115

1        MR. MASON:  Okay.  Thank you.
2        THE WITNESS:  Sorry.  That's -- that's my fault.
3  If you guys requested it, and I didn't turn it over to Will,
4  that is my fault and it would be --
5        MR. KING:  No problem.
6        THE WITNESS:  -- fixed immediately.
7    Q.   (BY MR. MASON)  Okay.  Back to this 'cause this was a
8  little bit of a side track for me.
9        Let's talk about the music at the club.  The
10 club charges a house fee to -- lease this space.
11       Is that fee also intended clubber -- to cover
12 amenities provided by the club such as music?
13   A.   I don't know.  I know that we pay for the appropriate
14 licensing to -- for the rights to be able to play the music,
15 but I don't -- I've never specifically heard a breakdown of
16 what the floor fee is used for.
17   Q.   Okay.  And maybe it's not something that's listed in
18 the accounting, but, generally, a dancer who pays a fee comes
19 to dance expects there to be music available, right?
20   A.   Yes.
21   Q.   Okay.  Is there any separate charge for music?
22   A.   No.
23   Q.   Okay.  Is the dancer expected to tip the DJ to play
24 music?
25   A.   No.

Page 116

1    Q.   Is it common practice for the dancers to tip the DJs?
2    A.   It's not unheard of.  There are some girls that they
3  just -- you know, when they go on stage, they give the ones to
4  the DJ because that's what they like to do.  Then there are
5  other girls that go on stage, and they keep every dollar for
6  themselves.  It's really their choice.
7    Q.   Has a DJ ever come to you, or one of managers, and
8  said, hey, this girl's not tipping me?
9    A.   I wish.  No.  No, 'cause he would not like the
10 response he got.
11   Q.   Okay.  And that response would basically be you're
12 not --
13   A.   That is --
14   Q.   -- entitled --
15   A.   -- you're --
16   Q.   -- not to a tip?
17   A.   Exactly.  You're not entitled to it so if I hear
18 another word out of your mouth or anybody else's about tipping,
19 we're gonna have a serious issue.  We don't shake the girls
20 down.  That's not okay.
21   Q.   Okay.  Okay.  What about the lighting system?  Is
22 that part of what the clubs are providing to the girls to do
23 their dances?
24   A.   We do have lighting around the stage, and it does
25 shine different colors and the girls will -- some girls only

Page 117

1  want to dance under pink light.  Some only want to dance under
2  blue, which whatever they feel the most confident under, they
3  can -- by all means, whatever color you want.
4    Q.   Okay.  So -- but girls do tend to believe that that
5  enhances their performance.
6    A.   Absolutely would look better under pink light.
7    Q.   Okay.  And maybe they feel they make more money if
8  they have the right lighting; is that right?
9    A.   Exactly.
10   Q.   Okay.
11   A.   And a lot of times, going on stage is -- in addition
12 to making the money up there, it's also good advertisement for
13 the girls because they're on the stage so they're s- -- the
14 center -- main -- you know, front row center.
15   Q.   Uh-huh.
16   A.   And guys will see her on stage, and then when she
17 gets off stage, go over to her and say, hey, could I get some
18 dances?  Would you like to go to the VIP?  I saw you on stage,
19 so...
20   Q.   Okay.  So dancing on stage is a way for the girls to
21 promote themselves to the customers?
22   A.   It would definitely be a good way to be seen.
23   Q.   Okay.  So based on your earlier answer, I'm guessing
24 you would say that you -- you're not sure if the dancers are
25 paying part of that house fee for the privilege of using the

Crystal Cowart
2/17/2022                                    31 (118 - 121)

Page 118

1  lights?

2  A.   Right.

3  Q.   Okay.  But it wouldn't be helpful if the dancers had

4  to perform in the dark, right?  There's got to be some kind of

5  lighting?

6  A.   Correct.

7  Q.   Okay.

8  A.   Although the power has gone out one time, and --

9  Q.   Uh-huh.

10  A.   -- the girl on stage continued to perform.  She just

11  turned the music on on her cell phone.  So we have some

12  dedicated dancers.

13  Q.   Okay.  Fair enough.

14        Just one second.  I thought I was done with

15  this, but -- so I just wanted to point out:  One of the other

16  policies -- and, again, you know, this may not be in effect any

17  longer.  You can -- you can tell me.

18        But policy No. 30 said that the club is not a

19  collection agency for the dancers.  All income claimed from

20  disputed credit card tabs and checks will be paid by the dancer

21  to the club until such time as the dispute has been resolved

22  but is not responsible for taking any further action.

23        Is that -- is that a policy that the club had?

24  A.   Yes, it is.  So, number one, I handle the disputes.

25  Q.   Okay.

Page 119

1  A.   And the way that this reads:  All income claimed from

2  disputed credit card tabs and checks will be paid by the dancer to

3  the club until such time as the dispute has been resolved.

4        That is not an accurate statement.  I do not

5  process my disputes that way.  The only time we go to a dancer

6  and ask that funds be repaid would be in the event that the tab

7  was fully charged back; meaning from our bank account, the

8  credit card company came in and deducted the subtotal of the

9  tab, and then we were told by the credit card company we have

10  no further recourse.  At which point, we're fully on the money

11  that -- for -- you know, that the dancer was paid so we would

12  go to her and request that she return the funds.

13        If she -- we had occasions where the girl simply

14  told us, I -- I can't afford it.  I'm not going to return it,

15  and I'll pay you over time.

16        And they paid $20 a month forever, and that's

17  fine.  It's just a matter of needing to recoup the lost funds.

18  But only in the event that it's a final chargeback, and I have

19  no way to continue to fight it.

20  Q.   Okay.  So basically you give the money to the dancers

21  and when the transaction happens at night or whatever.

22  A.   Uh-huh.

23  Q.   And only ask for the money back if the credit card

24  company charges you the money and you have no choice but to pay

25  them back, essentially?

Page 120

1  A.   Correct.

2  Q.   So if a customer pays with a credit card, would you

3  say that Centerfolds serves as a middleman between the customer

4  and the dancer?

5  A.   No.  Well -- no, Centerfolds is providing service to

6  the customer at that point by allowing him to process the

7  charges for the dancer through our credit card system.

8  Q.   Okay.  But, I mean, it -- you're kind of a middleman

9  in the sense that the customer is essentially paying the club

10  and then the club turns around and pays the dancer?

11  A.   Yes.  Yeah, you're right.

12  Q.   And Centerfolds charges their 25 percent fee but the

13  rest of that money belongs to the dancer; is that correct?

14  A.   Correct.

15  Q.   Okay.  We've already answered that one.

16        And just to clarify 'cause you -- you did

17  mention that, you know, if the club has to pay the money back,

18  you will ask the dancer to pay the club back.  Now -- and you

19  may give them time to do it, but you do ask the dancer to pay

20  the money back to the club, correct?

21  A.   Yes.

22  Q.   Eventually?

23  A.   Unless -- unless -- there is one catch; one caveat to

24  that.  Sometimes when I receive a dispute, it is not a dispute

25  for fraud or something that relates back to the dancer.  It

Page 121

1  could be a POS, the -- the -- the pro-- -- our actual computer

2  system.  Sometimes there's an error in communications from our

3  computer to the bank's computer, and that causes a chargeback.

4  If it's not -- if the chargeback is a result of a claim from

5  the customer of the dancer having failed to do her part or

6  whatever the agreement that they made was, that's one thing.

7  If it's -- if the tab went bad for something that was out of

8  her control like our computer not communicating, I'm not gonna

9  go to her and ask her to return those funds.  That's not right.

10  Q.   Okay.  So the -- in that situation, the club would,

11  essentially, eat the loss?

12  A.   Exactly.

13  Q.   Okay.  Let's talk for a moment about marketing.

14        How does the club promote its business?

15  A.   It really doesn't.

16  Q.   Well, I'm sure there are some things like -- well, if

17  nothing else, you have a sign, right?

18  A.   Okay.  Yes, we do have the sign on the building.  I

19  believe there is a -- at one time there was a Facebook page.  I

20  don't know if it's still up and active, but other than that, we

21  don't do billboards.  Back 20 years ago, we used to do the ads

22  on the back of taxi cabs, but obviously those don't exist

23  anymore.  So really -- you're right, the sign, and if there's

24  still a Facebook, that would be the only thing they do.

25  Q.   Okay.  And I -- I do believe the Facebook -- I'm not

Crystal Cowart
2/17/2022                              32 (122 - 125)

Page 122

1  gon- -- I'm not gonna bother to search it up right now.  But I
2  do believe there was a Facebook page disclosed in your
3  responses.
4            The -- Centerfolds doesn't have a Web site?
5     A.  I've never looked.  I know at one time, we had one
6  that was called Jack Pot Club or something like that.  But I
7  assume we have a Web site.  Who doesn't have a Web site in
8  2022?
9     Q.  Exactly.  That's -- I -- that kind of surprised me
10 when you said that.  In fact, you know -- just to correct...
11    A.  I figured you were checking.  I was like, I'm --
12    Q.  Yeah.
13    A.  -- not allowed to check.  I know you'll check.
14    Q.  It's fine.  Just, you know -- just so you know, I
15 will -- so yeah, there is --
16    A.  Okay.  So yes, we --
17    Q.  Centerfolds Houston.  It says, like us on Facebook.
18 So I'm assuming you still have a --
19    A.  Yes.
20    Q.  -- Facebook page as well?
21    A.  And we do have happy hour, look.
22    Q.  Yeah.  I was gonna say, yeah, it looks like you do
23 have a happy hour special till 9:00 p.m.
24    A.  That's great.  Awesome.
25    Q.  So that's interesting.  Obviously, somebody handles

Page 123

1  this, but it doesn't sound like it's -- you're the person
2  who's --
3     A.  No.
4     Q.  -- running it?
5     A.  I don't handle the marketing aspect of it.  What's
6  that company called?  Company that I last heard did it was
7  called Global Real World Corporation [sic].
8     Q.  Okay.  So there's some company that the -- that
9  Centerfolds has a deal with to do your marketing.  I'm assuming
10 mostly online marketing, it looks like?
11    A.  Uh-huh.
12    Q.  Okay.  Who at Centerfolds is in charge of monitoring
13 that or arranging for that?
14    A.  I don't know.  Somebody had to set it up, obviously,
15 but I'm not a hundred percent sure who chose the company or
16 oversees that.  I -- probably the management.  Most likely, I
17 would assume Thomas, but I hate to point the finger at Thomas
18 through the whole deposition.
19    Q.  Okay.  Fair enough.
20           So the managers have their discretion to -- to
21 do that?
22    A.  Yes.
23    Q.  And Thomas, or one of the other managers, would have
24 the authority to spend club money on things like that?
25    A.  I think so.  Yes, a reasonable...

Page 124

1     Q.  Okay.  Do you leave that to the manager's discretion
2  to have happy hour promotions or anything like that?
3     A.  Yes.  Clearly, since I wasn't aware we had one.
4     Q.  Yeah, that's -- that's -- that's kind of why I asked.
5  Some- -- somebody made that decision.  Did --
6     A.  So -- right.  Right.
7     Q.  -- didn't -- didn't tell you about it.
8     A.  But that's good.  That's good that -- that we have a
9  happy hour.  I think it helps generate more business for the
10 girl.
11    Q.  Okay.
12           Do you know of whether either of the plaintiffs,
13 Ms. Roberts or Ms. Gomez, have any sort of advertising of their
14 own promoting themselves at Centerfolds?
15    A.  I don't know.
16    Q.  Have you ever known of any dancer that has any sort
17 of advertising?
18    A.  Oh, yes.  OnlyFans is really big these days.  They
19 have Instagram, Facebook -- I don't know.  I don't know the
20 social media.  Twitter.  Whatever -- whatever the kids are
21 using these days.  I know that they do -- like, my best friend;
22 she's a dancer, and I know that she has found a lot of success
23 with having her photos up on OnlyFans and then meeting people
24 on -- online and then having them come visit her at the club.
25    Q.  Okay.  Do you know what sort of promotions work best

Page 125

1  in this industry to attract paying customers?
2     A.  I'm gonna say this and it's gonna sound terrible, but
3  realistically, we don't need to promote.  If you are here in
4  the city of Houston, you know that we have some of the best
5  gentlemen's clubs in the country; some of the most beautiful
6  women you're gonna find.  I don't need to promote to you to
7  come in.  You're gonna come in if that's what you're looking
8  for.
9     Q.  Okay.  So you feel like you get enough business
10 without going out of your way to promote the club?
11    A.  Yes.  We -- we do a good business.
12    Q.  Okay.  Have you ever researched advertising or
13 thought about doing more advertising for the club?
14    A.  It's a tough one with respect to the gentlemen's
15 clubs because we tried to billboard years ago, and the
16 neighborhood near the billboard threw a fit because they didn't
17 want our type of a- -- business advertising in their area.  You
18 can't go pass out -- like, you can't go to a convention and
19 pass out the business cards because you'll get thrown out
20 because you're from a sexually oriented business -- get out.
21 So in all reality, it -- it -- it's difficult to be able to
22 market because of the nature of what we do.  But on th- -- on
23 the contrary of that, we -- I truly don't feel like we need it.
24    Q.  Okay.  Let's talk about the attire the dancers wear.
25           Are the dancers allowed to wear basically

Crystal Cowart
2/17/2022                           33 (126 - 129)

Page 126

1  whatever they want?
2       A.   They can wear whatever they like as long as --
3  there's certain parts of the body that have to be covered.
4  It's in the -- I think it's in one of the parts of the license
5  and access agreement.  It's part of the city law.  I think your
6  genitals have to be covered.  So they wear their thong, but
7  other than that, they can wear whatever they like.
8       Q.   They can wear more?
9       A.   More or less.  I mean, not -- no less than the thong,
10 but they can wear -- you know, some girls choose to operate
11 strictly in their thong and that's it, and they run around that
12 way all night.  My mom, when she was a dancer, felt the
13 opposite.  She would always wear a full long dress because she
14 felt like running around half naked just let the customer see
15 it without having to pay for it.  So she always felt like she
16 was gonna wear something long so that they had to pay to see
17 more.  So it -- I mean, again, it goes to their preference.
18      Q.   Okay.  So if a dancer came in and wanted to wear
19 jeans while she was walking around the club and then take it
20 off if she goes on stage or for a dance, that's okay?
21      A.   Yeah, that's fine.
22      Q.   If she wanted to wear flats instead of high heels,
23 that's okay?
24      A.   Yes.
25      Q.   Okay.  Is there any limitation on -- would they be

Page 127

1  allowed to -- to use glitter?
2       A.   Sure.
3       Q.   Okay.  I wasn't sure if that would be a -- clean-up
4  problem for the club?
5       A.   You -- you read my mind.  I was like, I don't know if
6  you want to do a body slide on a customer covered in glitter,
7  but you're welcome to do it.
8       Q.   Okay.  Centerfolds is in control of the furniture for
9  the club; is that right?
10      A.   Yes.
11      Q.   Are there any -- the way club is laid out, are
12 the dancers required to do lap dances or table dances in a
13 particular area?
14      A.   No.  Anywhere in the -- in the building.
15      Q.   Okay.  Let's talk about the company's investment.
16      Do you -- well, this is gonna be a little hard
17 com- -- based on what we just talked about.
18      Do you know how much the club spends on
19 marketing?  I mean, there must be some money spent on these
20 Facebook pages or whatever.
21      A.   I don't know an exact amount, but, yes, I agree that
22 some amount of money is going out for the -- the Facebook
23 marketing.
24      Q.   Okay.  Do you have a rough idea how much per month,
25 say, the club has spent on marketing?

Page 128

1       A.   I have no idea.
2       Q.   Are you generally familiar with the -- the club's
3  expenses and...
4       A.   To an extent, yes.
5       Q.   So, for instance, would you know how much the club
6  spends on rent or lease?  Assuming --
7       A.   Well, I know --
8       Q.   -- they don't actually own the building outright?
9       A.   No.  I know that we pay rent, but I don't know how
10 much.
11      Q.   Sure this is gonna be in there somewhere, but I want
12 to jump to it now.
13      Is there -- do you have an accountant or a CPA
14 who keeps track of all your expenses?
15      A.   I keep track of the bills that I pay like the liquor
16 and the food bill, you know, ca- -- the goods that we sell.
17 But other than that, there's some man named Luther that they
18 say does our taxes, but I try not to involve myself in it.
19      Q.   Okay.  But it sounds like he just does the taxes.  He
20 doesn't prepare monthly or quarterly reports on profitability
21 or...
22      A.   Oh, no.  Huh-uh.
23      Q.   Okay.  Is there anybody at Centerfolds who does keep
24 track of revenue and expenses other than yourself?
25      A.   No.  I keep track of -- just for my check so that I

Page 129

1  know what I'm writing in checks and stuff.  But I've really
2  never -- I've never known this company to be super concerned, I
3  guess, for the lack of a better way to put it, with the
4  expenses and -- and that kind of stuff.
5       Q.   You make enough money, you don't have to really worry
6  about it?
7       A.   Yeah, exactly.  When you got that much money, I guess
8  it doesn't matter.
9       Q.   Okay.  Fair enough.
10      Do you have any idea how much the club spends on
11 food per month?
12      A.   Maybe 6- to 10,000.
13      Q.   Okay.  And I apologize, I did want to ask another
14 question about the rent.
15      You said you know the club does pay rent; is
16 that --
17      A.   Yes.
18      Q.   -- correct?
19      A.   Uh-huh.
20      Q.   Okay.  Do you sign the -- the checks for the rent?
21      A.   No.
22      Q.   Who -- who does?
23      A.   I guess the owners.  No, wait.  It pays rent to
24 D. Texas Investments so I -- I don't know that we even write
25 checks.  I don't know.  I'd have to look into that.

Crystal Cowart
2/17/2022                                    34 (130 - 133)

Page 130

1    Q.   Okay.  Yeah, I assume -- I mean, there's got to be
2  somebody who makes sure that the rent is getting paid each
3  month, right?
4    A.   Since there -- I mean, yes, in theory, there should
5  be somebody paying attention to that, but it's never been
6  tasked to me.  So I'm not a hundred percent sure who does it.
7  Maybe Luther does it.  Maybe he calculates that in at the end
8  of the year when he's doing all the numbers.
9    Q.   Okay.  So do you know how that money gets paid?
10   A.   No.  I just know that I've heard it mentioned before
11 that we pay rent.  Because I wondered one time if we owned the
12 property and I know that we don't own it.  So obviously we'd
13 have to pay rent if we don't own it, right?
14   Q.   Right.  Okay.  Do you know how much the club spends
15 per month on alcohol?
16   A.   I'd say probably 35- to 50,000.  May- -- maybe less.
17 Maybe 25.
18   Q.   Are you the one who pays your suppliers for alcohol?
19   A.   Yes.  But I didn't see any of that listed on the
20 deposition notice or I would have gone through and pulled
21 exactly specifically what numbers you wanted.
22   Q.   Okay.  I don't recall for sure off the top of my head
23 on this one.  I know, typically, our deposition topics list,
24 you know, the ones with knowledge of the expenses and
25 investments of the club.  But -- and it sounds like you're the

Page 131

1  right person.  You just didn't study this test, basically; is
2  that right?
3    A.   Exactly.
4         MR. KING:  Objection.  Form.
5    A.   The last time I didn't study --
6         MR. KING:  The topic is the inve- -- hold on.
7  The topic is the investment made by defendants towards this
8  business, which is an ultra-broad topic.  If there's some
9  specific area of inquiry that you're interested in, we'd be
10 happy to, you know, answer an interrogatory or present
11 Ms. Cowart again if -- if so needed.
12        MR. MASON:  Okay.  Fair enough.
13   Q.   (BY MR. MASON)  Do you know how much the club spends
14 approximately per month on electricity?
15   A.   No.
16   Q.   Do you get a bill for that, I assume?  For
17 electricity?
18   A.   Yes.  But, again, it's on autopay so if -- if you
19 need me to get the information, I can get it for you, and we
20 can come back or answer it in writing or whatever you want.
21   Q.   Okay.  Yeah, we may send some additional dist- --
22 discovery requests, but we won't have to worry about that
23 today.
24        Does the club have cable or satellite TV?
25   A.   Yes.

Page 132

1    Q.   Okay.  Do you know how much the club pays for that?
2    A.   No.
3    Q.   What about property taxes?  Do you know how much the
4  club pays annually in property taxes?
5    A.   No.  We have a company that handles that.
6    Q.   What about professional fees?  Do you have -- know
7  how much the club pays for attorneys, CPAs, etcetera, on a
8  monthly basis?
9    A.   I could get that information.
10   Q.   Okay.  What about for licenses like the alcohol
11 license?  Sexually oriented business license?
12   A.   Those are yearly.  I know that much, but I don't know
13 how much we pay for them.
14   Q.   What about payroll for, like, the wait staff,
15 bartenders, security?  Do you have any idea how --
16   A.   For, like, a month?
17   Q.   Yeah.
18   A.   I have no idea.
19   Q.   Do you have any idea what the total overhead per
20 month for the club is?
21   A.   No.
22   Q.   Do you have an idea of how much a typical entertainer
23 would have to spend to do her job?
24   A.   (Zoom lag) for her house fee, right?
25   Q.   Well, no, and other things like, for instance --

Page 133

1  would you have an estimate of how much a dancer typically
2  spends on makeup?
3    A.   Oh, no.  Some girls don't wear makeup at all.  Some
4  are all natural.
5    Q.   Gonna kind of skip it a little bit.  But so basically
6  you -- you have no idea how much a dancer typically spends on
7  her job -- on her dancing?
8    A.   Not specifically.  I mean, I could tell you my mom.
9  She did her hair, her nails, her makeup, her clothes.  And, I
10 mean, I don't think it was super expensive, but I also don't
11 think it was super cheap either.
12   Q.   Maybe 500 to a thousand a month?
13        MR. KING:  Objection.  Form.
14   Q.   (BY MR. MASON)  Give or take.
15   A.   I don't know.
16   Q.   Okay.  Would you agree that the club spends a lot
17 more per month than any one dancer?
18   A.   For marketing or --
19   Q.   Just in general.  Yeah, if you take -- if you add up
20 everything the club spends per month, that's more than what a
21 dancer would spend per month?
22   A.   Yes.
23   Q.   I mean, 'cause the one thing that -- or one of the
24 couple things we did talk about, if we say $25,000 per month on
25 alcohol and 6- to 10,000 on food; that's -- that's far more

Crystal Cowart
2/17/2022                                    35 (134 - 137)

Page 134

1  than any --

2  A.  Yes.

3  Q.  -- dancer spends.  Probably far more than they're

4  making per month.

5  A.  I don't know.

6  Q.  Do you think --

7  A.  I don't know.  Some of these girls make more -- they

8  make good money.

9  Q.  As much as 25,000 or more per month?

10  A.  I've got girls that on a yearly basis make

11  7-, $800,000.

12  Q.  Wow.

13  A.  Uh-huh.

14  Q.  Do you have any idea what the total revenue for the

15  club is?

16  A.  I know I saw that answer in one of our responses, and

17  it was:  We produce -- we gross in excess of 500,000 per month.

18  Q.  Okay.  Let's -- just satisfying the legal requirement

19  for an enterprise.  It could be quite a bit more than that;

20  is -- is -- is that true?

21  A.  That, I don't know, but I can find out for you.

22  MR. KING:  Let's -- could we just stipulate that

23  it's the enterprise and that the (Zoom lag)?

24  MR. MASON:  Okay.  Yeah, I mean, that's --

25  that's not what I was getting to.  It's -- I mean, obviously

Page 135

1  you've already answered that part.  I just kind of wanted to

2  see if I could get a estimate of the -- the total annual

3  revenue.

4  All right.  Let's talk a little bit about the

5  dancer's opportunity for profit or loss.

6  Q.  (BY MR. MASON)  You will agree that profit means the

7  difference between what someone collects and what they pay out

8  in expenses, correct?

9  A.  Okay.

10  Q.  Obviously that can vary quite a bit for these -- for

11  the dancers.  You're saying some dancers make hundreds of

12  thousands of dollars a year.  Okay.

13  And as far as the expenses for the dancers, that

14  would include the house fees that they -- the dancers pay to

15  the club, correct?

16  A.  I would think so, yes.

17  Q.  And Centerfolds created that schedule of payments for

18  house fees, correct?

19  A.  I did.  Well -- so, yes.  Technically, Centerfolds,

20  yeah.

21  Q.  And if a lady wants to work at Centerfolds, she's

22  refi-- -- required to follow that schedule of house fees --

23  A.  Yes.

24  Q.  -- basically.  House fees according to the schedule?

25  Okay.  Those fees apply equally to everyone?

Page 136

1  A.  Yes.

2  Q.  Okay.  So you -- you don't charge more for some girls

3  and less for other girls?

4  A.  Only based on the time that they come in.

5  Q.  Okay.

6  A.  Other than that, no.

7  Q.  Do dancers ever get to negotiate those rates?

8  A.  I have dancers that come in and they don't have the

9  money for whatever reason, and we'll let them sign in and work.

10  And when they make the money, they can bring it back and pay

11  their floor fee.  Sometimes that same girl that you extend the

12  courtesy of allowing her to work without having the money up

13  front, won't come back and pay it at all.

14  And you just have to ask her the next time you

15  see her, hey, girl, would you mind taking care of that floor

16  fee you missed the other day?  I don't want to get in trouble.

17  And hope for the best that she'll be honest

18  and -- and take care of what she owes.

19  Q.  Okay.  But you generally expect the dancers to pay

20  the fee at some point?

21  A.  Yes.

22  Q.  Okay.  Let me ask about that, too.

23  If -- so if a dancer comes in and she says,

24  look, I'm just totally broke right now.  Let me pay you later.

25  I don't have the house fee, but, you know, I can make it

Page 137

1  tonight and then I can pay you later, who is responsible for

2  keeping track of that?  Is that the door host or is --

3  A.  Yes.

4  Q.  Okay.  So, basically, does the door host have to pay

5  that fee to the club and then try to get it back from the

6  dancer or...

7  A.  No.  We would just leave the little fee box next to

8  her name on the sign-in sheet that you saw --

9  Q.  Uh-huh.

10  A.  -- we would just leave it blank, and when she comes

11  back and pays it, we'll write in how much she paid.  If she

12  doesn't come back and pay then we have to write out a little

13  ticket saying her dance name and her number and the amount that

14  wasn't paid.  That way, when we turn our money in, we're not

15  shorted the amount of her -- the floor fee that should have

16  been there.

17  Q.  Okay.  You said "when we turn our money in."

18  A.  Well, as the hostess.

19  Q.  Okay.  I was gonna say you're --

20  A.  My brain goes back --

21  Q.  -- that's not something you -- sorry, I didn't

22  mean --

23  A.  The hostess --

24  Q.  -- to interrupt.

25  A.  -- would need to make sure that she accounts for all

Compass Reporting Group
(844) 817-1080

Crystal Cowart
2/17/2022

36 (138 - 141)

Page 138

1  of that.

2    **Q.**   Okay.  So yeah, it's not something that you do in

3  your present job?

4    **A.**   No.

5    **Q.**   So to work at Centerfolds as an entertainer, does a

6  dancer need to have any kind of dance training or experience?

7    **A.**   No.

8    **Q.**   Does it help if they say, hello, I have, you know,

9  five years of jazz and, you know, tap dance experience?

10   **A.**   For, like, entertainment, it might help, but other

11  than that, no, it's not gonna affect their ability to make

12  money.

13   **Q.**   Okay.

14   **A.**   I want a tap dancing dancer now.  Thank you.  I'm

15  gonna -- I'm gonna find one.

16   **Q.**   You never know.  The customers might like that.

17   **A.**   We had one guy that would come in and he would pay

18  the girls strictly to reenact scenes from Peter Pan.  That was

19  it.  Never a dance.  Never nothing.  He just wanted her to

20  reenact the scenes.

21   **Q.**   Okay.  Well, who knows, maybe you have a opportunity

22  to turn it into sort of a dinner theater.

23   **A.**   There we go.

24   **Q.**   Seminole dinner theater.

25        Okay.  Does -- so everything -- you kind of

Page 139

1  said this earlier, I believe, but let me just ask it.  You --

2  if a dancer meets all of the qualifications, passes the

3  background check, you're not turning away dancers 'cause you

4  have too many; is that right?

5    **A.**   No.  You can never have too many dancers.

6    **Q.**   Okay.  Other than the background check, is there any

7  requirements, like, I assume -- do the dancers have to be

8  female?

9    **A.**   They are all, at least to my knowledge, female.  I've

10  never had a guy come in and apply.  I don't even know how that

11  would work.

12   **Q.**   Okay.

13   **A.**   I would definitely be very careful because I didn't

14  want to get sued.  I can tell you that much.  If a man walked

15  in and applied to be a dancer, I would really be very careful.

16   **Q.**   You'd probably have a conversation with Mr. King?

17   **A.**   I'd be calling Mr. Wallace, what do I do?

18   **Q.**   Okay.  Fair enough.  That -- that wasn't where I was

19  going with that at all.  But it's interesting to think about.

20  And, you know, of course, I don't know if there could be a

21  situation where a transgender person comes in and wants to

22  dance.  I don't know how that would work, but I'm -- I'm not a

23  discrimination lawyer so I'm not really -- I'm not here to ask

24  you questions about that.

25        Do the dancers have to be 18 or 21 to work at

Page 140

1  the club?

2    **A.**   18 but I know that there has been a lot of back and

3  forth with respect to certain legislation in the last year that

4  was pressing to make it to where the dancers could only -- they

5  had to go 21 and up.

6    **Q.**   Uh-huh.

7    **A.**   But I know that there was some challenges against

8  that so, currently, I think we're back to 18 and up for now

9  while it's being heard in some court somewhere.

10        MR. KING:  No, it's --

11   **Q.**   (BY MR. MASON)  Okay.

12        BY MR. KING:  -- still 21.

13        THE WITNESS:  It's 21 now?

14        MR. KING:  Yeah.

15        THE WITNESS:  You should have tried harder,

16  Will.

17        MR. KING:  I'll tell you off the record.

18   **Q.**   (BY MR. MASON)  Okay.  Fair -- fair enough.  Yeah, I

19  ki -- well, as I said, I wasn't sure about that myself.  But

20  I -- I thought there was some kind of requirement that people

21  working around alcohol had to be 21.

22        Anyways, that's neither here nor there.  That's

23  not a question.

24        Does a dancer's attitude matter?

25   **A.**   No.

Page 141

1    **Q.**   Okay.  So if they come in and just seem like they're

2  kind of lazy or surly or something like that, that's still

3  okay?

4    **A.**   That's up to them.  Some guys like it.

5    **Q.**   Okay.  And you said earlier that appearance is not

6  really a factor?

7    **A.**   No.

8    **Q.**   Prior work experience is not a factor.  Okay.

9        What would you say is the average amount of time

10  the dancer works for the club?  Like, not per night, but I

11  mean, do they work for a few weeks or for years or -- what --

12  what's kind of average?

13   **A.**   It's really a split.  You got the girls that come in

14  for a few weeks, maybe a month or two, and then we don't see

15  them again.  Then you've got the girls that have been dancers

16  as long as I've been in the business, and they've been dancers

17  at Centerfolds that whole time.  Now, granted, they can work

18  anywhere they want.  They could go to other clubs if they want,

19  but they choose to make Centerfolds their home.

20   **Q.**   Okay.  So some dancers do work there for years and

21  years, right?

22   **A.**   Yes.

23   **Q.**   In fact, I could be confused, but I think -- now, for

24  the purposes of this lawsuit, you know, we're only covering a

25  certain period, but -- covering a three-year period, but I

Crystal Cowart
2/17/2022

37 (142 - 145)

Page 142

1  believe Ms. Roberts said that she has kind of worked there on
2  and off for about 20 years.
3      A.   I would believe it 'cause we looked at -- earlier,
4  remember, we looked at the packet from 2014.  So I know for
5  sure she's worked there at least with -- from '14 to present.
6      Q.   Okay.
7      A.   I don't have any records from prior '14 for her, but
8  maybe she's mistaken on how long or maybe it was a different
9  club.
10     Q.   It -- it's -- it's possible.  But, yeah, I mean she
11 is currently, I believe, in her forties, and she said she was
12 working there since she was in her twenties.  So -- but, you
13 know, not necessarily consistently -- with -- at that time.
14          Do you know Grace Roberts?  Have you, like, seen
15 her in person?  Talked --
16     A.   No.
17     Q.   --to her?  Okay.
18          And you mentioned that some girls, they may show
19 up once or twice or for a week or two and then never come back;
20 is that right?
21     A.   Uh-huh.  Yes.  And some girls travel.  There's a
22 circuit of that.  Girls that like to specifically travel and go
23 to all the cities where the large sporting events are, and
24 they'll go and stay for a week or two, get hired on, and --
25 follow the trend, the -- events, or the conferences, stuff

Page 143

1  like that.
2      Q.   Okay.  You mentioned a minute ago, there was kind of
3  a split.  So you have some that work for a very short time.
4  Some work for a very long time.
5          Would you say that if a dancer gets beyond a
6  certain amount, they tend to go for a longer period of time?
7  In other words, there are more that are really short and really
8  long and not that many that are, say, six months or eight
9  months or a year?
10     A.   No, we have those, too.
11     Q.   So it -- it's just a full spectrum.
12     A.   It re- -- it really is a full -- the full spectrum of
13 people.
14     Q.   Okay.  And so as far as Grace Roberts, the only thing
15 you know about how long she's worked at the club is she's
16 worked there at least since 2014 because that's what was in her
17 packet; is that accurate?
18     A.   Correct.  That's what I show as her original hire
19 date.
20     Q.   Okay.  Hold on.  We rehashed too much, but I think
21 this is -- at least one more question here.
22          So, yeah, I don't know if that -- would you
23 agree that the dancers are very important for the club's
24 business?
25          MR. KING:  Objection.  Form.

Page 144

1      A.   I would say they are top three.  Food, drinks,
2  dancers; that's what makes the business.
3      Q.   (BY MR. MASON)  Okay.  But you can't really have a
4  strip club if you didn't have strippers, can you?
5      A.   I guess that would make us a bar if we didn't have
6  dancers, yeah.
7      Q.   So then it is essential to your business model to
8  have strippers -- to have dancers?
9      A.   I mean, we could -- if the dancers for some reason
10 disappeared tomorrow, we could adjust and have it be more
11 towards beautiful servers, for example, I guess, but it --
12     Q.   Like maybe a --
13     A.   -- would be -- it wouldn't be easy.
14     Q.   Like maybe a Hooters or a Bombshells or --
15     A.   Exactly.  Something like that.  But still -- then
16 we're still not a gentlemen's club like we were originally.
17     Q.   Right.  So that -- that would be basically a
18 different kind of business?
19     A.   Exactly.  So yeah.
20     Q.   Okay.  Walk me through a typical work shift for a
21 dancer.
22     A.   I mean, they come in the front door.  They're gonna
23 stop at the desk.  They're gonna sign in with the hostess.
24 They'll pay their floor fee if they have it with them or not,
25 if they don't.  Probably head to the dressing room and change

Page 145

1  from what they were wearing before they arrived to what they
2  want to work in.
3          But some girls come in dressed in what they plan
4  on working in.  It's just literally a matter of preference.
5  Once they do -- once they're changed or not changed or
6  whatever, they'll get on the floor and they'll start.  Either
7  they'll sit down on the floor -- like, in a booth and start
8  playing on their phones and wait for a guy to walk up to them
9  or they'll circulate and try to visit with people and see if
10 people want company or they'll hit the stage.  Every girl has
11 their different process for what they -- how they like to start
12 their -- their day or night.
13     Q.   Okay.  You mentioned the stage.  Are all of the times
14 on the stage assigned to particular girls, or is it -- they can
15 kind of go up if they want to, if there's nobody else dancing?
16     A.   Yeah, exactly.  If they want to go up -- even if
17 there is somebody else on stage -- obviously we're not gonna
18 pull that girl off stage, but say I feel like going on stage
19 right now, I go to the DJ and say, hey, if you -- you know,
20 when you have a spot, put me up.  And then you get to go up
21 whenever you want or vice verse, if you're busy and the DJ
22 calls your name, all you have to do is let him know, hey, I'm
23 busy.  I -- I'll go up later.  And that's fine, too.
24     Q.   So how does the DJ determine who to call?  Do they
25 have, like, a list?

Crystal Cowart
2/17/2022                                    38 (146 - 149)

Page 146

1    A.   I make -- or not me.  I keep going back to the
2    hostess.  The hostess makes a list of all the girls has
3    signed in for the DJ.  And then the DJ will either call them
4    over the microphone or -- most of the time, the girls know or
5    chose when they get -- once they're done getting ready, they'll
6    go and tell the DJ, hey, I'm here.  Put me up whenever you're
7    ready.
8              Because, like I said earlier, it's like an
9    advertisement for the girls.  They want to get up and be seen
10   as soon as they hit the floor so that the customers will come
11   get them and they can make a bunch of money.
12   Q.   Okay.  Does the DJ make sort of a -- a set list,
13   essentially?  Okay, I'm gonna call this dancer, then I'm gonna
14   call that dancer, then I'm gonna call this dancer.
15   A.   No.  He usually just runs through his list.  And it's
16   basically in the order in which they feel like going on stage
17   as far as the girls.  Because some girls might get there with
18   no hair and makeup done but want to get full hair and makeup
19   done so they spend two or three hours after they've arrived
20   getting ready.  So we're not gonna harass her while she's
21   trying to get ready to go on stage.  That would just put her in
22   a foul mood, so, you know, you'd go to a different girl or you
23   go ask another girl who isn't busy, hey, you want to go on
24   stage right now?  You kind of have to work and beg a little
25   bit.

Page 147

1    Q.   So the DJ kind of just plays it by ear?
2    A.   Yeah.  Yes.
3    Q.   And it sounds like from what you just said, there's
4    no requirement after a girl shows up and signs in that she be
5    ready to dance within 15 minutes or 30 minutes after she got
6    there?
7    A.   Oh, no.  No.
8    Q.   So if a dancer comes in, signs in, they want to hang
9    out in the locker room with her friends for an hour, that's
10   okay?
11   A.   Yeah.  Well, I mean, for example, like in the early
12   time of the morning where there is no house fee for the girls,
13   a lot of girls want to get there when it's free.  So they'll
14   get there early and then they'll eat some buffet, they'll get
15   ready, do their makeup, visit with the other girls, and then
16   three or four hours later, they decide, okay, now I feel like
17   working.  And they'll go out and hit the floor.
18   Q.   Okay.  Just out of curiosity, you mentioned the
19   buffet.
20             Do the girls pay the regular price for the
21   buffet or do they get a -- free food or discount?
22   A.   In my experience, we've always given the girls, for
23   buffet, comp buffet.  Like, if you want -- if you want to eat,
24   we're gonna feed you; make sure you're fed and in a good mood.
25   We don't need any hangry dancers.

Page 148

1    Q.   So how does a dancer decide what day to work on?
2    A.   I guess each of them has their own stipulations.
3    They're free to work any day, seven days a week, day, night,
4    doesn't matter.  Whatever works for them.
5    Q.   I see that the dancers have ID numbers assigned to
6    them; is that correct?
7    A.   Yeah.  Yes.
8    Q.   Okay.  How are those numbers assigned?
9    A.   Just in chronological order.  You come in, you got
10   hired today, the number was 123.  Tomorrow, the next girl gets
11   hired, it's 124.  Whate- -- you know, it's just in numerical
12   order.
13   Q.   Okay.  And who assigns those numbers?
14   A.   The hostess.
15   Q.   What's the purpose of having the ID number?
16   A.   Well, the dancers change their dance names
17   constantly, so we had to find a way to give them some piece of
18   information that remained consistent while they changed their
19   dance names a million times.  So your dance number, once it's
20   issued to you, remains your dance number.
21             Even if you leave and you come back three or
22   four years later, when you get -- you come back, the hostess is
23   gonna pull up your old information and make sure that you
24   remember the correct dance ID number so that when the paperwork
25   gets to me, I can put it in the right file, and make sure that

Page 149

1    everything's nice and pretty.
2    Q.   Okay.  Are the numbers ever recycled?
3    A.   No.
4    Q.   Okay.
5    A.   No, that would be way too much room for error.
6    Q.   Okay.  Yeah, I kind of -- I kind of thought so.  I
7    guess, maybe it's been five years since, you know, a danc- --
8    A.   My mom has not danced in seven years, and her dance
9    number was 233.  And it is still her dance number if she came
10   back to use it.
11   Q.   Okay.  So if a dancer's no longer dancing, their
12   number gets retired essentially?
13   A.   Essentially, yes, it goes with them.
14   Q.   Does the -- does Centerfolds use any software to
15   track when the dancers come and go or what --
16   A.   No.
17   Q.   -- days they work?  Okay.
18             Do dancers typically quit if they're not coming
19   back or do they just not show up anymore?
20   A.   Yeah, we just never see them again.
21   Q.   Okay.
22             Now, you'll have some of them that want to make it
23   known if they're coming back.  They'll come say bye and give
24   you hugs and stuff like that.  But, generally speaking, more
25   often than not, I -- I just wonder where they went.

Crystal Cowart
2/17/2022                    39 (150 - 153)

Page 150

1    Q.   Okay.  What happens if a dancer owes some fees or,
2 you know, you have a chargeback and the dancer owes money to
3 the club but then she just never shows up again?  Do you ever
4 try to collect from those dancers?
5    A.   No.  No, we just -- we'll eat the loss.
6    Q.   So you never hire, like, a debt collection agency or
7 anything like that to...
8    A.   No.
9    Q.   Okay.  We mentioned the lockers earlier, which -- got
10 a couple more questions here.
11          But are the dancers allowed to leave stuff in
12 the lockers overnight?
13    A.   Yes.
14    Q.   Do they -- does a dancer supply their own locks or
15 are the locks already on the lockers?
16    A.   No, they bring their own.
17    Q.   How do dancers know when they're expected to dance a
18 set on stage?
19    A.   They will go and let the DJ know when they're
20 available and then the DJ will communicate, okay, well, I've
21 got two girls that have already let me know they're available
22 before you, so would you mind going on in four songs?
23          Or the DJ will call off the names of the girls
24 on the list and the girls will come check in with him at that
25 point and let them know -- let the DJ know whether or not they

Page 151

1 are ready to go on stage.
2    Q.   Okay.  The DJ generally gives them an idea
3 beforehand, hey, it's gonna be -- hey, it's gonna be -- you
4 know, there's a couple ahead of you or...
5    A.   Yeah.  Hey, I'd like to put you up in a few girls.
6 Are you gonna be available?  Do you feel like going on right
7 now?
8          Like, some girls just don't feel like going on
9 till later on.  They want to get situated so -- you don't want
10 to put them in a position where it makes them uncomfortable.
11    Q.   Right.  Okay.  And then when they finally get called
12 up, it's basically, now dancing on stage is Cinnamon or
13 whatever?
14    A.   Exactly.
15    Q.   What happens if a dancer doesn't want to dance on
16 stage for that night?
17    A.   She doesn't go.  She just tells the DJ, I'm not
18 going.
19    Q.   So there's no requirement that they dance on stage?
20    A.   No.  No.
21    Q.   Okay.  Is there any fee they have to pay for skipping
22 stage?
23    A.   No.
24    Q.   You kind of hesitated there.
25    A.   I was thinking through.  I was like, hold on, is

Page 152

1 there any way that -- but the DJs don't charge them.  We don't
2 charge them at the door, so no.
3    Q.   Okay.  Do the dancers typically earn more money from
4 dancing on stage or from doing lap dances?
5    A.   Definitely -- well, not even the lap dances.  They
6 earn the most money from going to VIP.  Second to VIP is gonna
7 be lap dances.  Last on the list is gonna be going on stage.
8    Q.   Yeah.  You mentioned that some of the dancers just go
9 ahead and give the singles for stage dancing to the DJ or
10 somebody else 'cause that money's not -- cons- --
11    A.   Exactly.  Yeah.
12    Q.   What happens if, you know, all the dollar bills that
13 are left on stage?  Does somebody come by and collect those?
14 Are dancers expected to collect all of that or how does that --
15    A.   The girl will -- when she's done with her dance or
16 whatever version of a dance she's gonna do, you'll see her go
17 grab the broom because they're not gonna crawl around the stage
18 on their hands and knees and pick up ones.  They'll get the
19 broom and they'll broom -- sweep them all off the stage and
20 then they'll sweep it into their purse.
21    Q.   Okay.  Is a dancer expected to pay any of that money
22 to the DJ?
23    A.   No.
24    Q.   Or to a manager?
25    A.   No.

Page 153

1    Q.   Okay.  So Centerfolds does not pay any kind of wages
2 to the dancers; is that correct?
3    A.   Correct.
4    Q.   Does Centerfolds ever make any effort to determine if
5 the dancers are making at least minimum wage?
6    A.   No.
7    Q.   Does Centerfolds believe that it's complying with the
8 law by not paying them at least minimum wage?
9    A.   We -- yes.
10    Q.   Have you ever considered paying dancers like
11 waitresses, which would basically be the tipped minimum wage?
12 You mentioned earlier that you're giving the option 7.25.
13          Have you considered paying them, like, 2.13
14 an hour and then letting them keep their tips?
15    A.   I have never considered it, but it's not a bad idea.
16    Q.   Okay.  Have you ever -- well, that would be privilege
17 there.
18          Have you ever looked into whether that would be
19 an option?
20    A.   No.
21    Q.   Okay.  So does the -- does Centerfolds issue 1099s to
22 the girls?
23    A.   Yes.
24    Q.   And what does that cover?
25    A.   The 1099 is a record of the sum total of all funds

Crystal Cowart
2/17/2022                                      40 (154 - 157)

Page 154

1  that the dancer received on credit card for that year.  And the
2  1099 total that she receives does not include the percentage
3  that the cu- -- the club charges to the customer for the
4  processing fee.  It's strictly the mo- -- the funds that she
5  retained from the transactions.
6      Q.   Okay.  So dancer gets a dance on a credit card.  She
7  charges $20.  $5 goes to the club.  The 1099 shows $20?
8      A.   Yes.
9      Q.   Okay.  Cash tips are not included in what's reported
10 on the 1099s; is that correct?
11     A.   Correct.
12     Q.   Has the club ever considered issuing W-2s?
13          MR. KING:  Objection.  Form.
14     A.   No.  Wouldn't that imply we considered them
15 employees?
16     Q.   (BY MR. MASON)  Basically, but you are offering that
17 option, right, so if a dancer chose the option...
18     A.   Oh, then she would be receiving a W-2 because she
19 chose to be an employed dancer.
20     Q.   Okay.  But you've never had anyone make that --
21     A.   No.
22     Q.   -- choice so it's never come up?  Okay.
23          So since there are 1099s, the club doesn't do
24 any withholding for social security, Medicare?
25     A.   No.

Page 155

1      Q.   Are all of the tips from the customer treated as
2  property of the dancers?
3      A.   Yes.
4      Q.   Other than credit card fees?
5      A.   Right.
6      Q.   Okay.  And the dancers that are paid with credit
7  card, the -- other than the amount of the fee, that is still
8  considered the property of the dancers?
9      A.   Yes.
10     Q.   Have managers ever told the dancers that they weren't
11 allowed to keep some of their tip money because it belonged to
12 the club?
13     A.   No.
14     Q.   So this entire relationship is basically based on the
15 understanding that the tips from the customers belong to the
16 dancers?
17     A.   Yes.
18     Q.   The club has never tracked cash tips?
19     A.   We wouldn't have a way to.
20     Q.   So that includes for the plaintiffs, Grace Roberts
21 and Lilibeth Gomez.  You have no accounting for how much they
22 made in cash tips; is that --
23     A.   No.
24     Q.   Okay.  So if a customer pays for a dance with a
25 credit card, who -- who does the customer hand the credit card

Page 156

1  to?  To the dancer?  To a waitress?  Manager?
2      A.   It will either be a waitress or a bartender depending
3  on who's been serving them, but either of those positions have
4  access to the credit card machine needed to run the t- -- the
5  transaction.
6      Q.   Okay.  And when does the dancer get her money?
7      A.   It's up to her.  As soon as the customer signs the
8  receipt, she can either go straight away and collect her cash
9  or she can wait till the end of the night and collect her cash;
10 all at once from all of the transactions she has or she can
11 leave it there and collect it at the end of the week, two
12 weeks, whatever.  However long she wants, it'll be waiting
13 there for her.
14     Q.   How does she keep track of that?  Is there a voucher
15 issued or anything?
16     A.   No, no voucher is issued to her.  We have a voucher
17 with the cus- -- with her dance name, her number, the tab
18 number that relates back to where the customer got charged, and
19 then it's got the customer's signature on it.  And that'll just
20 be held until she gets ready to collect it, and then when she
21 collects it, she'll sign and put the last four digits of her
22 social.
23     Q.   Okay.  So the club keeps track of how much the
24 dancers are owed but the dancer wouldn't have any paperwork for
25 that?

Page 157

1      A.   Oh, the dancers know how much money they've got
2  coming to them.  I assure you of that.
3      Q.   Well, I'm sure, but they -- they just kind of have to
4  keep track of it themselves.  They don't have a piece --
5      A.   We don't hand them a piece of paper.  Yeah.
6      Q.   Okay.  And you said the dancers are paid for that in
7  cash?
8      A.   Yes, they receive cash.
9      Q.   Okay.  And so if a customer pays for a table dance in
10 cash, that money goes directly from the customer to the dancer.
11 The club never sees that money, right?
12     A.   Correct.
13     Q.   Does the -- does Centerfolds ever make the dancers
14 report how much they're earning in cash tips to the club?
15     A.   No.
16     Q.   Other than the house fee when a dancer first arrives,
17 does Centerfolds ever make the entertainers turn over any cash
18 payments to the club?
19     A.   No.  Wait, unless it's a charged-back tab like we
20 talked about earlier.
21     Q.   Okay.
22     A.   Other than that.
23     Q.   Does Centerfolds record in its books as revenue the
24 amount of cash payments from the customers to the entertainers?
25     A.   I mean, I don't know what they record in their books,

Crystal Cowart
2/17/2022                                    41 (158 - 161)

Page 158

1  but we don't keep track of what the dancers get in cash, so no.

2      Q.   Yeah.  I assume that has to be no 'cause you're not

3  keeping track of it, but I --

4      A.   Ex- -- I'm like, that was smart.

5      Q.   I know, it -- it sounds like def- -- you know, we are

6  considering what we talked about, but there's a reason for --

7      A.   I know.  That's all right.

8      Q.   So Centerfolds doesn't report any of that money that

9  the dancers get in tip cash to the IRS?

10     A.   No.

11     Q.   Okay.  And the club doesn't keep any records of that?

12     A.   Of their cash, no.

13     Q.   Okay.  I know you mentioned the -- your accountant's

14  name that does your taxes, but I think you just mentioned his

15  first name.

16          Do you know his last name?

17     A.   I do not.

18     Q.   Luther; is that right?

19     A.   Luther.  I know that much.  He's a very nice man,

20  too.

21     Q.   Do you normally deal with Luther to make sure he's

22  filing the club's taxes and everything?

23     A.   No.  He usually deals with the Davaris directly.

24     Q.   Okay.  So the policies and the procedures that we've

25  talked about today, those apply to all of the entertainers,

Page 159

1  correct?

2      A.   The ones that --

3          MR. KING:  Objection.  Form.

4      A.   -- we went on -- oh, the ones that we went over were

5  listed for 2014.  At that time, yes, those were the policies in

6  effect.  However, since then, we have had several amendments

7  and most of what we went over today is no longer in our license

8  and access agreement or -- or, you know -- or enforced in the

9  club.

10     Q.   (BY MR. MASON)  Okay.  Does Centerfolds have any

11  plans to -- to change the policies in the next six months?

12          MR. KING:  Objection.  Form.

13          Calls for attorney/client privileged

14  information.  Don't answer.

15     Q.   (BY MR. MASON)  Okay.  Sorry, you mentioned earlier

16  that the club has been sued for FLS- -- FLSA violations in the

17  past, correct?

18     A.   Yes.

19     Q.   Do you know how many times the club has been sued for

20  FLSA violations while you've been working there?

21     A.   Twice.

22     Q.   And both of those were, I think you --

23     A.   Well, not including this one.

24     Q.   Not including this one.

25          The other two were initiated last year, it

Page 160

1  sounds like or --

2      A.   One was in --

3          (Simultaneous speaking.)

4      Q.   (BY MR. MASON)  -- deposed last year?

5      A.   -- and then the other was actually back in 2013.

6      Q.   I think -- I could be wrong, I thought you said

7  the -- they were still active.

8          Is that 2013 case still active?

9      A.   No.  I never was deposed in that case.  Currently, we

10  have -- I guess, company, not against -- I have one active case

11  against Centerfolds.  The other FLS ca- -- FLSA case is against

12  de- -- against one of our other entities.

13     Q.   Okay.  Did that 2013 case settle?

14     A.   It settled and in addition to settling, it was

15  actually kind of cool.  We had a group of intervener dancers

16  who were actually still working in the industry who intervened

17  saying they did not want this to happen.  And the judge -- it

18  was Judge Rosenthal -- actually deemed dancers to be

19  independent contractors in that -- in that case.

20     Q.   Uh-huh.  Okay.  Were you generally aware of the

21  claims being made in those lawsuits?

22     A.   Yes.

23     Q.   And you were -- you mentioned you were deposed at

24  least in the more recent one?

25     A.   Yes.

Page 161

1      Q.   You were not deposed in the 2013 lawsuit; is that

2  correct?

3      A.   Correct.

4      Q.   Were those dancers also claiming to be employees, not

5  independent contractors --

6      A.   Yes.

7      Q.   -- in the lawsuit?

8      A.   Uh-huh.

9      Q.   Have you taken any courses on labor law or the FLSA?

10     A.   No specific courses.  I took an employment law course

11  at HCC and the Fair Labor Standard Act was generally -- in a

12  large general sense -- touched.  So I had some familiarity with

13  what the words were, but other than that, no.  No, education on

14  it.

15     Q.   And you were working for A.H.D. when you took those

16  classes at HCC?

17     A.   Yes.

18     Q.   Have you ever gone to any seminars for H&R personnel?

19  Human --

20     A.   No.

21     Q.   -- resources?  Okay.

22          Have you ever done personally done any research?

23  Google searches?  Anything like that?

24     A.   About FLSA?

25     Q.   Right.

Crystal Cowart
2/17/2022                                    42 (162 - 165)

Page 162

1      A.   Every once in a while when I have some down time,
2   I'll google FLSA and just see if there's any new case law or
3   any news articles that pop up.  But I'm pretty confident in
4   that if anything substantial occurs, I'm going to immediately
5   hear from Will or Casey so...
6      Q.   Okay.  But you ki- -- you try to keep up with it on
7   your own as well?
8      A.   Ri- -- I -- I have that interest in the law so...
9      Q.   Have you had any opinion let- -- opinion letters from
10  the Department of Labor concerning Centerfolds or concerning
11  exotic dance clubs that you've run?
12     A.   No.
13     Q.   Okay.  What is your understanding of what it would
14  take to be considered an employee as opposed to an independent
15  contractor?
16     A.   A schedule.  A uniform.  We would exercise control
17  over them.  You need to be there at a certain time, you
18  couldn't leave at a certain time.  You would have duties while
19  you were there.  Tasks that were expected to be performed to
20  benefit the business.
21     Q.   Okay.
22     A.   That's really it.
23     Q.   All right.  Do you believe that any of those are
24  requirements?
25     A.   Requirements to be considered an employee?

Page 163

1      Q.   Right.  Like, could somebody be considered an
2   employee even if they don't have a set schedule?
3              MR. KING:  Objection.  Form.
4      A.   Not in my experience.
5      Q.   (BY MR. MASON)  Okay.  So in your understanding,
6   there are certain minimum things that would have to be in place
7   for someone to be an employee?
8      A.   Correct.
9      Q.   And the decision to structure the dancer contracts
10  the way they are is based on the advice of counsel, correct?
11     A.   Yes.
12             MR. KING:  Objection.  Form.
13     Q.   (BY MR. MASON)  Centerfolds is asserting a good faith
14  affirmative defense in this case; is that true?
15     A.   Yes.
16     Q.   Okay.  Is it part of Centerfold's good faith defense
17  that Centerfolds relied on the advice of counsel?
18     A.   I don't know.
19     Q.   Okay.  Do you know if Wallace, Casey prepared any
20  type of opinion letter, memo, or brief regarding classifying
21  the dancers as independent contractors?
22     A.   No.  I don't recall that.
23     Q.   Other than the lawyers at Casey Allen, has
24  Centerfolds Club engaged other counsel to per- -- prepare an
25  opinion on the decision to classify dancers as independent

Page 164

1   contractors?
2      A.   Not to my --
3              MR. KING:  Objection.  Form.
4      A.   -- knowledge.
5      Q.   (BY MR. MASON)  Okay.  And you said earlier that the
6   current policies were prepared by Wallace, Casey or someone at
7   that firm?
8      A.   Yes.
9      Q.   When was the most recent set of policies prepared?
10     A.   After the pandemic, so May 2020.
11     Q.   Have you kept track of -- other than in individual
12  dancer files, have you kept track of prior versions of the
13  independent contractor agreement?
14     A.   Yes.
15     Q.   Okay.  So, like, if you had to look up what the
16  policy was in effect in, say, 2018, you could go find out,
17  okay, this is what we had in effect in 2018?
18     A.   Yes, sir.
19     Q.   Where do you keep those records?
20     A.   Those files are gonna be somewhere on one of these
21  flash drives on my desk.  I know I have them.  If I needed to
22  pull them up, I can find them.
23     Q.   Okay.  Do you have an idea of how many different
24  versions of the contractor agreement you've had over the years?
25             MR. KING:  Objection.  Form.

Page 165

1      A.   Six.
2      Q.   (BY MR. MASON)  Have any of your agreements contained
3   an arbitration clause?
4      A.   Yes.
5      Q.   Does the current agreement contain an arbitration
6   clause?
7      A.   Yes.
8      Q.   Does the current agreement waive the right to proceed
9   as a class action or collective action in arbitration --
10     A.   Yes.
11     Q.   -- in court?  Okay.
12             This present lawsuit was filed on July 14th of
13  2021, does that sound correct?
14     A.   For Grace Roberts?
15     Q.   For Grace Roberts, yes.
16     A.   Yes.
17     Q.   As long as you've worked there, has there always been
18  a written contract -- contractor agreement?
19     A.   Yes.
20     Q.   Are there any, like, conventions for the exotic
21  entertainment industry?
22     A.   There's one in Vegas.  I've never been to it before.
23  But I think it's -- what do you call it?  Sexually Oriented
24  Business Owners something or other.  Other than that, I've
25  never heard of one.

Crystal Cowart
2/17/2022                          43 (166 - 169)

Page 166

1   Q.   I know you're getting antsy.  I'm getting towards the
2   end here so shouldn't be too much longer.
3        Q.   Do you know if there's a National Organization
4   of Club Owners?
5   A.   I think there is.
6   Q.   Is there any kind of, like, industry trade magazine
7   or anything like that?
8   A.   We used to use -- there's this one magazine called
9   Nightmoves that we used to use ten years ago, and that was
10  basically the industry magazine.
11  Q.   Yeah.  I was wondering if that's kind of out of date.
12  I didn't -- got some old questions here.
13  <mark>Q.   Okay.  Does Ali Davari or Hassan Davari have the</mark>
14  <mark>authority to write checks on the Centerfolds' bank account?</mark>
15  <mark>A.   I'm sure they do.</mark>
16  Q.   Do you have authority to write checks for the club?
17  A.   Yes.
18  Q.   What bank does Centerfolds use for banking?
19  A.   Spirit of Texas.
20  Q.   Do you have a -- like, a main contact person you deal
21  with at the bank?
22  A.   No.
23  Q.   Are all of the expenses of Centerfolds run through
24  that bank account?  The rent?  Payroll?  All that?
25  A.   I have no idea.

Page 167

1   Q.   Okay.  What -- so Centerfolds has employees, correct,
2   including yourself?
3   A.   Uh-huh.
4   Q.   Are bartenders considered employees?
5   A.   Yes.
6   Q.   Security people?
7   A.   No, that's a third-party company.
8   Q.   Oh, okay.  And the security people and the bouncers,
9   the same thing or they're different?
10  A.   We don't actually have bouncers at Centerfolds.  The
11  security is in our parking lot, and if there's an issue or we
12  need manpower inside, management will go outside and get
13  security to come inside and assist.  But our management
14  generally handles the issues.
15  Q.   Okay.  Do the security people wear uniforms?
16  A.   Yes.
17  Q.   Do you have bathroom attendants?
18  A.   No.
19  Q.   Okay.  Do you have a door girl?
20  A.   Uh-huh, yes.
21  Q.   A house parent?  Do you have a house parent?
22  A.   We did at one time, but I don't think we currently
23  have one.  But that person was not an employee of the company.
24  Q.   Okay.  So when you did have a house parent, they were
25  independent contractors as well?

Page 168

1   A.   They leased the space from us.
2   Q.   Oh, okay.  So --
3   A.   Like a landlord/tenant kind of thing.
4   Q.   Or like the dancers.  They pay a fee to --
5   A.   Yes, but the difference would be that the house
6   person paid on a monthly consistent basis, and I had an
7   agreement with them that mimicked that of a -- like a standard
8   apartment lease agreement kind of thing where --
9   Q.   Huh.
10  A.   -- you agree for this specific space X amount of
11  dollars per month versus the dancer who comes in and she just
12  pays X amount of dollars for the use of the space for that one
13  particular day.
14  Q.   Okay.  So how did the -- the house parent get paid?
15  A.   House parent would get paid through -- like, they
16  would have snacks that the girls could buy or, like, provide
17  hair and makeup services and the girl would pay for that.  But
18  that's about it.
19  Q.   Okay.
20  A.   Probably why we don't have one anymore.  It was kind
21  of hard for them to generate income.
22  Q.   Was there any mandatory payment from the dancers to
23  the house parent?
24  A.   No.
25  Q.   Is there anyone else who is an employee of

Page 169

1   Centerfolds?
2   A.   Who is an employee?
3   Q.   Yeah.
4   A.   Servers, managers, bussers, barbacks, kitchen
5   personnel.  I believe that's it.
6   Q.   Okay.  So the club's payroll covers all these
7   employees that we just talked about, correct?
8   A.   Yes.
9   Q.   Okay.  What name appears on the club's alcohol
10  licenses?
11  A.   I think it's the business entity, the A.H.D. Houston,
12  Inc.
13  Q.   Okay.  And is there a -- there's a license for
14  running an adult entertainment business, a sexually oriented
15  business?
16  A.   Yes.  I think.  Yes, we'd have to have a license for
17  that, yes.
18  Q.   Do you have any idea what name appears on that
19  license?
20  A.   No.  It's probably gonna be the corporate A.H.D.
21  though.
22  <mark>Q.   Do you -- do you have an address for Luther?</mark>
23  <mark>A.   No.</mark>
24  <mark>Q.   Do you have Luther's phone number?</mark>
25  <mark>A.   No.</mark>

Page 170

1   Q.   So if anyone contacts him, it's probably the Davaris?

2   A.   Yes.  I mean, my communication with him has been when

3   he calls here --

4   Q.   Okay?

5   A.   -- and asks to speak to one of them.

6   Q.   So after he prepares the tax returns, who -- who

7   signs them?

8   A.   I have no idea.

9   Q.   Do you know how far back Centerfolds keeps tax

10  records?

11  A.   No.  I'd assume at least two years though.

12  Q.   Do you know who does the property taxes?  You said

13  you have a company for that.

14  A.   That's a company.  The company is called Flagship.

15  Q.   Do you know who signs off on those taxes?

16  A.   No.

17  Q.   I take it Luther is not an employee of Centerfolds?

18  A.   No.

19  Q.   Okay.

20  A.   No.

21  Q.   If Mr. Davari wanted to -- if Ali Davari wanted to

22  hire or fire a club manager, does he have that authority?

23  A.   I mean, he's the boss.  He could do whatever he

24  wants, I guess.

25  Q.   Okay.  Just making sure.

Page 171

1        Do you have authority to hire and fire managers?

2   A.   Yes.

3   Q.   As far as you know, has Mr. Ali Davari ever hired a

4   manager or --

5   A.   No.

6   Q.   -- dancer?

7   A.   No.

8   Q.   Any of the employees?

9   A.   No.

10  Q.   Other than Ali or Hassan Davari, are you the highest

11  decision-maker --

12  A.   Yes.

13  Q.   -- at Centerfolds?

14       Who hired you?

15  A.   Many, many, many, many years ago, I walked into one

16  of our other businesses called Treasures --

17  Q.   Uh-huh.

18  A.   -- and a nice man named John was managing, and he

19  hired me as a waitress.

20  Q.   Who -- who hired you for the position that you're in

21  now?

22  A.   I kind of just came about this position.  But it was

23  at the benefit of Mr. David -- Ali --

24  Q.   Okay.  Who has the power to fire you?

25  A.   Nobody.  If somebody wanted to get rid of me, they

Page 172

1   would have to call Ali Davari, and I would not believe the

2   words unless they came out of his mouth.

3   Q.   So ultimately does Ali Davari have the final word on what

4   happens at the club?

5   A.   No.

6   Q.   Okay.  Well --

7   A.   Nice try, though, but no.

8   Q.   Okay.  Who ultimately has the final word over whether

9   to classify the entertainers as independent contractors?

10       MR. KING:  Objection.

11  A.   Myself and --

12       MR. KING:  Form.

13       -- Casey Wallace.

14  Q.   (BY MR. MASON)  Does Centerfolds keep track of e-mail

15  accounts for its employees?  Does it have e-mail accounts for

16  employees?

17  A.   No.

18  Q.   Do you have a club e-mail address?

19  A.   I have a D. Texas address.

20  Q.   What is your D. Texas e-mail address?

21  A.   Brook, b-r-o-o-k- --

22  Q.   Uh-huh.

23  A.   -- -@d-t-x-i-n-v.com.

24  Q.   Do you know Ali Davari's e-mail address?

25  A.   Not off the top of my head.

Page 173

1   Q.   Okay.  I assume that's true for Hassan --

2   A.   Correct.  I could -- I mean, I have them.  I just

3   don't have them memorized.

4   Q.   Okay.  Fair enough.

5        Do you communicate with either of the -- either

6   of the Davaris by e-mail?

7   A.   No.

8   Q.   Okay.  Do you have an IT person for Centerfolds?

9   A.   No.

10  Q.   If there -- IT issue, something needs to be fixed,

11  what do you do?

12  A.   We figure it out ourselves usually, unfortunately.

13  If it's, like, a maintenance issue, obviously, we have to call

14  in a proper repairman, or if it's a issue with the cable going

15  out or something like that, obviously, we're gonna call the

16  cable company.  But other than that, we're usually pretty --

17  pretty versatile.  We'll -- we'll fix it if we can.

18  Q.   Okay.

19  A.   If not, we're --

20  Q.   Do you --

21  A.   -- gonna (Zoom lag) to my third party.

22  Q.   Do you have a regular company that you use for

23  something like that?

24  A.   No.  It's gonna be depending on, you know, I got this

25  little kid that is a good plumber so if it's a plumbing issue,

Crystal Cowart
2/17/2022                                    45 (174 - 177)

Page 174

1   I'll call him.

2   Q.   Okay.

3   A.   If it's cable, I'm calling Comcast or DirecTV.  I --
4   you know, just who -- whomever is gonna be my easiest source to
5   get the problem fixed.

6   Q.   Okay.  Do you use accounting software to keep track
7   of the club's --

8   A.   No.

9   Q.   Other than the sign-in sheets that we talked about,
10  do you have any records that would indicate the number of
11  shifts that an entertainer has worked?

12  A.   No.

13  Q.   Okay.  And so you don't have any records that would
14  indicate the number of hours that an entertainer has worked,
15  correct?

16  A.   No.  In these scenarios, when I'm doing the damages
17  models for FLSA cases, because we don't --

18       MR. KING:  Whoa, hold on.  Before you -- hold --
19  Brook.  Hold on.  Don't go into attorney/client work (Zoom lag)
20  stuff.

21  A.   Oh.  Never mind.

22  Q.   (BY MR. MASON)  Fair enough.

23       Are you familiar with the typical number of
24  hours that a dancer would work on a shift?

25  A.   I am familiar with the variety of typical hours that

Page 175

1   a dancer works depending on who the dancer is and what her
2   choice is.

3   Q.   How long would you say on average a dancer works on a
4   given night?

5   A.   That's really gonna vary depending on the dancer.
6   Some girls come it when we open and stay till we close.  Some
7   girls come in at midnight and work till close.  Some girls come
8   in at 9:00.  It really varies depending on the individual.

9   Q.   Okay.  Do some girls work more than eight hours in a
10  day?

11  A.   I'm sure they have.

12  Q.   Do you have any idea what the typical length of time
13  for a shift that Grace Roberts or Lilibeth Gomez has worked at
14  their time at Centerfolds?

15  A.   No, because I know when they left.  I know what time
16  they get there, but I don't know when they leave.

17  Q.   Okay.  I think that should be everything.

18       Have you understood all of my questions today?

19  A.   Yes.

20  Q.   Have you given full answers to the best of your
21  knowledge?

22  A.   I have.

23  Q.   Okay.  Is there anything that you want to go back and
24  correct or change your answer to that you can think of right
25  now?

Page 176

1   A.   No, I think -- I think everything's good.

2   Q.   Okay.

3        MR. MASON:  Pass the witness.

4        MR. KING:  Let's see.

5        EXAMINATION

6   BY MR. KING:

7   Q.   Ms. Cowart, you'd agree that the amount that
8   Centerfolds spends on the rent, utilities, insurance, billing,
9   maintenance, its capital costs on a monthly basis will exceed
10  the amount of money that any individual dancer spends on her
11  attire or makeup or beauty regimen (Zoom lag).  True?

12  A.   True.

13  Q.   Okay.

14       MR. MASON:  The -- that kind of broke up.  I
15  just want to make sure that the court reporter caught all that.

16       THE WITNESS:  Yeah, you were kind of garbled at
17  the end.

18       MR. KING:  Did --

19       MR. MASON:  Anna --

20       THE REPORTER:  Sorry, just the very end.  Spends
21  on her -- I heard attire and beauty regimen.

22       MR. KING:  Oh, and other tools of the trade.

23  Q.   (BY MR. KING)  Are bussers, waitresses, servers, door
24  girls, other employees at Centerfolds -- are they told what to
25  do?

Page 177

1   A.   Yes.

2   Q.   By who?

3   A.   My the managers.  By myself.

4   Q.   Are they told when to do their duties?

5   A.   Yes.

6   Q.   Are those individuals told when to show up?

7   A.   Yes.

8   Q.   Are waitresses allowed to set the price for their own
9   drinks -- well, for the drinks that they're serving to
10  customers, rather?

11  A.   No.

12  Q.   What is the job of a waitress?

13  A.   The job of a waitress?  To --

14  Q.   Yeah.

15  A.   -- serve drinks and process credit card tabs.

16  Q.   All right.  Where -- where does a waitress get those
17  drinks from?

18  A.   The bar.

19  Q.   Okay.  And who owns those drinks?

20  A.   A.H.D. Houston, Inc.

21  Q.   Okay.  So waitresses are selling products that
22  Centerfolds owns, right?

23  A.   Correct.

24  Q.   All right.  What do dancers sell?

25  A.   Their own product.  Them -- their time, their talent.

Crystal Cowart
2/17/2022                          46 (178 - 181)

Page 178

1   Q.   Does Centerfolds own any of that?

2   A.   No.

3   Q.   I -- I think you were asked a couple of questions

4   about why not just put dancers -- or treat dancers like tipped

5   employees who make 2.13 an hour.

6        How does that -- how does that work for

7   waitresses who are paid 2.13 an hour?

8   A.   The process for waitresses, they get paid 2.13 an

9   hour and we calculate all the tips that they make on credit

10  card and then they're required to claim any cash tips that they

11  make.  And then it's calculated out to make sure that the

12  server has met or exceeded seven dollars, twenty-five cents per

13  hour.  In the event that they do not meet or exceed 7.25 per

14  hour, the company then goes in and compensates them the

15  difference to bring them to 7.25 an hour.

16  Q.   So I think I heard you say that waitresses have to

17  report not just their credit card but their cash tips, too,

18  true?

19  A.   True.

20  Q.   Right.  So that Centerfolds can calculate how much to

21  make up the difference, if necessary?

22  A.   Correct.  They have to fill out a tip report form.

23  Q.   Okay.  Are -- are dancers required to report how much

24  they make?

25  A.   No.

Page 179

1   Q.   All right.  What would happen if dancers were

2   required to report how much cash they make?

3   A.   They're not gonna tell the truth.

4   Q.   Why?  Why do you say that?

5   A.   Because why would you admit to making -- why would

6   you admit to having funds that you don't have to admit to and

7   then have to pay taxes on it?  If nobody has --

8   Q.   Do some dancers --

9   A.   -- records of it --

10  Q.   Do some dancers --

11  A.   If I don't have record of it as Centerfolds and

12  nobody else knows, how do I know that they're being honest?

13  Q.   Are you saying that some dancers don't pay their

14  taxes?

15  A.   Yes.

16  Q.   Is that common in your experience?

17  A.   It is not common in my experience, but my own mother,

18  for whatever personal reasons, had that issue, and it took us a

19  bit to get it cleared up.

20  Q.   Do you know if any dancers consider Centerfolds as

21  essential to their -- their -- their business?

22  A.   I'm sure they do.

23  Q.   Do you know if that's true for all dancers?

24  A.   I wouldn't say all dancers because perhaps some of

25  the dancers consider Vivid or a different gentlemen's club

Page 180

1   essential to their businesses, but the -- our long-term dancers

2   that are with us on a consistent basis, I assure you they

3   consider Centerfolds essential.

4   Q.   Okay.  So Centerfolds is -- is -- some dancers are

5   economically dependent on Centerfolds, right?

6   A.   Yes.

7   Q.   But not all dancers, right?

8   A.   Right.

9   Q.   Okay.  So it just depends on the dancer we're talking

10  about?

11  A.   Correct.

12  Q.   Do some dancers have business ventures aside from

13  exotic dancing?

14  A.   Absolutely.

15  Q.   All right.  I just want to kind of recap some of the

16  testimony that you gave Mr. -- Mr. Mason.

17       At Centerfolds, dancers -- they can set their

18  own schedule; is that true?

19  A.   Yes.

20  Q.   Dancers can work for other clubs if they want to?

21  A.   Yes.

22  Q.   They have the ability to choose their own costume and

23  routine?

24  A.   Yes.

25  Q.   All right.  Are dancers able to -- are dancers at

Page 181

1   Centerfolds able to keep all of the money that they earn?

2   A.   Yes.

3   Q.   All right.

4   A.   With the exclusion of their house fee.

5   Q.   Okay.  Which they pay up front, right?

6   A.   Right.

7   Q.   And the house fee isn't contingent on how much a

8   dancer makes in any given day or -- or shift, rather?

9   A.   No.

10  Q.   Okay.  Dancers have the ability to choose how much

11  they charge for custo- -- charge customers, right?

12  A.   Yes.

13  Q.   All right.  What are the different things that

14  dancers at Centerfolds can charge customers for?

15  A.   Physical dances, their time, reenacting Peter Pan

16  scenes.  I mean, whatever.  As long as it's not a violation of

17  law, it doesn't matter what you're charging them for.

18  Q.   Centerfolds doesn't care, right?

19  A.   I really don't care as long as you're not breaking

20  the law.

21  Q.   All right.  Don't sell drugs, don't commit

22  prostitution, right?

23  A.   Correct.

24  Q.   Okay.  Centerfolds doesn't reimburse dancers for any

25  makeup or cosmetic surgery that they might have or anything

Crystal Cowart
2/17/2022                          47 (182 - 185)

Page 182

1  like that, right?

2     A.   No.

3     Q.   Do dancers ever have to take initiative -- dancers at

4  Centerfolds ever have to take initiative in terms of when they

5  work at Centerfolds?

6     A.   I don't understand the question.

7     Q.   Sure.  How much does -- does initiative go into a

8  dancer's work at Centerfolds?

9     A.   Her work?  Just, like, showing up there?

10     Q.   How much initiative?

11     A.   Right.  But what do you mean?  Like, the initiative

12  to get up and come to work or the initiative to do something --

13     Q.   To make money at Centerfolds.

14     A.   -- while they're there?

15     Q.   Yeah.  When she's there.

16     A.   When she's there?  That's up to her.  A lot of girls

17  sit around and play on their phone all night.  I don't know how

18  they make money, but that's their choice.

19     Q.   Okay.

20             MR. KING:  That's all I got.

21             MR. MASON:  Okay.  I don't have any further

22  questions.

23             THE REPORTERS:  Okay.  And so are there any

24  further stipulations under Rule 30(b)(5)(C) that need to be put

25  into the record before I get orders?

Page 183

1             MR. KING:  No.

2             THE REPORTER:  Okay.  Would anyone like to

3  purchase a copy of the transcript today then?

4             MR. KING:  We need a re- -- a read and sign.

5             THE REPORTER:  No copy, correct?

6             MR. MASON:  For him or us?

7             THE REPORTER:  For Mr. King.

8             MR. KING:  Oh, yeah, we will need a copy.

9             THE REPORTER:  Okay.  And that is it.

10             We are off the record at 3:54 p.m.

11             (Proceedings concluded; 3:54 p.m.)

12             -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 184

1             CHANGES AND SIGNATURE

2  WITNESS NAME: CRYSTAL COWART      DATE: February 17, 2022

3  PAGE LINE      CHANGE        REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 185

1          I, CRYSTAL COWART, have read the foregoing

2  deposition and hereby affix my signature that same is true and

3  correct, except as noted above.

4

5

6            CRYSTAL COWART

7

8  THE STATE OF _____)

9  COUNTY OF _____)

10

11          Before me, _____, on this day

12  personally appeared CRYSTAL COWART, known to me (or proved to

13  me under oath or through _____)

14  (description of identity card or other document) to be the

15  person whose name is subscribed to the foregoing instrument and

16  acknowledged to me that they executed the same for the purposes

17  and consideration therein expressed.

18          Given under my hand and seal of office this

19  _____ day of _____, _____.

20

21

22

23                 NOTARY PUBLIC IN AND FOR

24                 THE STATE OF _____

               COMMISSION EXPIRES: _____

25

Crystal Cowart
2/17/2022                        48 (186 - 188)

Page 186
```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   GRACE ROBERTS, ON BEHALF OF    §
     HERSELF AND ALL OTHERS         §
 4   SIMILARLY SITUATED,            §
          PLAINTIFF,                §
 5                                  §  CIVIL ACTION
     VS.                            §
 6                                  §  NO.: 4:21-cv-02101
     A.H.D. HOUSTON, INC., D/B/A    §
 7   CENTERFOLDS HOUSTON, ET AL.,   §
          DEFENDANTS.               §

 8

 9   ***************************************************

10            REPORTER'S CERTIFICATION

11         DEPOSITION OF CRYSTAL COWART

12              February 17, 2022

13             (Reported Remotely)

14   ***************************************************

15         I, ANNA MAR, Certified Shorthand Reporter in and for

16   the State of Texas, hereby certify to the following:

17         That the witness, CRYSTAL COWART, was duly sworn by

18   the officer and that the transcript of the oral deposition is a

19   true record of the testimony given by the witness;

20         That the original deposition was delivered to JERRY

21   MASON.

22         That pursuant to information given to the deposition

23   officer at the time said testimony was taken, the following

24   includes counsel for all parties of record:

25      MR. JERRY MASON, Attorney for Plaintiff;
```

Page 187
```
 1      MR. WILLIAM X. KING, Attorney for Defendants

 2   A.H.D. Houston, Inc., d/b/a Centerfolds Houston, et al.;

 3         I further certify that pursuant to FRCP Rule

 4   30(f)(1) that the signature of the deponent:

 5      __X__ was requested by the deponent or a party before the

 6   completion of the deposition and returned within 30 days from

 7   date of receipt of the transcript.  If returned, the attached

 8   Changes and Signature Page contains changes and the reasons

 9   therefor;

10      _____ was not requested by the deponent or a party before

11   the completion of the deposition.

12         I further certify that I am neither attorney nor

13   counsel for, related to, nor employed by any of the parties to

14   the action in which this testimony was taken.

15         Further, I am not a relative or employee of any

16   attorney of record in this cause, nor do I have a financial

17   interest in the action.

18         Subscribed and sworn to on this _____ day of

19   _____, 2022.

20

21

22   _____
     Anna Mar, Texas CSR #11083
23   Expiration Date:  02/28/2023
     Compass Reporting Group
24   Firm Registration No. 795
     P.O. Box 79487
25   Houston, Texas 77279
     T: (844) 817-1080
```

Page 188
```
 1   THE STATE OF _____)

 2   COUNTY OF _____)

 3         I hereby certify that the witness was notified

 4   on _____ that the witness has 30 days or

 5   (_____ days per agreement of counsel) after being notified by

 6   the officer that the transcript is available for review by the

 7   witness and if there are changes in the form or substance to be

 8   made, then the witness shall sign a statement reciting such

 9   charges and the reason given by the witness for making them.

10         That the witness' signature was/was not

11   returned as of _____.

12         Subscribed and sworn to on this, the _____

13   day of _____, 2022.

14

15

16

17

18

19   _____
     Anna Mar, Texas CSR #11083
20   Expiration Date:  02/28/2023
     Compass Reporting Group
21   Firm Registration No. 795
     P.O. Box 79487
22   Houston, Texas 77279
     T: (844) 817-1080

23

24

25
```

Compass Reporting Group
(844) 817-1080