**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**
*Roberts, et al. v. A.H.D. Houston, Inc., et al.*
Case No. 4:21-cv-2101

# EXHIBIT C

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 1

```
IN THE UNITED STATES DISTRICT COURT
  FOR THE SOUTHERN DISTRICT OF TEXAS
             HOUSTON DIVISION

GRACE ROBERTS, on Behalf *
Of Herself and All Others*
Similarly Situated     *
                       *
VS.                    *  CIVIL ACTION NO. 4:21-CV-02101
                       *
A.H.D. HOUSTON, INC.,  *
D/B/A CENTERFOLDS      *
HOUSTON, et al.        *

*******************************************************
         ORAL VIDEO-CONFERENCE DEPOSITION OF
                   GRACE ROBERTS
                 FEBRUARY 18, 2022
                (Reported Remotely)
*******************************************************
```

ORAL VIDEO-CONFERENCE DEPOSITION of GRACE ROBERTS, produced as a witness at the instance of the DEFENDANTS, and duly sworn, was taken in the above-styled and numbered cause on the 18th of February, 2022, from 1:42 p.m. to 6:39 p.m., before Trista Jamail, Certified Shorthand Reporter, No. 6329, in and for the State of Texas, reported by stenographic means via Zoom/Remote Counsel, with the witness located in PANAMA, pursuant to the Federal Rules of Civil Procedure, the Texas Supreme Court Most Recent Emergency Order Regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.

Page 3

I N D E X

                                              PAGE
Stipulations............................     1
Appearances.............................     2
Testimony of GRACE ROBERTS
    Examination by Mr. King.............     4
Signature and Changes...................   169
Reporter's Certificate..................   171


            E X H I B I T S
NUMBER         DESCRIPTION              PAGE
Exhibit A...............................    18
     LinkedIn page
Exhibit B...............................   135
     Centerfolds dancer packet
     Bates label Centerfolds 21 through
     Centerfolds 53

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Mr. Jerry Wayne Mason
    HODGES & FOTY, LLP
    4409 Montrose Blvd., Suite 200
    Houston, Texas 77006
    713.523.0001 713.523.1116
    E-mail: Jmason@hftrialfirm.com

FOR THE DEFENDANTS:

    Mr. William X. King
    WALLACE & ALLEN, LLP
    440 Louisiana, Suite 1500
    Houston, Texas  77002
    Phone:  713.227.1744  Fax:  713.227.0104
    E-mail: Wking@wallaceallen.com

Page 4

```
                    GRACE ROBERTS,
having been first duly sworn, testified as follows:
                     EXAMINATION
BY MR. KING:
    Q.  All right.  Good afternoon.  How are you,
Ms. Roberts?
    A.  I'm well.  How are you, sir?
    Q.  Doing fine.  Thank you.
        Are you currently located in the U.S.?
    A.  Not currently, no, sir.
        MR. KING:  Mr. Mason, will you stipulate
that the fact that she's out of the country is not going
to create any issues, as far as her being sworn in under
U.S. law?
        MR. MASON:  Oh, yeah.  No, that's fine.
        MR. KING:  Okay.  Just wanted to check.
    Q.  (BY MR. KING)  Okay.  You are currently located
in Panama, true?
    A.  Correct.
    Q.  Okay.  Do you have any plans to return to the
U.S.?
    A.  Yes, sir.  I have a return flight in two weeks.
    Q.  Okay.  So your permanent residence isn't in
Panama, right?
    A.  No, sir, my permanent residence is in Panama, but
```

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 5

1  I do have -- I'm not a citizen here, so I'm mandated to,
2  not necessarily return to the United States, but to leave
3  Panama every few months.
4      Q.  Where is your permanent residence?
5      A.  Well, I have two permanent residences.  I have
6  one in Houston, and I have one here in Panama.
7      Q.  All right.  And where is -- what is the address
8  of your current residence in Houston?
9      A.  My permanent residence in Houston is █████████
10 ████████████████████████████████.
11     Q.  When did you relocate to Panama?
12     A.  October 11th, last year.
13     Q.  Out of curiosity, how did you get to go to
14 Panama?
15     A.  I searched around.  It was the most economical
16 thing that I could do.
17     Q.  I'll bet the weather is pretty good there right
18 now?
19     A.  Beautiful.
20     Q.  Okay.  Your full legal name is Grace Marissa
21 Roberts, true?
22     A.  Yes, sir.
23     Q.  Have you ever gone by any other legal name?
24     A.  No, sir.
25     Q.  Have you ever gone by Grace Marissa Taylor?

Page 6

1      A.  Oh, yeah, that was 20 -- pardon my memory.  I was
2  married, yes, sir.  That was so long ago.
3      Q.  I understand.
4          So Grace Roberts is your maiden name, right?
5      A.  Correct, yes.
6      Q.  All right.  How long were you Grace Taylor?
7      A.  Not -- not too long.  Maybe a few years.
8      Q.  All right.  Do you recall from when to
9  approximately when, you had your married name?
10     A.  I was married, I think I want to say when I was
11 19, maybe -- 19 or 20, and then I got divorced shortly
12 thereafter.  So I was maybe 21, 22.  Somewhere around in
13 there.  Don't quote me on that because that was
14 20-something years ago you are asking me to remember dates
15 for, so --
16     Q.  I understand.
17          So to the best of your recollection, you
18 were married in maybe 1999 and you got divorced in 2002,
19 2003, that time frame, right?
20     A.  Somewhere around in there.
21     Q.  Okay.  And if I ask you a question about dates or
22 years and you can't remember, you can give me an
23 approximation.  I don't remember what I did last Tuesday,
24 so don't worry about it if you get it wrong.  I just want
25 to know kind of general temporal parameters.

Page 7

1      A.  Yes, sir.
2      Q.  What county did you get divorced in?
3      A.  Murray County.
4      Q.  Is that in Texas?
5      A.  Yes -- no, no, no.  Georgia.
6      Q.  Okay.  Fair enough.
7          And what was the first name of your
8  ex-husband?
9      A.  Jason.
10     Q.  All right.  Aside from --
11     A.  You are asking me questions I'm trying to forget.
12     Q.  That's why depositions are so much fun.
13     All right.  Aside from Grace Roberts and
14 Grace Taylor, have you had any other legal names?
15     A.  No legal name, no.  I've never been remarried.
16 No.  No.
17     Q.  All right.  Now, as a dancer, you've gone by
18 stage names, right?
19     A.  Yes.  Correct.
20     Q.  And stage names that I have are Regan.  You've
21 gone by Regan as a dancer?
22     A.  Yes.
23     Q.  And you've also gone by Katelynn, right?
24     A.  Yes.
25     Q.  Do you have any other stage names that you've

Page 8

1  used during your time as a dancer?
2      A.  I pretty much stuck with those throughout the
3  years.
4      Q.  How long have you been a dancer?
5      A.  Gosh, for a long time.  I started in my early
6  20s.  I don't know exactly when, but early 20s.
7      Q.  So you've performed as a dancer since what, the
8  early 2000s?
9      A.  Yes.  That's correct.
10     Q.  Have you performed as a dancer exclusively in
11 Texas during those 20 years?
12     A.  No.
13     Q.  What other states have you performed in?
14     A.  I've worked in Louisiana and I worked in -- it
15 was one or two nights, I worked in a place in Tennessee,
16 and I think that's it.  Texas, Louisiana, and Tennessee.
17     Q.  Have you ever performed in Vegas?
18     A.  No.
19     Q.  California?
20     A.  No.
21     Q.  I just want to run some addresses by you.  Have
22 you ever lived at █████████████████?
23     A.  Yes.
24     Q.  Have you ever resided at ████████████████?
25     A.  Yes, sir.

Page 9

1    Q.  Have you ever resided at ████████████
2    A.  Yes, sir.
3    Q.  Have you ever resided at ████████████
4    A.  Yes, sir.
5    Q.  Have you resided at ████████?
6    A.  Yes, sir.
7    Q.  All right.  Have you resided at ████████
8    ████████?
9    A.  Yes.  Wow, that's -- I don't even remember living
10   there, but, yeah.  I do -- I do remember living there,
11   but, yeah.  That was a long time ago.
12   Q.  I understand.  If you looked up my addresses, I
13   would have a bunch, too.  So I get it.
14        Your e-mail addresses, you have used
15   ████████████?
16   A.  Yes.
17   Q.  Have you ever used ████████████?
18   A.  That is my current address.
19   Q.  Have you previously used
20   ████████████?
21   A.  I don't recall that one.
22   Q.  What about ████████████?
23   A.  I don't recall, honestly.
24   Q.  That's all right.
25        What about ████████████?

Page 10

1    A.  I don't recall.  I've had a lot of e-mail
2    addresses over the years.
3    Q.  I get it.  They are like mailing address.
4        What about ████████████?
5    A.  I actually don't recall, either.  Probably, but I
6    don't recall.
7    Q.  That's fine.
8        Your date of birth is January 28, 1980,
9    true?
10   A.  Yes.
11   Q.  All right.  Have you ever been deposed before?
12   A.  Yes.
13   Q.  All right.  In what circumstance?
14   A.  It was a child-care issue.
15   Q.  Was it a -- like a family law issue?
16   A.  I hired someone to watch over my children, and an
17   event happened in their care.
18   Q.  I'm assuming you were the plaintiff in a lawsuit
19   against these other people?
20   A.  Yes.  That was many, many years ago.
21   Q.  Where was the suit filed?
22   A.  Texas.
23   Q.  What county?
24   A.  Harris.
25   Q.  Okay.  Do you recall about how long ago it was?

Page 11

1    A.  Fifteen, twenty years ago.
2    Q.  So I take it you have children who are grown --
3    A.  Adults, yes.  I'm also a grandmother, yes.
4    Q.  How many children do you have?
5    A.  Three.
6    Q.  Well, I don't know if you remember the experience
7    of being deposed.  I'll just go over some real quick
8    ground rules.  Really, these are for the benefit of your
9    lawyer and for the court reporter.
10        The first one is, if I ask you a question
11   that you don't understand or is confusing or I just offer
12   you a bunch of word salad, please feel free to ask me for
13   clarification or to restate the question.  I'm happy to do
14   that.
15        The second thing is, when we kind of get
16   into the rhythm of I'm asking questions and you are giving
17   answers, sometimes people can have a tendency to speak
18   over each other.  Before you give your answer, if you
19   could, just give it about a beat after I ask a question.
20   That will allow your lawyer to lodge any objections and
21   for the court reporter to take down one person at a time.
22        If your attorney does object to one of my
23   questions, you still have to answer it unless he tells you
24   not to.  So you might hear "objection, form" throughout
25   the deposition.  If you hear that, you still have to

Page 12

1    answer my question.
2        If you need a break, just let me know.  As
3    long as there is not a question pending, I'm happy to be
4    flexible.  I will probably have to take a break after
5    about an hour and a half, and I think the court reporter
6    will, too, so that she can give her hands a rest.
7        Do you have any questions for me?
8    A.  No, sir.
9    Q.  Okay.  What have you done to prepare for today's
10   deposition?
11   A.  Well, I spoke with my lawyer.
12   Q.  Okay.  And I don't want to know the subject
13   matter of your conversation with your lawyer, but you
14   spoke with Mr. Mason, right?
15   A.  Yes.
16   Q.  And how long did you speak with Mr. Mason
17   approximately?
18   A.  It was at least an hour.
19   Q.  Was it yesterday or today?
20   A.  It was a few days ago.
21   Q.  Aside from your attorney, have you spoken with
22   anyone else about your deposition today?
23   A.  No.
24   Q.  Haven't spoken with any friends or family members
25   or anything like that?

Deposition of Grace Roberts                     Grace Roberts vs. A.H.D. Houston, Inc

Page 13

1    A.  Not -- not direct -- I might have mentioned that
2  I had a deposition, but I didn't mention anything related
3  about it, details of it or anything like that.  No.
4    Q.  Have you reviewed any documents in preparation
5  for today's deposition?
6    A.  I did review some documents, yes.
7    Q.  Okay.  Do you recall what those documents were?
8    A.  Yes.  They were what the -- what my lawyer had
9  prepared.
10    Q.  Do you know what those documents are called?
11    A.  I don't know the name of them, no.  They were
12  full of questions, a lot of them, and it was many
13  documents.
14    Q.  I understand.
15         Out of curiosity, do you have any documents
16  in front of you right now?
17    A.  No, I do not.
18    Q.  No hard copies or anything, right?
19    A.  No, sir.  No, I do not.
20    Q.  And you don't have any kind of documents on your
21  iPad screen, either?
22    A.  No, sir.  No, I do not.
23    Q.  Are the documents that you reviewed, did you
24  review the first amended complaint in this case?
25    A.  Which -- which -- I'm sorry, could you jog my

Page 14

1  memory?
2    Q.  Sure.  I'll be happy to.  I'll share my screen
3  with you so you can see it.
4    A.  Okay.  Yeah, that would be great.
5    Q.  Have you seen this document before?
6    A.  I actually did not get to this document.  I
7  looked at several of them, but I didn't get to this one.
8    Q.  Okay.  I know you said you reviewed a lot of
9  them --
10    A.  Yes.  Quite a few.
11    Q.  I'll show you a couple of examples.  Have you
12  reviewed the documents with the word interrogatories in
13  the title?
14    A.  I don't -- I don't think so.
15    Q.  All right.  These were documents with a bunch of
16  questions --
17    A.  Oh, wait.  Yeah, I did see -- I did see this.
18  This was the -- yes.  I -- I looked at several of these.
19    Q.  For the record, we're looking at Ms. Roberts'
20  objections and answers to defendant Ali Davari's first set
21  of interrogatories.
22         So you've seen this document, right?
23    A.  Yes.
24    Q.  Have you had an opportunity to review defendant
25  A.H.D.'s first set of interrogatories to you?

Page 15

1    A.  Which one was -- this one was for Mr. Davari?
2    Q.  This one that we're looking at are A.H.D.'s --
3  A.H.D. Houston, one of the defendants in the case, doing
4  business as Centerfolds -- A.H.D.'s interrogatories to
5  you.
6    A.  Okay.  The ones -- this one I have not reviewed,
7  actually.
8    Q.  And I'll just scroll through it and give you an
9  opportunity to see if that might jog your memory.
10         Do any of these questions look familiar?
11    A.  This particular document, I have not reviewed.
12    Q.  Have you ever seen it before?
13    A.  No.
14    Q.  So attached to this document is a declaration,
15  and it appears that it was signed by you on November 23rd,
16  2021, saying that you've read A.H.D. Houston's
17  interrogatories and verified that the answers provided
18  therein are true and correct.
19    A.  Okay.
20    Q.  Do you recall reviewing this back in November of
21  2021?
22    A.  I do recall signing something.  If this was that,
23  then, okay.
24    Q.  Do you recall reviewing these answers in November
25  of 2021 or sometime before then?

Page 16

1    A.  I'm sorry.  There is interference on the -- the
2  feed.
3         THE REPORTER:  Mr. King, can you repeat
4  your question, please?
5         MR. KING:  Sure.
6    Q.  (BY MR. KING)  Do you recall reviewing the
7  answers that we're looking at right now, before you signed
8  the declaration?
9    A.  I do recall -- actually, I do.  I do recall this.
10         I do need to take a -- I do need to take a
11  short break.  I need to plug in my -- my device for 10
12  minutes or so.
13    Q.  Are you going to just plug it in or do you have
14  to go for 10 minutes?
15    A.  I -- I really need to -- well, let me see if I --
16  let me just go grab the charger.
17         THE REPORTER:  Do you want to go off the
18  record?
19         MR. KING:  Yeah.  We can go off the record
20  for a few minutes.
21         (Recess taken from 2:00 p.m. to 2:01 p.m.)
22    Q.  (BY MR. KING)  Okay.  We were talking about
23  documents that you might have looked over before today's
24  deposition.  Have you seen documents called request for
25  production?

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 17

1    A.  So this is what my lawyer would have sent to me,
2  asking me for -- for -- yes.  I have seen that.
3    Q.  So these are written requests that I sent to your
4  lawyers sometime last year, and I don't know if you've
5  ever seen them after I sent them to your lawyer.  So
6  that's why I'm asking you.
7          Okay.  So we're looking at the A.H.D.
8  Houston's first requests for production to you,
9  Ms. Roberts, asking for different kinds of documents and
10 communications.  Do you recall ever seeing this document?
11   A.  Yes.
12   Q.  And now we're looking at A.H.D. Houston's first
13 request for admission to yourself, Ms. Roberts.  Do you
14 recall seeing documents asking you to admit or deny
15 certain things?
16   A.  Yes.
17   Q.  Okay.  Were you able to review these discovery
18 requests or things that looked like them, before today's
19 deposition?
20   A.  Yes.
21   Q.  Aside from what we've been discussing, have you
22 reviewed any other kinds of documents?
23   A.  No, not that I know of.  I don't think so.
24   Q.  Okay.  Tell me about your educational background,
25 ma'am.

Page 18

1    A.  My educational background.  Well, I didn't finish
2  college.  I studied securities, trading the securities
3  industry essential.  I sat for the exam.  I failed it by
4  one point.  I studied Series 3, which is securities
5  trading.  I didn't sit for that exam because I couldn't.
6  I -- I have a lot of just self-taught experience, I guess
7  is my education, basically.  I did attend the Art
8  Institute for a short while.  I attended the University of
9  Phoenix for a short while.
10   Q.  I take it you graduated from high school, right?
11   A.  Yes.
12   Q.  And you have self-taught yourself various things
13 about futures and commodities and trading, right?
14   A.  Yes.
15   Q.  And you maintain a LinkedIn profile, right?
16   A.  Yes, I do.
17   Q.  I'll go ahead and attach your LinkedIn profile.
18        (Exhibit A marked for identification.)
19   Q.  (BY MR. KING)  I'll mark this as Exhibit A.
20        All right.  We are now looking at Exhibit a.
21 Can you see my screen, ma'am?
22   A.  Yes.
23   Q.  Okay.  Is your username on LinkedIn Grace Roberts
24 12345?
25   A.  Yes, it is.

Page 19

1    Q.  And this is the PDF download that you can get
2  from LinkedIn, right?
3        Oh, sorry, you have to give an audible
4  answer.
5    A.  Oh, yes, I'm -- I'm assuming it is.  I've never
6  downloaded a PDF from -- from LinkedIn, but it does -- it
7  looks word for word taken from my profile, yes.
8    Q.  You authored this text that we're looking at in
9  Exhibit A, right?
10   A.  Yes, I did.
11   Q.  No one else wrote this, right?
12   A.  No.
13   Q.  Okay.  And this Exhibit A that we're looking at
14 provides some of your experience that you've had over the
15 years, true?
16   A.  It does.  It also lists -- I didn't list dancing
17 as my profession, but I did list a trade show company that
18 my boyfriend owns, and I didn't ask him to -- I did work
19 for him for a short while, for a few years, but I just
20 sort of continued to work for him as a one-off project, so
21 it wasn't necessarily a full-time job.  I just left it
22 there, because every now and again, every blue moon, I
23 would have someone say, you know, Could you do a brochure
24 for my company or something, but it wasn't something that
25 he paid me to do.  It was just something that I project

Page 20

1  managed and gained experience at.  Does that make sense?
2    Q.  Yes.
3        And the business that you are talking about,
4  that's Spearhead Creative, right?
5    A.  Yes.
6    Q.  And your boyfriend's name is Jeff -- was Jeff
7  Smith, right?
8    A.  Yes.
9    Q.  Did you perform off and on types of work for
10 Spearhead between June of 2008 to January of 2020?
11   A.  It was very, very little.  Very, very little.  It
12 didn't take up a lot of my time.
13   Q.  How much time did it take up?
14   A.  I mean, like I said, it was a contract sort of
15 thing.  I didn't even ask him to pay me to do it.  It
16 really wasn't much.  It was just a little bit of project
17 management.  Maybe -- maybe one hour a week, if that.
18   Q.  Okay.  Does Exhibit A, the description that we're
19 looking at in Exhibit A under Spearhead Creative, is this
20 a fair representation of what you did at Spearhead?
21   A.  Yes.
22   Q.  And your testimony is that on average you spent
23 about an hour a week performing various duties for
24 Spearhead, true?
25   A.  When I had duties.  I didn't always have work.

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 21

1    Q. We also have, here on Exhibit A, that you've
2 been -- you've identified yourself as self-employed as a
3 retail options and futures trader and also a real estate
4 investor and entrepreneur, true?
5    A. Not a real estate investor, no. A retail
6 investor, but, yes.
7    Q. Apparently I can't read today. I apologize.
8 Retail investor.
9         Okay. And that's something that you've been
10 doing for the past eight years now, right?
11   A. Part-time.
12   Q. Part-time.
13        About how much time do you spend performing
14 activities as a self-employed retail options and futures
15 trader?
16   A. Maybe -- it depends on the -- on the strategies.
17 I mostly invest, which is just something you just buy the
18 dip and leave alone so you don't have to watch it. That's
19 something I can do from my mobile phone. If I take five
20 minutes to go use the bathroom, I can purchase something
21 from the app on my phone and I'm done.
22   Q. It's been a painful past six weeks, hasn't it?
23   A. Yes.
24   Q. I understand. I ignore my portfolio right now.
25 It's not been great.

Page 22

1         Okay. So do you conduct research in
2 different kinds of investment opportunities, different
3 kinds of securities, things of that nature?
4    A. Sometimes.
5    Q. Okay. And do you share articles on LinkedIn
6 about interesting things that you've read about market
7 conditions or updates, things of that nature?
8    A. I do.
9    Q. And just on your average week, about how much
10 time would you say that you devote to your investment
11 activities?
12   A. Oh, I don't know. I can do them at nighttime,
13 before bed, and I do them first thing in the morning when
14 I wake up and sometimes around lunchtime. So I don't
15 know, maybe four hours, four or five hours.
16   Q. How did you get into investing?
17   A. Oh, wow. A friend of mine that was an oil and
18 gas analyst, and it interested me, and I just wanted to
19 learn it. I was struggling. I was raising three
20 children. Didn't know the first thing about how to manage
21 money. I wanted to do better, so I learned.
22   Q. Has investing been a good source of income for
23 yourself over the past eight years?
24   A. Tremendously successful. I wouldn't say I would
25 consider it a source of income, per se. Just -- well, I

Page 23

1 don't use it as a source of income, I will say that. My
2 portfolio has grown, yes, but I don't -- I don't live on
3 that.
4    Q. I get it. You are not taking dividends out all
5 the time or anything like that --
6    A. No.
7    Q. Okay. But it's a source of financial security
8 for yourself, true?
9    A. Yes.
10   Q. At Page 3 of Exhibit A, you've got different
11 kinds of educational things that you've done, right?
12   A. Yes.
13   Q. I'll share my screen again with you.
14        Right now, we're just look at my browser
15 window, at your LinkedIn profile. It goes through like
16 what you just testified, that you attended the Art
17 Institute of Houston between 2008 and 2009, right?
18   A. Yes.
19   Q. Okay. And you attended the University of Phoenix
20 in 2003 and 2006, true?
21   A. Yes.
22   Q. And from time to time, you share articles on
23 LinkedIn about --
24   A. Correct.
25   Q. -- commodities, things like that --

Page 24

1    A. When I have time, because I can do that from my
2 phone, no matter where I am.
3    Q. Of course.
4         You maintain a Twitter account, true?
5    A. Not anymore. I -- I haven't -- I haven't -- you
6 can see there, I haven't posted anything since 2011.
7    Q. What was Peerless firm?
8    A. I -- I had started a -- I was trying to start a
9 company, but it -- it never was successful -- it never
10 amounted to anything.
11   Q. What was the idea behind the company that you
12 were trying to start?
13   A. I was trying to start a marketing company.
14   Q. What industry were you trying to market for or
15 targeting, rather?
16   A. Just in general, really, could have been the oil
17 and gas, could have been -- could have been any industry,
18 really. Banking industry. You name it -- you know, was
19 just looking to sell websites and trade shows and things
20 like that, so -- but it never -- I never did anything with
21 it, so...
22   Q. Your active Twitter account is --
23   A. That's not my active Twitter -- I don't have an
24 active --
25   Q. Oh, you do not have an active Twitter --

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 25

1    A.  Not for a while.

2    Q.  And right now we're just looking at

3 Twitter.com/TUGTraderMom?

4    A.  I used to use that account, yes.

5    Q.  Okay.  It's inactive, though?

6    A.  Yes.

7    Q.  Okay.  And you did maintain this account, and the

8 last tweet was January 14 --

9    A.  I did.

10    Q.  -- of 2020, right?

11    A.  Yes.

12    Q.  Okay.

13    A.  But again, that's just something I can just do

14 in -- in spare time, you know, when I'm -- when I'm not

15 doing anything else, you know, I'm -- I'm sitting, just

16 waiting, yeah.

17    Q.  I understand.  The reason I'm asking these

18 questions is because I didn't know what you looked like.

19 I'm sure there are a lot of Grace Roberts out there, so I

20 just want to make sure that this is you and not somebody

21 else.

22    A.  Yes.

23    Q.  Okay.  For example, on your LinkedIn profile,

24 that is a picture of you, Ms. Roberts?

25    A.  Correct.

Page 26

1    Q.  Okay.  And, in fact, it looks like you had the

2 same window there too?

3    A.  Yes.  Correct.

4    Q.  You have a much better view than I do.

5    A.  I'm sure it's more cost effective for you to live

6 here.  You should consider it.

7    Q.  Believe me, I've thought about doing a lot of

8 other things than being a lawyer.  There are easier ways

9 of making a living.

10        Last couple of things, this is your YouTube

11 channel, right?

12    A.  Yes.  Was.  It's not active.

13    Q.  Right now, we're looking at Grace M. Roberts,

14 Flute is the username on YouTube.com.  You are a trained

15 flutist?

16    A.  Correct.

17    Q.  Where did you gain your training as a flutist?

18    A.  I was taught by one of the world's most renowned

19 players.  His name is Sergio Pallottelli.  He's located in

20 Houston.  As a child -- I started playing as a child, when

21 I was in the sixth grade, I think, sixth or seventh grade.

22 I took lessons from the -- from the top player in the

23 state there.  I just -- it's just a hobby, but I was

24 trained.  It's just a hobby.  I never went anywhere with

25 that, either.

Page 27

1    Q.  You grew up in Houston, right?

2    A.  No, I did not.

3    Q.  Where did you grow up?

4    A.  I grew up in Tennessee.

5    Q.  Where in Tennessee?

6    A.  A tiny town called Harriman, Tennessee.  Oak

7 Ridge, near Oak Ridge.

8    Q.  When did you move to Houston?

9    A.  In my 20s.  In my early 20s.  I think actually it

10 was when I was 20, now that I think about it, because I

11 had my 21st birthday at Sam's Boat.

12    Q.  Maybe I misheard you.  So you received training

13 from a gentleman named Sergio --

14    A.  As an adult.

15    A.  As an adult.  Okay.

16    A.  Yes.

17    Q.  When you were in the sixth grade in Tennessee,

18 you also played the flute?

19    A.  Correct.

20    Q.  Have you ever played professionally or anything

21 like that?

22    A.  No.

23    Q.  It's just a hobby that you have --

24    A.  Just a hobby, yes.

25    Q.  Are you still engaged in any kind of marketing

Page 28

1 activity?

2    A.  From time to time, I will work on a project here

3 and there if somebody had -- it's very rare that somebody

4 comes to me anymore for something like that.  Every now

5 and again, I will make a post to say, Hey, you know, if

6 you are looking for a good marketing company, I recommend

7 Spearhead Creative.  Maybe something will come out of it,

8 maybe not.

9        It's not a big deal one way or the other.  I

10 just try to do it because my boyfriend owns the company

11 and it's a source of revenue for him, for us, you know,

12 so -- so I just do that for him.

13    Q.  With respect to Spearhead, were you a member or

14 anything like that --

15        (Simultaneous speaking.)

16    A.  I was a member -- no, not a -- I'm sorry, repeat

17 that.  An LLC?  I wasn't.  No.  No.

18    Q.  (BY MR. KING) Let me ask it like this.  Did you

19 have an ownership interest in Spearhead?

20    A.  No.  Just girlfriend ship.

21        (Simultaneous speaking.)

22    Q.  (BY MR. KING) Is Spearhead an --

23    A.  We live in the same house interest, yeah.

24    Q.  Is Spearhead an ongoing concern?

25    A.  An ongoing concern?  What do you mean?  I don't

Deposition of Grace Roberts                          Grace Roberts vs. A.H.D. Houston, Inc

Page 29

1  understand the question.

2      Q.  Does it still exist?

3      A.  Does it still exist?  Yes, it does.

4      Q.  Okay.  And are you still performing work off and

5  on for Spearhead?

6      A.  Every blue moon.

7      Q.  Since 2018, how often have you done work for

8  Spearhead on a monthly basis, on average?

9      A.  Honestly, it's probably been two years since I've

10 done a project for them.  Two or three -- it probably has

11 been that long.  I had someone ask me about doing a

12 project, but then they didn't -- they didn't act on it,

13 so...

14     Q.  Since 2018, what other companies have you worked

15 for, aside from gentlemen's clubs?

16     A.  Since 2018 -- well, when COVID happened, I had

17 left the gentlemen's clubs and I -- I had to have an

18 income of some kind at that point.  So I turned to the

19 camera, but that was after I left.

20     Q.  Are you referring to, like, OnlyFans?

21     A.  Something similar, yes.

22     Q.  Okay.  Just so you know, I depose a lot of

23 dancers.  So nothing -- nothing shocks me.

24     A.  Oh, I'm all over the Internet.  No worries.  If I

25 was embarrassed about it -- yeah.

Page 30

1      Q.  All right.  We're all adults here.

2      A.  Yes.

3      Q.  Was is the name of the platform that you used

4  post COVID?

5      A.  I used Streamate and Chaturbate.

6      Q.  Prior to COVID, did you use any of those --

7      A.  No.

8      Q.  -- platforms --

9      A.  No.

10     Q.  A lot of dancers turned to OnlyFans, Streamate,

11 Chaturbate after all the clubs got shut down, right?

12     A.  No choice, yeah.

13     Q.  Did you derive income from your post-COVID web

14 activities?

15     A.  Yes.

16     Q.  How much income approximately did you derive?

17     A.  Depending on how much I work, every --

18 every time -- every week is different.  It's not

19 consistent because it's all about how much hours you put

20 in.  On average, I average $50 an hour.  Sometimes more,

21 sometimes it's less.  My average is $50 an hour.  On

22 average, I work 25, 30 hours a week, sometimes less,

23 sometimes more, but on average, that's what I do.

24     Q.  And you are still active on these platforms,

25 true?

Page 31

1      A.  Yes.

2      Q.  Okay.  What is the user name that you go by on

3  these platforms?

4      A.  Katelynn Heart.

5      Q.  Spelled K-a-i-t-l-y-n-n?

6      A.  No, sir.  It's K-a-t-e-l-y-n-n.

7      Q.  And Heart is spelled H-e-a-r-t, true?

8      A.  Yeah.  And I think KatelynnHeartcams.

9      Q.  Now, on these platforms, people will pay to see

10 you in various states of undress or something like that,

11 right?

12     A.  Yes.

13     Q.  In a nutshell?

14     A.  Yes.  Without going into detail, yes.

15     Q.  How do you gain a customer base on these

16 platforms?

17     A.  The platform provides our customer base.

18     Q.  Did you have any customers on OnlyFans,

19 Streamate, Chaturbate that you met while performing as a

20 dancer at any clubs?

21     A.  One.

22     Q.  Just one?

23     A.  Just one, yeah.

24     Q.  Okay.  All right.

25     A.  That I recall.  I think one.

Page 32

1      Q.  Prior to COVID, which seems like a long time ago

2  at this point, what other business activities were you

3  engaged in, aside from dancing?

4      A.  Just trading, and I really haven't been doing

5  that much of that.  Just buying the dip and letting it go,

6  so...

7      Q.  I don't know where this dip is going.  I will

8  just say that.

9          Okay.  Since 2018, you spent your daytime

10 hours engaged in various trading activities, right?

11     A.  Watching Bloomberg.  If I wasn't -- I'm sorry.

12 Wait.  Prior to -- let me make sure I heard you correctly

13 so I'm answering you correctly.  Say that again.

14     Q.  Right now I'm talking about the window of time

15 between January of 2018 and, say, the end of March 2020,

16 because that's when things really got going with COVID.

17     A.  Yeah.  I left right -- sort of right when COVID

18 happened, so -- and your question was -- was what else am

19 I doing, if anything?

20     Q.  Yeah.  Just what other sources of income did you

21 have --

22     A.  No, that's --

23          THE REPORTER:  Hold on.  Let him finish.

24          THE WITNESS:  Oh.  Sorry.  Yeah.

25     A.  Go ahead.

**Page 33**

1    Q.  (BY MR. KING)  All right.  It's normal.

2         Between 2018 and the beginning of the

3  pandemic, in roughly March, April 2020, aside from

4  dancing, what other sources of income did you have?

5    A.  That was it.

6    Q.  The trading activity?

7    A.  Just investing, yeah, and --

8    Q.  Okay.

9         MR. KING:  Can we take a real quick break?

10        MR. MASON:  Sure.

11        (Recess taken from 2:28 p.m. to 2:32 p.m.)

12   Q.  (BY MR. KING)  Have you ever formed any entities,

13  ma'am?

14   A.  I have, but they have all been dissolved.

15   Q.  In years past, you formed an entity called CBD

16  Hemp Industrials, true?

17   A.  I did, yeah.

18   Q.  Okay.  What was the idea behind that entity?

19   A.  The idea was to work with the U.S.D.A. and start

20  a hemp company.  This was prior to some of the laws going

21  into -- we couldn't -- the law just wasn't ready for us at

22  the time, so we couldn't get funding.  So it never went

23  anywhere.  But the idea was to grow hemp for cars and --

24  and Hempcrete and houses and things like that.  So

25  industrial uses.

**Page 34**

1    Q.  That's a good idea.  Maybe the laws will change.

2    A.  Maybe.  Actually, it is legal there in the

3  United States now.  Yeah.

4    Q.  This entity that we're talking about, CBD Hemp

5  Industrials, it was formed in 2016, right?

6    A.  It was just a side project.  It never went

7  anywhere.

8    Q.  But it was formed in 2016, right?

9    A.  Sounds right.

10   Q.  Were you the founder and director of this entity?

11   A.  Yes.

12   Q.  Did you invest any money into this entity?

13   A.  Not -- not much, other than to just register

14  the -- the paperwork.  Beyond that, it didn't -- it didn't

15  go anywhere.  I learned my lesson.

16   Q.  I get it.  You don't have to apologize to me.

17        Did you generate any kind of revenues

18  with this --

19   A.  No, sir.  It was -- we didn't even finish the

20  business plan all the way.  It never -- it was just a --

21        (Simultaneous speaking.)

22   Q.  (BY MR. KING)  Did you have partners in this

23  business -- prospective business, rather?

24   A.  I did have two people that were going to help me

25  with the project, had it blossomed, but it didn't.  It

**Page 35**

1  just sort of died as soon as we started it, but, yes, I

2  did.

3    Q.  Are you still engaged in any kind of business

4  with these individuals?

5    A.  Well, one of them is my boyfriend, who owns

6  Spearhead Creative, and the other one is my -- my best

7  friend, and we're talking about doing some things in the

8  future, but who knows?

9    Q.  Your boyfriend's name was Jeff Smith, right?

10   A.  Yes.

11   Q.  Were you involved in an entity named G.T.

12  Productions, LLC?

13   A.  I forgot about that one.  Yes, I was for sure.

14  It was dissolved almost immediately, also.

15   Q.  Okay.  What was the idea behind G.T. Productions?

16   A.  It was just another marketing agency, just doing

17  videos, just like corporate-style videos for CEOs.

18   Q.  Does the G.T. stand for Grace Taylor?

19   A.  Yes.  That's what it stood for back then.  That

20  was many, many years ago.  20-something, I want to say.

21  Maybe a little less.

22   Q.  That entity has been forfeited, right?

23   A.  Yeah.  It's gone, dissolved.

24   Q.  Have you formed any other entities in the past 20

25  years, that you can recall?

**Page 36**

1    A.  I don't recall.  I don't think so, but...

2    Q.  What about Miss Stripper America, LLC?

3    A.  Oh, I did do that one, yes.  Yes.  I'm an

4  entrepreneur, what can I say?  I've been trying.

5    Q.  I see that.

6         Do you recall when this entity was formed?

7    A.  I really don't, honestly.  I know it was sometime

8  around in my early 20s, also.

9    Q.  Does 2005 sound right?

10   A.  Somewhere.  That's my early 20s, yeah.

11   Q.  Were you the managing member of this entity?

12   A.  Yeah.  I was the founder.

13   Q.  Okay.  What was the idea behind this entity?

14   A.  At the time, they had a show on -- on SHOWTIME,

15  and it sort of -- I had the idea to sort of make a mockup

16  show of the girls and put it all together, but I just

17  wasn't experienced enough to pull something like that off,

18  you know, so -- so it didn't happen.  It fell apart almost

19  immediately.

20   Q.  It was worth a shot, right?

21   A.  It was, yeah.

22   Q.  Did anyone else participate in this entity or

23  have an ownership interest or was it just you?

24   A.  I think it was just me -- I really don't recall,

25  honestly.  I'm pretty sure it was just me.

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 37

1    Q.  Any other entities that we haven't covered yet?
2    A.  I don't think so, but, you know, you might
3  surprise me.
4    Q.  Well, for what it's worth, I couldn't find any,
5  but I don't know.  That's why I'm asking.
6    A.  I don't think so.  You are asking me for my life
7  history, my first-born child, too.  That's a long time to
8  remember things.
9    Q.  All right.  Earlier, we were talking about the
10 request for production, where the defendant sent you
11 written request for documents.  I just want to go over
12 some of them real quick.
13      All right.  The first one asks if you have
14 any documents or communications basically in which you
15 wrote down the days, hours, weeks or months that you
16 worked at Centerfolds.  Have you been able to review your
17 records for any kind of documents like that?
18   A.  I don't have anything like that.
19   Q.  All right.  So no documents exist with respect to
20 the first request for production?
21   A.  Correct.
22   Q.  In your possession?
23   A.  Correct.
24   Q.  Do you have any documents in which you wrote down
25 or recorded the amounts of money that you made working at

Page 38

1  Centerfolds?
2    A.  No.
3    Q.  Do you have any sorts of documents in which you
4  recorded the amounts in house fees that you paid when you
5  went --
6    A.  No.
7    Q.  Do you have any kind of documents reflecting the
8  amount that you paid to managers.  Or D.J.s or anybody
9  else at Centerfolds?
10   A.  No.
11   Q.  Is it safe to assume that you have no documents
12 related to Centerfolds?
13   A.  Yes, sir.
14   Q.  And that includes things like text messages.  Do
15 you have any text messages between yourself and somebody
16 else at Centerfolds?
17   A.  Oh, I -- I provided those.
18   Q.  What did you provide?
19   A.  It was messages.
20   Q.  All right.  What do those messages say?
21   A.  They were related to me coming to work and
22 related -- I think one of them asked a manager to dim the
23 lights in the champagne room, or something to that effect,
24 and I don't really recall what all they were about now.
25   Q.  All right.  Do you recall who was on the other

Page 39

1  end of those communications that you've just described?
2    A.  Kirk Ramirez.
3    Q.  Are these text messages?
4    A.  They were -- I think they were Facebook
5  Messenger.
6    Q.  Facebook.  Okay.
7        And when did you provide these documents --
8  I assume to your lawyers?
9    A.  Correct.
10   Q.  When did you provide these?
11   A.  How long has it been since we started this?  So
12 maybe almost a year ago or seven or eight months ago.
13   Q.  What other kinds of messages did you provide?
14   A.  I talked about some of the girls in the -- in the
15 bar and how they shouldn't be allowing certain stuff and I
16 voiced my concerns about how the place was falling apart
17 and I don't really recall what else.  There wasn't a
18 whole, whole, whole lot.
19   Q.  Do you recall about how many text messages you
20 provided?
21   A.  Ten, fifteen, maybe, if that.  I really don't
22 recall how many exactly.
23   Q.  The only reason I'm asking is because I don't
24 have them.
25   A.  Oh.

Page 40

1    Q.  So do you recall when these text messages took
2  place?
3    A.  I really don't.  I'm sorry.  I would have to look
4  at them.
5    Q.  Did you provide your lawyers with any other kinds
6  of documents related to your time at Centerfolds?
7    A.  No.
8    Q.  So the only documents that you've got related to
9  Centerfolds are these electronic messages that we've been
10 talking about, right?
11   A.  Correct.
12   Q.  Do you have any records --
13   A.  Oh, I did provide them with a -- I believe it was
14 a 1099.
15   Q.  1099.
16       Centerfolds sent you a 1099, right?
17   A.  Yes.
18   Q.  Do you recall what the tax year was on that?
19   A.  I don't recall currently.  I would have to look
20 at it.
21   Q.  Do you recall how many 1099s you've received from
22 Centerfolds?
23   A.  I only got the one.
24   Q.  You can only recall just one, right?
25   A.  Yes.  I had -- I don't know what happened.  I had

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 41

1  tried to get other ones from them, and they just never
2  they just never showed up, so...
3      Q.  Have we now covered all of the documents that are
4  in your possession or custody or control, related to
5  Centerfolds?
6      A.  I believe so.
7      Q.  Did you report the income that you made from your
8  time at Centerfolds in your tax returns?
9      A.  I'm sorry, I need to go to the bathroom -- how do
10 I put it on the --
11     Q.  Well, you've got to answer my question first.
12     A.  Oh.  Well, let me -- let me just go and then I'll
13 come right back.  I just need to take a break.  I'm sorry.
14         How do I -- how do I -- oh, my gosh, I've
15 got to go -- how do we --
16         MR. MASON:  There should be something on
17 the bottom left corner, but you can answer the current
18 question.
19         MR. KING:  It's all right.  I understand.
20 Go ahead.
21         (Recess taken from 2:45 p.m. to 2:47 p.m.)
22     Q.  (BY MR. KING)  Did you report the income that you
23 made from your work at Centerfolds in your taxes?
24     A.  So currently my taxes are late.  I have them
25 printed out, I have them ready to go.  I gave them to my

Page 42

1  mom.  She was supposed to do it, and we had a falling out.
2  So that is on my agenda to do when I fly back to Houston,
3  but it will be done.
4      Q.  What about for tax year 2018?
5      A.  I don't recall, honestly.  I will have to look.
6  I don't have my taxes in front of me.
7      Q.  Did you file your taxes in tax years 2018, 2019,
8  2020?
9      A.  I know certain years I have filed and then some
10 are -- are behind.  So I don't -- I would have to look at
11 those to fully answer your question.
12     Q.  Okay.
13     A.  But I will be --
14     Q.  In the tax filings that you have submitted, have
15 you reported the income that you made while at
16 Centerfolds?
17         MR. MASON:  Objection.
18     A.  I -- I -- I really don't recall without looking
19 at them.
20     Q.  (BY MR. KING)  For the webcam platforms that we
21 were talking about, do they provide you with some sort of
22 documentation about the amounts of money that you --
23     A.  Yes, they do.
24         THE REPORTER:  Ms. Roberts, let him finish
25 his whole question.

Page 43

1          THE WITNESS:  Oh.  Sorry.
2      Q.  (BY MR. KING)  What are those documents called?
3      A.  1099s.
4      Q.  Oh, so they send you a 1099?
5      A.  Yes.
6      Q.  Is there some sort of page where you can look at
7  how much money that you've generated over a certain period
8  of time?
9      A.  Yes, sir.  You can log in and you can see all of
10 that information in your account.
11     Q.  Did you ever exchange messages, electronic
12 messages with anyone at Centerfolds regarding any club
13 policies or procedures or rules or anything like that?
14     A.  Not that I recall.
15     Q.  Have you received any billing records or invoices
16 from your attorneys?
17     A.  No.
18     Q.  Did you ever take any photographs or videos while
19 you were inside Centerfolds at any time?
20     A.  One, in the dressing room.
21     Q.  Like a selfie?
22     A.  Yes.
23     Q.  Do you have an Instagram account?
24     A.  I do.
25     Q.  Okay.  What is your username or handle on

Page 44

1  Instagram?
2      A.  Throbbing Heart Productions.
3      Q.  How long have you had your --
4      A.  Sorry.  Go ahead.
5      Q.  How long have you had this Instagram account that
6  you are discussing?
7      A.  If memory serves me, it was created after I left
8  the clubs because it's related to my cam girl.
9      Q.  So you started an Instagram account to kind of
10 facilitate webcamming activities?
11     A.  Correct.
12     Q.  Did you maintain this Instagram account during
13 the time that you were performing as a dancer?
14     A.  No.
15     Q.  Do you have a Facebook account?
16     A.  Yes.  It's not currently active.
17     Q.  Was it active at any point between 2018 and 2020?
18     A.  Yes.
19     Q.  What is the username for your Facebook account?
20     A.  Oh, it's just my name, my real name.  I didn't
21 use that for -- for club promotions, if that's what you
22 are getting at.  It's just a personal account.
23     Q.  Okay.  Well, I'll let you know what I'm getting
24 at.
25     A.  Okay.

Deposition of Grace Roberts                                    Grace Roberts vs. A.H.D. Houston, Inc

Page 45

1    Q.   Oftentimes, people with social media accounts,
2    particularly dancers, will post things related to
3    performing or being at the club or selfies of themselves
4    being in the club, and those would be relevant to this
5    case.
6    A.   Correct.   No.   At the time, I had not made the
7    decision to come forward that I was in the adult
8    entertainment industry, with anyone on social media.
9    Q.   So your Facebook account did not -- you didn't
10   use that to say, hey, I'm an exotic dancer, right?
11   A.   Correct.
12   Q.   Did you ever use Instagram or Facebook or any
13   other social media platform to discuss your whereabouts on
14   any particular given day?
15   A.   Could you rephrase the question because that --
16   is that related to the -- is that a -- in general, yes.
17   Are you asking me did I post a photograph or a statement
18   or check in somewhere?   For instance, I'm at a restaurant
19   down the street, yes, I did those things.   I don't think
20   I -- I did that while I was at working at Centerfolds.
21   Q.   I understand.
22        But like a lot of people, you might post,
23   I'm checked in at Pizza Hut, or something like that?
24   A.   Correct.
25   Q.   Do you have any kinds of electronic

Page 46

1    communications with any dancers who have performed at
2    Centerfolds at any point?
3    A.   Yes.   I have many friendships.
4    Q.   And you exchanged text messages with those other
5    dancers, true?
6    A.   Yes.
7    Q.   Have you searched for those text messages and
8    retrieved them?
9    A.   I have them.
10   Q.   Okay.   Have you provided those --
11        (Simultaneous speaking.)
12   A.   Well, they -- they are not specific conversations
13   regarding Centerfolds, if that's what you mean -- well,
14   actually, one of them is, now that I think about it.   I
15   don't think I have, but I will.
16   Q.   (BY MR. KING)   Okay.   What sorts of things, in
17   general, would you discuss with other dancers at
18   Centerfolds?
19   A.   In general, oh --
20   Q.   And let me clarify.   I'm talking about in text
21   messages.
22   A.   Pertaining to Centerfolds, is that your question?
23   Q.   Or --
24   A.   Not life in general or exotic dancing?   Some of
25   them were saying they don't work there anymore.   Some of

Page 47

1    them were saying the club was run down.   Some of them were
2    complaining about how they'd been sexually harassed by the
3    management.   Some of them are talking about customers.
4    Q.   So these text messages -- well, are they text
5    messages or are they social media?
6    A.   They are Facebook Messenger.
7    Q.   Facebook Messenger.   Okay.
8        And the general substance of these
9    back-and-forth messages with other dancers are about
10   customers, management, the condition of the club.
11   Anything else that you can recall?
12   A.   No.   I mean, our conversations were friendly in
13   nature.   They -- they talked about other things not
14   involving the club, too, but -- but, yeah, that -- that --
15   that was pretty much the gist of things.   Some of them
16   talked to me -- they read the publication in the
17   newspaper.   One of them was a door girl; she worked there
18   for a really long time, as long as I did, if not longer,
19   or maybe the same time, but she reached out to me; a D.J.
20   reached out to me.
21   Q.   And what was the door girl's name that you are
22   referencing?
23   A.   Misty Blue.
24   Q.   Misty Blue.
25        And the D.J.'s name?

Page 48

1    A.   Trey Meekins.
2    Q.   And what did Ms. Blue talk with you about?
3    A.   This lawsuit, her lawsuit.   Just overall how the
4    club had gone down in years, how the management had run it
5    down, how they were involved in stuff, and like -- how --
6    how the manager, Chris, was a bad guy, and that was pretty
7    much it, you know.
8    Q.   You mentioned that the D.J. reached out to you
9    after reading an article in the press, right?
10   A.   Yes.
11   Q.   All right.   What was the substance of that
12   exchange?
13   A.   He just said that he knew that I had been there
14   for a long time and -- I really don't recall what else.   I
15   would have to reread them.   It's been a while.
16   Q.   I understand.
17        Did other dancers at Centerfolds reach out
18   to you after the lawsuit hit the press?
19   A.   I don't recall -- I don't think so, but maybe.   I
20   think I had somebody reach out to me from a different
21   club, from the Men's Club.
22   Q.   About what?
23   A.   About the suit, and I wouldn't talk to him.
24   Q.   Oh, it was a him?
25   A.   Yeah.   I think he was a D.J.

Deposition of Grace Roberts                          Grace Roberts vs. A.H.D. Houston, Inc

Page 49

1    Q.  Oh, a D.J.  Oh, okay.  I was going to say, I
2  don't think the Men's Club has any men -- male dancers.
3    A.  They have D.J.s and cooks and valet guys,
4  managers.
5    Q.  Does the name Stephanie Elise ring a bell?
6    A.  Yes.  Oh, yes.  Yes.  See, I didn't recall.  I do
7  remember her, yes.
8    Q.  And what was her stage name?
9    A.  I think she went by Stephanie, I believe.  I
10  don't recall, actually.
11    Q.  That's fair.
12        What about Ally Tran?
13    A.  Yes.  I don't remember what she went by, either.
14    Q.  What about Angela Flowers?
15    A.  Yes, but I don't recall her dance name, either.
16    Q.  What about Analana Gilbert?
17    A.  Yes.
18    Q.  Is that how you pronounce it?
19    A.  You got me.
20    Q.  Bethany Adams?
21    A.  Yes.
22    Q.  And all of these individuals that I've just
23  named, these are women that you know who performed at
24  Centerfolds, right?
25    A.  Correct.  Yes.

Page 50

1    Q.  And they performed during the same time period
2  that you --
3    A.  Correct.
4    Q.  -- performed?
5    A.  Yes.
6        THE REPORTER:  Let him finish his question,
7  please.
8        THE WITNESS:  Sorry.
9    Q.  (BY MR. KING)  I have to ask kind of long-winded
10  questions because it's easier when it's all written out,
11  just so you know.
12        Okay.  All of these individuals reached out
13  to you after you filed suit, true?
14    A.  I would not say all of them.  I would say some of
15  them we had prior relationships, but, yes, we have spoken
16  since.
17    Q.  What have you spoken about?
18    A.  I mean, different things with different people,
19  but in regards to the suit, just -- just that, that I
20  filed suit and they all said they were on my side and that
21  was that.  I didn't talk about it too much, per my
22  lawyer's recommendation.
23    Q.  Aside from these individuals that we've just
24  named, Ms. Elise, Ms. Tran, Ms. Flowers, Ms. Gilbert, and
25  Ms. Adams -- did we get to Bethany Adams?  I think we did.

Page 51

1        Have you spoken with any other dancers about
2  this lawsuit?
3    A.  To my knowledge, I don't think so, but...
4    Q.  Okay.  Aside from these dancers, have you spoken
5  with anybody else at Centerfolds about this lawsuit?  For
6  example, waitresses, D.J.s, door girls, other kind of
7  personnel?
8    A.  Well, I mentioned the D.J.
9    Q.  Right.
10    A.  I don't recall if I have.  I don't believe so,
11  but I don't recall, so I'm not real sure.
12    Q.  Okay.  What was the general substance of your
13  communications with the D.J.?
14    A.  I mean, again, it was, you know, just about the
15  lawsuit and that he was on my side, and that was that.
16    Q.  Did he give a reason why he would be on your
17  side?
18    A.  I don't recall.  I don't think so -- I don't
19  recall.
20    Q.  The D.J.'s last name is, did you say Nagan?
21    A.  No.  Meekins.
22    Q.  Meekins.
23        Did you ever tip Mr. Meekins during your
24  time at Centerfolds?
25    A.  I did.

Page 52

1    Q.  Okay.  Did Mr. Meekins ever make you tip him?
2    A.  Tips were not mandatory.
3    Q.  Have you spoken with a dancer named Lilibeth
4  Gomez?
5    A.  I don't recall.  Maybe.
6    Q.  She's another plaintiff in this case.
7    A.  I don't think so, but...
8    Q.  She went by Gina.
9    A.  I don't think so.  I don't think I know her.
10    Q.  Have you had -- since filing this suit, have you
11  had any kind of communication, written or verbal, with
12  Kirk Ramirez?
13    A.  Not since filing the suit, no.
14    Q.  What about Thomas Venza?
15    A.  No.
16    Q.  Chris Malusa?
17    A.  No.
18    Q.  Ali Davari?
19    A.  No.
20    Q.  Hassan Davari?
21    A.  I'm sorry, what was that?
22    Q.  Hassan Davari.
23    A.  No.
24    Q.  Have we now covered everybody that you had any
25  kind of exchange with, after filing suit, about the

Page 53

1  lawsuit?
2      A.  I believe so.
3      Q.  To the best of your recollection?
4      A.  Yes.  To the best of my recollection.
5      Q.  When did you first begin performing at
6  Centerfolds?
7      A.  Oh, gosh.  In my mid to -- early -- mid 20s,
8  maybe late 20s.  So, gosh, it's a long time ago.  I worked
9  there and then I left and then I came back maybe around
10 2013.  I worked at Davari clubs from the time I was 20,
11 but I didn't start at Centerfolds.  I worked at Gold Cup
12 for a long time, and Treasures for a while.
13     Q.  Did you ever work at Cover Girls?
14     A.  Yes -- oh, no.  No, I did not.  No.
15     Q.  Well, let's do it like this.  Can you give me
16 a -- to the best of your recollection, a chronological
17 list of the clubs that you've performed at since you
18 started working as an exotic dancer?
19     A.  Davari -- Davari clubs.  Could you clarify that
20 question?
21     Q.  Well, let me help you a little bit.
22         Since 2015 through the present, can you give
23 me a rundown of all the different gentlemen's clubs,
24 topless clubs, strip clubs, that you performed at as a
25 dancer?

Page 54

1      A.  I can try.
2         Ritz, Houston.  Centerfolds.  Bucks Wild.
3  Divot.  PT's.  Stilettos, New Orleans.  That's it, I
4  believe, to the best of my recollection.  I didn't work at
5  those other places, like, a whole lot.  So it was just --
6      Q.  Sure.
7         The Bucks Wild, is that the Bucks Wild in
8  Houston?
9      A.  Yes.
10     Q.  Okay.  Have you ever performed at any clubs in
11 Austin?
12     A.  Oh, yes.  Yes, actually.  Perfect 10 and -- and
13 The Landing Strip, but again, it was just like a one- or
14 two-day sort of -- it was no length of time at all.
15     Q.  What about the Yellow Rose?
16     A.  No.
17     Q.  Back here in Houston, have you performed at the
18 Men's Club?
19     A.  Yes, but I don't believe it was during that time.
20     Q.  This is before 2015 --
21     A.  I believe so.
22     Q.  Since 2015, is it your testimony that you
23 performed at Treasures?
24     A.  No.
25     Q.  So before 2015 is when you worked at Gold Cup,

Page 55

1  Treasures, and Cover Girls, right?
2      A.  Far before, yes.
3      Q.  Okay.  When you first entered the industry?
4      A.  Correct.
5      Q.  A lot of different women have different reasons
6  for starting work as an exotic dancer.  What was yours?
7      A.  I have inflammatory bowel disease, and it's hard
8  for me to hold down a regular job.  I have over 200 food
9  allergies and I stay sick and so -- on the days I worked,
10 I didn't eat, so I didn't get sick.
11         I also have -- well, now they are adults,
12 but at the time, when I first started, I had three
13 children and I also needed the flexibility of that so I
14 could be a mother, and I needed the good income in a fast
15 pace so I could pay my rent and put food on the table, so,
16 yeah.  So that's it, and I just studied and kept myself
17 busy, just trying to learn things, just trying to survive,
18 so...
19     Q.  You said you suffer from an intestinal
20 disorder --
21     A.  Correct.  A severe one.
22     Q.  -- is it cystic fibrosis?
23     A.  It's a CF -- I don't have cystic fibrosis.  I
24 have a CFTR mutation, which is why I have so many
25 allergies.

Page 56

1      Q.  And so you found that dancing was an occupation
2  that afforded you a degree of flexibility?
3      A.  Correct.  I didn't have to worry about being
4  fired for missing a day of work.
5      Q.  And it provided a stream of income that could
6  not --
7      A.  Correct.
8      Q.  -- be found elsewhere?
9         At the Ritz, you performed between
10 approximately 2016 and 2020, true?
11     A.  It was on and off, but I -- I don't really recall
12 what years I was there, honestly.
13     Q.  I understand.  Let me see if I can help you.
14         So I'm showing you the interrogatory answers
15 that you gave to your lawyers, right here.
16     A.  Okay.
17     Q.  Do these time frames -- are they accurate?
18     A.  Yeah, they -- to my recollection, they look
19 accurate, but again, it might have been a place where I
20 only performed at two times or three times or it wasn't
21 something -- Centerfolds was my home club.
22     Q.  Let's talk about that a little bit because I've
23 heard this from many dancers.  Dancers will often have a
24 home base club, right?
25     A.  Yes.

Deposition of Grace Roberts                        Grace Roberts vs. A.H.D. Houston, Inc

Page 57

1    Q.  Why is that?

2    A.  Comfortability {sic}, flexibility, the -- the

3  girls that are there -- you know, you have your friends

4  and you have waitresses that you like and that work with

5  you and you make -- you know, you make good money, working

6  with people that you get along with, right.  So -- so it

7  was that.  Other places didn't have -- quite have that --

8  they -- they were more strict about schedules and they

9  were further away from my house and most of the customers

10 that I had over the years, I met at Centerfolds or one of

11 the Davari clubs, so naturally, they would want to meet at

12 Davari club, you know, so it was just -- it was

13 convenient.

14    Q.  Okay.  So you mentioned that when it comes to

15 kind of assessing where your anchor club is, it's your

16 comfort with the personnel that are there, because you

17 want to work with people that you get along with, right?

18    A.  Correct.

19    Q.  Because the relationships in a club, between

20 dancers, waitresses, D.J.s, managers, those things affect

21 how much money you are going to make as a dancer?

22    A.  Correct.

23    Q.  And the same thing goes for waitresses, too, I

24 think, right?

25    A.  Correct.

Page 58

1    Q.  Can you explain the dynamic, because I don't

2  think a lot of people understand it?

3    A.  So the dynamic was you tipped everyone out, and

4  if you tipped everyone out, they scratched your back, and

5  if you didn't, you didn't make good money and they outcast

6  you.

7    Q.  How would they outcast you?

8    A.  They wouldn't send you to good tables any more.

9  They wouldn't tell you where the parties were.  They

10 wouldn't invite you to anything, to -- they wouldn't say,

11 Hey, that's my guy, go sit with him, he'll tip you well or

12 whatever, you know.  They just -- you -- you got X -- is

13 that the right word?

14    Q.  Yeah.

15    A.  But, yeah, you -- you -- you had to fend for

16 yourself at that point.  So -- and then you had to work

17 hard to, like, get back in the good graces of people,

18 so...

19    Q.  All right.  So tipping other personnel,

20 waitresses, D.J.s, managers, whatever, that was something

21 that you had to do to ensure that your revenue streams

22 basically remained consistent, right?

23    A.  Correct.

24    Q.  And if you didn't do that, it could hurt the

25 amount of money that you would make, right?

Page 59

1    A.  You could actually just be -- like if

2  something happened or arose, if somebody had a problem

3  with you or a customer or anything could happen, you know,

4  but if just -- you could look at them the wrong way or

5  something and they just decide, well, she doesn't really

6  tip me that much and just -- if it doesn't work out, let's

7  just get rid of her.

8    Q.  Right.

9    A.  So you could potentially lose your job from it,

10 yes.

11    Q.  Do all clubs basically have the same kind of

12 internal dynamics?

13    A.  No.  Most, not all.

14    Q.  Most.  Okay.  Explain that to me.

15    A.  The Ritz was different and the one in -- PT's in

16 Dallas was different.  They are not allowed to take tips

17 at all.  The -- the waitresses were allowed to, but the

18 management was not allowed to.

19    Q.  At the Ritz?

20    A.  Correct.

21    Q.  Okay.

22    A.  So they are not allowed to do that, so there is

23 no favoritism.

24    Q.  Did you ever work with a manager at the Ritz

25 named Damon Jackson?  Eye patch guy?

Page 60

1    A.  I don't recall.  I don't recall an eye patch.

2  Maybe, but I don't recall.

3    Q.  I was just curious.  Have you ever worked at

4  Heartbreakers?

5    A.  It seems like I did at one point, but I don't

6  think I stayed there very long.

7    Q.  Have you ever worked at any Rick's club?

8    A.  Prior to it being taken over by whatever it is

9  now, yes, but not for very long.

10    Q.  What about a Jaguars?

11    A.  Jaguars -- I don't think so.

12    Q.  Have you ever performed at an XTC location?

13    A.  No.

14    Q.  So you were explaining how the -- how tipping

15 works inside the club.  So at Centerfolds, how did that

16 dynamic work?  Was it basically like what you just told

17 me, where it's tipping enhances the amount of money that

18 you are going to be directed to, in effect?

19    A.  I'm going to answer this and then I'm going to go

20 to bathroom again.  I'm sorry.

21    Q.  Okay.  Go ahead.

22    A.  You want -- you wanted me to explain how tipping

23 works --

24    Q.  Right.

25    A.  -- outside of clubs -- outside of Centerfolds, at

Page 61

1   the other clubs; is that correct?

2       Q.   Now I'm talking about at Centerfolds.

3       A.   At -- at -- well, I already explained

4   Centerfolds, so...

5       Q.   Okay.  So your prior answer was specifically with

6   respect to Centerfolds that -- I'm paraphrasing -- the

7   amount that you tip waitresses, D.J.s, managers, whatever,

8   would have an effect on how much money you could make?

9       A.   Correct.  Yes.

10      Q.   And the reason why is because they would then

11  direct you to customers, right?

12      A.   Correct.

13      Q.   Maybe refer you to a private party or private

14  event?

15      A.   Correct.

16      Q.   What other advantages would there be, I guess for

17  lack of a better term, to participating in this tipping

18  system?

19      A.   Still having a job.  I mean, yeah.

20           MR. KING:  Let's take a break because I

21  also have to run.

22           (Recess taken from 3:22 p.m. to 3:25 p.m.)

23      Q.   (BY MR. KING)  I think a lot of people have an

24  idea of what dancers do, but maybe not a complete picture.

25  Can you tell us what -- how would you describe the work of

Page 62

1   exotic dancing?

2       A.   Yes, I can.

3            So exotic dancing involves dancing naked,

4   sometimes entirely naked, sometimes just in a pair of

5   panties, on a stage or on someone's lap.  But it also

6   involves 8 to 12 hours of walking in 8-inch stiletto

7   heels.  It also involves negotiation.  It also involves

8   flattery and finesse and the ability to flirt and -- and

9   speak and carry on a conversation.  It involves the

10  ability to dance -- not everyone can dance.  Some of them

11  have to be trained.  I know I did when I first started.

12  It takes a degree of fortitude to even do, and it takes a

13  degree of fortitude to handle, because you put up with a

14  lot of non-gentlemen and --

15           (Simultaneous speaking.)

16      Q.   (BY MR. KING)  And not just customers?

17      A.   Yes.  You took the words right out of my mouth.

18  Yes.  And not just customers --

19           (Simultaneous speaking.)

20      A.   -- also girls.

21      Q.   (BY MR. KING)  Managers?

22      A.   And managers, from time to time.

23      Q.   All right.  The dancers are not always pleasant

24  with each other, shall we say?

25      A.   No, not always.  There were fights.  Not often,

Page 63

1   but it did happen.

2       Q.   It is a physically demanding job, true?

3       A.   Yes, it is, very.  Extremely.  A lot of people

4   wouldn't be able to do it.

5       Q.   Right.

6       A.   Yeah, I have injuries from it.

7       Q.   It can be an emotionally demanding job, as well?

8       A.   Yes.  Absolutely.

9       Q.   As a dancer, you face a lot of rejection, right?

10      A.   You face not only rejection, but mistreatment

11  that you would never allow in the normal world.  You know,

12  I might allow someone in the club to speak to me in a

13  manner or -- well, we're not talking about the website,

14  but -- but in that kind of job in general, in the adult

15  industry in general, I might allow someone to speak to me

16  in a certain manner.  Whereas, if I met you in a -- or

17  anyone, in a regular environment, a regular, everyday bar,

18  I would never allow someone to speak to me that way or

19  treat me that way, because it's disrespectful.

20      Q.   Right.

21      A.   But in the club, you have to have thick skin.

22  You have to put up with that, if you want the money.

23      Q.   How does having thick skin affect your income?

24      A.   Significantly, because if you let that get to you

25  in your head, you won't come back.  You'll just sit -- or

Page 64

1   you will come back and you'll just sit there and be like,

2   I just don't want to deal with it today, and then you

3   won't make money.

4       Q.   There are dancers who do that, right?

5       A.   Yes.  You have to have a good attitude all the

6   time.

7       Q.   And I've heard from many dancers that a big part

8   of the job is not just the actual act of dancing on stage

9   or performing a lap dance, that a lot of it has to do with

10  your customer interaction; is that accurate?

11      A.   Personality.

12      Q.   Personalities?

13      A.   Correct.  Your ability to hold an intelligent

14  conversation, your ability to befriend your customer, to

15  listen to -- to -- in some ways, to give them -- it's

16  almost -- you are not their therapist, but it's -- it's --

17  some of them come to cry to you -- you know, you get all

18  kinds of different -- different guys for -- you know,

19  they -- they -- some of them are there to do business,

20  some of them are there to complain about their marriage,

21  some of them are there just because they are lonely.  You

22  get all kinds of different ones.  Some of them are just

23  drunk and mean.  So it -- it takes some mental fortitude.

24      Q.   I'm sure it does, because you have people, total

25  strangers coming and unloading on you basically?

Page 65

1    A.  Yes.

2    Q.  Like therapists -- you know, therapists get paid

3  for their time, you know, people talking to them about

4  their various problems or whatever.  Is that something

5  that you would also be paid for as a dancer?

6    A.  For my time, just as a -- just to sit there from

7  time to time?

8    Q.  Yes.

9    A.  Yes.  I would have men tip me, just -- just for

10  sitting with me and enjoying our conversation.

11    Q.  Was that a frequent or infrequent occurrence at

12  Centerfolds?

13    A.  It was frequent.  I had a nice mix.

14    Q.  You had a nice mix?  Can you describe for us what

15  that mix entailed?

16    A.  I mean, it would involve some dances, also, but,

17  you know, it would be less dances and just more

18  conversation.  Those men were just, like, emotionally

19  lonely, you know, so I might do three dances for them, but

20  they might pay me for 30.

21    Q.  For 30 dances?

22    A.  Correct.

23    Q.  Because they appreciate your time?

24    A.  Correct.

25    Q.  All right.  My understanding is that is often the

Page 66

1  case, that newer, kind of younger dancers in their 20s,

2  they -- they have a different kind of business model, so

3  to speak; is that accurate?

4    A.  Yeah.  Without -- they're -- they're -- they have

5  not learned the art of finesse and it's -- it's all about

6  next, dance, dance, dance, you know, I mean, it -- I try

7  to work harder -- work smarter, not harder, you know,

8  so...

9    Q.  And you tell me if I'm wrong.  For a lot of, say,

10  newer, younger dancers, whatever, it's more of a volume

11  business than anything else, right?

12    A.  Yes.

13    Q.  It's how many dances you can perform in one

14  shift?

15    A.  Yes.

16    Q.  And you move from customer to customer to

17  customer?

18    A.  Yes, but in the Ritz, when I worked there, they

19  didn't allow you to be paid, like, large tips for your

20  conversation.  They didn't allow that there.  So it was

21  dance for dance for dance for dance, which is also why I

22  didn't work there very long.

23    Q.  More physically exhausting to have to do that?

24    A.  Yes.  Absolutely.

25    Q.  All right.  So there is kind of the volume

Page 67

1  practice, right, and then there is a less volume-intensive

2  way of making money as a dancer?

3    A.  Correct.  I might work one day and do --

4  literally, I might do 30 dances in a day --

5    Q.  Yes.

6    A.  -- where in the next day, I might only see one

7  guy and make the same money.

8    Q.  And you were saying earlier that the -- well, you

9  were saying that one of the tools is a degree of finesse

10  that you develop over time, right?

11    A.  Correct.  And a relationship.

12    Q.  Can you tell me what you mean by finesse?

13    A.  Well, like I said before, the ability to listen,

14  the ability to -- I don't want to say pretend to care, but

15  to -- to be an actress.  To -- to comfort them and -- and

16  to make them feel better about themselves often, you know.

17    Q.  Having a sense of empathy?

18    A.  Yes.

19    Q.  And that -- that can be more lucrative than

20  basically just performing lap dance after lap dance after

21  lap dance, right?

22    A.  Yes.  They became your regulars because they like

23  the conversation with you.

24    Q.  Is developing a base of regulars something that

25  all dancers do or is it kind of --

Page 68

1    A.  Yes.

2    Q.  It is?

3    A.  I'm sorry.  The smart ones do.

4    Q.  I mean, there are different kinds of dancers, and

5  different woman take different approaches to the

6  occupation?

7    A.  Sure.

8    Q.  Yeah.

9    A.  Centerfolds is not the kind of club where you

10  dance on a pole all day and it's not a -- you know, like a

11  Bucks Wild, you made the bulk majority of your money on

12  the stage, like, doing a dance or doing a lap dance,

13  you know, but Centerfolds was not like that.

14    Q.  A place like Bucks is more of a party atmosphere,

15  correct?

16    A.  Correct.

17    Q.  Because it's BYOB, it's open until 4:00 in the

18  morning and it's fully nude, right?

19    A.  Correct.

20    Q.  That's a different atmosphere and it caters to a

21  different kind of demographic --

22    A.  Correct.

23    Q.  All right.  Centerfolds has more of a -- I mean,

24  it's a strip club, but it has a more social atmosphere,

25  right?

Page 69

1    A.  Correct.

2    Q.  And it's true that some dancers, they thrive more

3  in the really, like, crazy, drunk, party atmosphere,

4  right?

5    A.  Some do.

6    Q.  Some do.  Not everybody, because there are

7  different approaches --

8    A.  Correct.

9    Q.  -- to making money.

10        What plays into the negotiations with the

11  customer as a dancer?

12    A.  Well, I just like to start high and then -- and

13  then they tell me what they are okay with.

14    Q.  You've got to have an anchor number, right?

15    A.  It depended on how long I sat there, you know?  I

16  mean, honestly, if I sat with them my whole shift, I would

17  probably ask them for, you know, two or three grand.

18  So -- I might not get it.  I might get 8 or 900, but... I

19  might only get 400, I don't know, you know.  It's just

20  that's what goes into it.  Start high and then ultimately

21  you get what they -- what they agree to give you.  It's

22  not -- there is no, you know, it's they just tip you out

23  of -- it's like going to a restaurant when they give you

24  good customer service with your food, you know, you tip

25  them what you want, so that's how it works.  But if it was

Page 70

1  dances, it was always $20.

2    Q.  So for dances at Centerfolds is always $20?

3    A.  Yeah, but not at other clubs.  Sometimes -- like

4  at Bucks Wild, it's 35.

5    Q.  At Centerfolds, was it your experience that

6  charging $20 for a lap dance was something that was

7  enforced by management?

8    A.  Yeah, because if we wanted to get paid on credit

9  card, which is hardly the case.  Most of the time, it was

10  cash, but if we wanted to get paid on credit card, they

11  would automatically write $25 on the -- the dance ticket

12  and we would get paid 20 out of that.  So they kept 5 for

13  themselves and they gave us 20 and they charged the

14  customer 25.

15    Q.  Okay.  If there's a lap dance transaction being

16  paid by cash --

17    A.  Then I got -- sorry, I didn't mean to interrupt

18  you.  Continue.

19    Q.  That's all right.

20        If a customer is paying you by cash for a

21  lap dance, were you only permitted to charge $20?

22    A.  If it was for a dance only, if that was the going

23  rate.  If a customer wanted to tip me more, I was not

24  going to tell him no, but that was the standard -- that's

25  the standard price.  You can ask anybody.

Page 71

1    Q.  The standard price as far as the industry is

2  concerned or just at Centerfolds?

3    A.  I would say as -- as far as the Davari clubs are

4  concerned, and maybe one or two other ones, but, no, I

5  wouldn't agree with that industrywide because I've worked

6  at several of them and they are all -- each one has

7  different -- different stuff, you know.

8    Q.  Some clubs will let you charge 50 bucks for a lap

9  dance, right?

10    A.  It's 40 in New Orleans.  Yeah.  Yeah.

11    Q.  40?

12    A.  Yes.

13    Q.  Were there any prohibitions against charging less

14  than $20 for a lap dance?

15    A.  In writing, no, but I wouldn't recommended doing

16  that.  You won't make any friends and you won't make any

17  more money.

18    Q.  Well, explain that.

19    A.  So there was an ongoing thing with girls about

20  being a cheap girl.  If you had a reputation for being

21  cheap, then you didn't have friends and you couldn't

22  work with -- they outcast you.  It's the same way they

23  outcast you if you didn't tip them and take care of them,

24  you know, so...

25    Q.  So other dancers would -- they would effectively

Page 72

1  exile dancers who undercut the market?

2    A.  Yes, and they would talk terrible about you to

3  everybody.

4    Q.  Are there dancers at Centerfolds who try to

5  charge $5, $10 for a lap dance?

6    A.  I'm unaware of them, if they were.

7    Q.  Did you ever try to do that?

8    A.  No.

9    Q.  You say that very adamantly.  Why is that?

10    A.  Why would I charge less than the club -- you

11  know, like, if the club is saying this is -- this is what

12  the rate is, I'm not going to -- you know --

13    Q.  Well, I'll give you an example that I've heard

14  sometimes.  Let's say that the place was about to close

15  and you are with a customer and he's, like, look, sorry,

16  I've only got 10 bucks on me, what would you tell him?

17    A.  I'd say sorry, because the minute I take that

18  money, somebody is going to hear it, somebody is going to

19  see it, somebody -- you know, it was just -- it was just

20  how it was.  Sometimes you have to lose a little money

21  just so you don't lose the big money, you know.  So I

22  imagine you could, you know, just I -- I wouldn't

23  recommend it.

24    Q.  Fair enough.  I mean, why would you do something

25  that's counterproductive to your own economic gain?

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 73

1    A.   Yes.

2    Q.   Okay.

3    A.   But if they wanted to pay on credit card, they
4 wouldn't be allowed to.

5    Q.   Okay.  So let's say a customer wanted -- only has
6 a credit card and we're only talking about Centerfolds
7 right now.

8    A.   Correct.

9    Q.   Customer has a credit card, yeah, I want a lap
10 dance.  Let's say he wants to give you more than $20 after
11 that, like, Hey, that was a wonderful lap dance.  I want
12 to hang out.  I want to pay you extra.  How would that
13 financial transaction have to work?

14    A.   He would have to give me, at a minimum of two
15 instead of one.  So he would have to pay me $50 -- well,
16 not -- I wouldn't get 50.  I would get 40.  The club would
17 get 10 and he would pay 50, because they only charge in
18 $25 increments.

19    Q.   Is there any reason why, that you are aware of,
20 Centerfolds would only transact lap dances at $20 on a
21 credit card?

22    A.   You got me.

23    Q.   Did you ever ask anybody?

24    A.   No.

25    Q.   Okay.  Do you know if it had anything to do with

Page 74

1 customer chargebacks?

2    A.   I have no idea.

3    Q.   Did you ever have an experience with a customer
4 chargeback problem?

5    A.   No.

6    Q.   Have you ever heard of that?

7    A.   I've heard of chargebacks happening, but I've
8 never experienced it myself.  But I never -- I honestly
9 can't say that I've ever even seen it happen inside of
10 Centerfolds.  I've heard stories.  My friends have told me
11 that it happened to them at other clubs.  I don't -- I
12 don't know that I've ever heard about it happening -- I'm
13 sure it has, I just don't know that I've heard about it,
14 so...

15    Q.   But in your experience, it wasn't something that
16 you had to mess with?

17    A.   No.  I never dealt with it.

18    Q.   Okay.  Was there any particular reason for that?

19    A.   I don't know, but I'm glad I never dealt with it.

20    Q.   Let me ask you like this --

21    A.   I guess because I -- I try to be real, you know,
22 I try to be -- I don't -- some girls like to rip people
23 off and they -- they -- they try -- you know, people are
24 drinking and people -- and some of those girls, they have
25 too much hustle, and I just try to, you know, I just -- I

Page 75

1 like for repetitive business to come my way, so I try not
2 to, yeah, so...

3    Q.   Right.  Some dancers can be very pushy, shall we
4 say, with customers, right?

5    A.   Yes.

6    Q.   And it sounds like in your experience, you found
7 that it was more lucrative in the long run to have repeat
8 customers?

9    A.   Yes.

10    Q.   Were you paid, during your time at Centerfolds
11 between 2018 and 2020, right?  When did you leave
12 Centerfolds?  Was it February of 2020?

13    A.   I don't recall exactly.  It was right when COVID
14 happened.

15    Q.   Okay.  Well, it was in 2020, right?

16    A.   Yes.

17    Q.   Between 2018 and 2020, at Centerfolds, did you
18 make most of your income by cash or credit card?

19    A.   Cash.

20    Q.   Okay.  Was that a personal preference for you?

21    A.   No.  I didn't mind.  It's just that they took
22 the -- they used to not have an ATM machine there and so
23 they were forced to do it on the -- well, not forced, but,
24 you know, most people carry plastic.  They don't walk
25 around with a thousand or two -- you know what I mean?

Page 76

1    Q.   Yeah.

2    A.   Some do, but not most.  And so I guess there was
3 some sort of something that had happened and so they
4 decided they didn't really want to deal with credit cards
5 any more.  So I don't know what that was, but I remember
6 when that happened and I remember an ATM machine going in
7 the building and then after that it's just all ATM money.

8    Q.   Do you recall if that was after 2018?

9    A.   I really don't recall when, honestly.

10    Q.   But as far as you can recall, since 2018, when
11 you were performing at Centerfolds, most of your
12 transactions were done in cash, right?

13    A.   Yes.

14    Q.   Did Centerfolds have like the dance dollars or
15 the --

16    A.   No.

17    Q.   Okay.  A lot of clubs have dance dollars, right?

18    A.   Correct.

19    Q.   Centerfolds had basically, like, if a customer
20 wants to be on a credit card, they put it on their tab and
21 then the club gives you a little piece of paper that you
22 turn in at night with your money, right?

23    A.   Correct, but they did away with giving the paper
24 to the dancers.  They used to do that.  They used to give
25 the dancer the dance ticket, is what they called it.  If a

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

1  customer paid on credit card, they give them a dance
2  ticket, and the dancer would have to keep that in her
3  possession like it was her money because it was her money.
4       A smart one would put it in her locker right
5  away, right, so then it stays there until the end of the
6  shift, depending -- they used to not even pay on the day
7  shift, but I think now they pay on the day shift, but used
8  to only nighttime.  So I had to wait until 2:00 in the
9  morning to get paid from the cash cage, but I would hand
10 them the -- the -- the dance ticket, but now it's -- they
11 don't even give the dancer the dance ticket anymore.
12 There was one incident that I got paid by a customer on
13 credit card and the dance ticket never got handed in and
14 so I never even got my money from it.
15      Q.  Do you recall when that was?
16      A.  Maybe -- seemed like it -- maybe around 2019.
17      Q.  Do those dance tickets, do they have your dancer
18 ID on it?
19      A.  Yes, it does.
20          I'm sorry.  I need to take another break.
21 I'm getting old.  I need to go to the bathroom again.
22          MR. KING:  Fair enough.  Off the record.
23          (Recess taken from 3:49 p.m. to 3:55 p.m.)
24      Q.  (BY MR. KING)  Ms. Roberts, how did your
25 scheduling at Centerfolds work?

1       A.  I mean, they didn't give me a specific schedule.
2  I worked when I wanted to, but it was very lenient, you
3  know.
4       Q.  How did you go about deciding which days or which
5  shifts -- let me start over.  Let me break that down.
6           How did you go about deciding which days you
7  wanted to perform or could perform?
8       A.  I'm sorry, let me -- let me close the door.  I'm
9  going to have you repeat the question.
10          Okay.  Sorry.  Ask me that again.
11      Q.  Sure.  How did you go about deciding which days
12 you would go in to perform at Centerfolds?
13      A.  You are asking me was there a method to my
14 madness.  There really was -- it depended on a few
15 factors.  First and foremost, depending on if I was sick
16 or not, that always played a -- the main factors -- after
17 that, if I was feeling well, I would try to work, you
18 know, two to three days a week, if not more.  Sometimes I
19 worked four, five days, sometimes it would be two days --
20 you know, it just depends if I had a customer that called
21 me and said, Hey, you want to get together today and hang
22 out, I would go in, you know, just meet him.
23      Q.  So there were a lot of variables that went into
24 whether you would decide to go in to Centerfolds on any
25 particular given day, right?

1       A.  Correct.
2       Q.  I've heard that some dancers, they are kind of
3  like weekend dancers, where they show up on Friday nights,
4  Saturday nights and that's pretty much it --
5       A.  No.  No.  No.  Mine strictly depended on whether
6  or not I felt good enough to go to work and whether or not
7  I had a reason to go -- you know, if I wasn't feeling all
8  that great, you know, I would be willing to go -- it might
9  be worthwhile, you know, but I didn't really have a set
10 schedule.
11      Q.  What about deciding what -- what time of day that
12 you went in?
13      A.  Again, those factors played into that certainly,
14 because sometimes I would get sick, you know, in the
15 morning, and then I wouldn't be feeling up to -- to par
16 and I might not go until the nightshift.  But that was
17 very rare, it was a blue moon sort of thing.  Most of the
18 time I would go in on a dayshift because I'm a daytime
19 person.  I like to be up and aware -- you know, I'm on my
20 phone, looking at stuff and seeing what's going on.  I've
21 got to be up, you know, and seeing what's happening with
22 the world, but, you know, it -- as far as me going in, it
23 was usually a daytime thing.  Like I said, not always.  It
24 was sometimes on the weekends, sometimes during the
25 weekdays, just whenever, you know.

1       Q.  Right.  I've heard from some dancers that they
2  really prefer going in when they know that the club is
3  going to be real busy.  Was that true for you?
4       A.  No.  No.  There were many times where I went in
5  and that club would be completely dead and I would be
6  sitting there, twiddling my thumbs and working on my
7  phone, doing other things because there was nothing else
8  to do in that club but just sit there.
9       Q.  That's interesting.  I haven't heard that before.
10          So on those occasions when you went in there
11 and the club was dead, how would you make money?
12      A.  You didn't.  It was hit or miss.
13      Q.  It was hit or miss?
14          I assume that you went to go perform at
15 Centerfolds during shifts when there were a lot of people
16 there, right?
17      A.  Those are usually night shifts.  People don't
18 really start coming in until about happy hour.  Again, I'm
19 a daytime girl most of the time, so -- not always, but
20 most of the time, and daytime is slower.  It only takes
21 one customer, so if I had one customer to get, you know,
22 10 dances, that's $200, right, so...
23      Q.  It doesn't matter if there are a hundred
24 customers in there if you just find the one?
25      A.  Right.  Because you -- I've worked when there has

Page 81

1  been, you know, a couple hundred people in the club and
2  not made a dime, so...
3       Q.  Did the club ever put on, like, USC fights or --
4       A.  Yes.
5       Q.  Did that -- did you ever work a shift when they
6  had, like, a USC fight and everyone's there just to watch
7  the fight?
8       A.  Yes.
9       Q.  Okay.  Did that affect your bottom line in any
10 way?
11      A.  Absolutely.
12      Q.  Okay.  Those customer who would go there to watch
13 a sporting event on TV, in your experience, were they more
14 or less likely to pay for dances or pay for your time?
15      A.  No.
16      Q.  They were less likely?
17      A.  Yes.
18      Q.  Would you avoid going in on days when the club
19 was having some sort of event on TV?
20      A.  Not necessarily.
21      Q.  Okay.  How did that factor into your calculus --
22      A.  It didn't.  If I needed money, I would go.  It
23 only takes one.  That's the only thing that figured into
24 my calculus.  It only takes one.  That's what you have to
25 have in your mind.  It only takes one.

Page 82

1       Q.  So how --
2       A.  And it could be that one guy that doesn't care
3  about sports.
4       Q.  They exist.
5       A.  Yes, they do.
6       Q.  I'm one of them.
7            How would you identify that one?
8       A.  Because he would be sitting off to the side and
9  not glued to the TV with his buddies.
10      Q.  I take it that -- as a dancer, you've got to be
11 able to kind of scan a room and be able to figure out who
12 to approach?
13      A.  Within the first minute.
14      Q.  The first minute?
15           I've heard from some dancers that they just
16 go up to whoever and they just go from table to table to
17 table, right?
18      A.  Kind of have to.  But you get a rhythm, most -- I
19 try not to be too picky because I've learned that not all
20 people with money dress like they have money.  I find
21 usually the ones that dress like money don't spend money,
22 so...
23      Q.  So you might look at how they are dressed, right?
24      A.  Like I said, I used to, but I don't anymore.
25 Some of the best customers I've ever had have had on just

Page 83

1  $40 pair of tennis shoes and a wrinkled shirt and -- you
2  know, from the -- from the Walmart, so...
3       Q.  Right.  You may not approach somebody who is
4  really just -- who is a 30k millionaire, so to speak?
5            MR. MASON:  Objection, form.
6       Q.  (BY MR. KING)  How else would you identify
7  customers to approach?  What else went into that
8  evaluation?
9       A.  Whether they were staring at me.  Like, you know,
10 you can -- even you, having the good sense to know if you
11 approach a girl at -- a random girl at a bar, you want to
12 try to get her number, you know before you approach her,
13 like, should I -- is she approachable?  You know what I
14 mean?  You look for approachability, so -- because
15 otherwise I'm just going to waste my time.
16      Q.  On that point, on wasting time, how did -- did
17 you try to allocate your time working a shift at
18 Centerfolds?
19      A.  I'm sorry, I don't understand the question.  Say
20 it again.
21      Q.  That was probably a bad question.  It's going to
22 turn out like garbage on the record.
23           How did you allocate your time while working
24 on the floor at Centerfolds?
25      A.  Okay.  So again, Centerfolds, I worked mostly,

Page 84

1  not always, during the day.  Centerfolds is very dead
2  during the day, with very minimal customers.  So for
3  several hours throughout the daytime until around happy
4  hour-ish, there might only be three people in there.  So
5  during that time, I didn't have anything to do except for
6  take classes online from my phone.  I -- I can project
7  manage an account, I can track the markets, I can get on
8  LinkedIn, I can do social media, I can do -- I can -- I
9  can learn.  That's how I utilized my time when I was bored
10 when there was nobody in there.  But the minute somebody
11 walked in there, I was on them, because you have to be,
12 you know.
13      Q.  Did you have to compete with any other dancers
14 during these late afternoon shifts that we're talking
15 about?
16      A.  Absolutely.  There's plenty of them.  The later
17 in the afternoon -- see, they know -- they know -- the
18 dancers know that the customers don't start coming in
19 there until about 4:00 or 5:00.  So they don't start
20 showing up until about then.  So I would get there a
21 little earlier most times because I like those one-off
22 guys.  I get their attention and I can make repeat clients
23 out of them if I can get their attention, you know,
24 because they might have 30 girls to pick from otherwise.
25 If there's only two girls there, they've got me and one

Deposition of Grace Roberts                                    Grace Roberts vs. A.H.D. Houston, Inc

Page 85

1  other one, right, so...

2      Q.  Sure.  I mean, you laugh, but it's the reality of

3  the work.

4      A.  It is true.

5      Q.  And I think there's something that maybe not

6  everybody understands, that there is an actual reality to

7  the work.  You don't -- the club doesn't just send you

8  customers and say, okay, you know, Regan or Katelynn,

9  you've got ten guys to go entertain right now, right?

10  That never happened?

11      A.  Say what, now?  I'm sorry.

12      Q.  No one at the club ever sent ten guys to you and

13  said, Okay, well, now you have to perform for these ten.

14  There is your book of business for the night.  That never

15  happened, right?

16      A.  So if you -- this goes back to if you tip the

17  right people, they would tell you where the parties are.

18  So the management sometimes would say, hey, there is this

19  party, go over there.

20      Q.  In circumstances, just as a general matter,

21  though, when you would go in, was there ever a time when a

22  manager said, well, I need you to perform for these five

23  customers right now?

24      A.  Not in those specifics words.  Just they would

25  say, go try that guy over there.

Page 86

1      Q.  I guess what I'm getting at is that no one at the

2  club basically gave you a quota of people who you have to

3  entertain for, like you've got to check the boxes --

4      A.  No.

5      Q.  There's not like a conveyor belt of customers or

6  anything like that?

7      A.  No.  There was no quota.

8      Q.  You have to find the opportunity within the mix,

9  correct?

10      A.  Correct.

11      Q.  Okay.  And as part of that, you've also got to

12  compete with other dancers who are doing the exact same

13  thing, right?

14      A.  Correct.

15      Q.  How would you contend with other dancers who are

16  basically competing for the same business?

17      A.  Different strokes for different folks.

18      Q.  Fair enough.

19          Well, what do you mean by that?

20      A.  Well, some guys like them young, some guys like

21  them older like me, some like them super skinny, some guys

22  like them thick, some guys like them a different

23  ethnicity, some guys like them short, some guys like them

24  tall, some guys like them blonde.  You know what I mean?

25  It's not -- there's -- it's not about -- I don't take

Page 87

1  any -- I just brush rejection off.  Like, I don't know

2  what their reason is for not wanting -- maybe they are

3  broke.  I don't know, you know.

4      Q.  It's true.

5      A.  It is true.

6          So that's how I dealt with it -- you know,

7  I just -- okay, they want her, they don't want me.  No

8  skin off my back.  Best of luck to her.  I hope she banks,

9  right.

10      Q.  But it sounds like that -- that -- one initial

11  hook is definitely the appearance of the dancer and just

12  kind of their -- their different, like, esthetic

13  variables, right?

14      A.  Yes.  And then -- then on top of that, you have

15  to have a good personality, because if your personality

16  doesn't match the outside, it's not -- you know.

17      Q.  Right.  So do you think it's fair to say that

18  appearance for a dancer is the thing that basically gets

19  you in the door --

20      A.  Yes.

21      Q.  -- and that your personality is what can really

22  open up the wallet?

23      A.  I would say, as a skill set as a dancer, you

24  should also have the ability to do your own hair and

25  makeup and have some sort of style sensibility about

Page 88

1  yourself for that particular job.  I mean, you don't --

2  we -- we will -- we were instructed -- not -- not, like,

3  uniform-wise what to wear.  The waitresses were instructed

4  what to wear --

5      Q.  Sure.

6      A.  -- but the dancers, we -- we were required to

7  wear skimpy things, you know.  We didn't have, like, a

8  mandated outfit to wear, per se, but we were not allowed

9  to wear street clothes.  I'll put it that way.  But we

10  were told, you know, like, one of the managers told me one

11  time, you know, I would really like to see you in a -- in

12  a teddy with stockings.

13      Q.  What did you with this point of advice, shall we

14  say?

15      A.  At the time I told him I didn't have any money.

16  He said he would take me shopping, which he never did.

17      Q.  Did he get after you for not showing up with a

18  teddy?

19      A.  No, because I didn't work on his shift normally.

20  I wasn't on his shift.

21      Q.  Who was the manager?

22      A.  Chris Malusa.

23      Q.  Malusa.

24          So like you were saying, you can't show up

25  to be a dancer at a strip club with a starter jacket on

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 89

1  and jeans, right?

2      A.  No.  Absolutely not.  They would say, Go change.

3  Go put on something skimpy, like a bathing suit.

4      Q.  Have you ever worked at a club where you could do

5  that?

6      A.  No.

7      Q.  If you had had the opportunity, would you have

8  ever appeared in street clothes or some sort of costume

9  where you are fully clothed?

10     A.  You could wear fully clothed -- I wore a -- you

11 could wear a fully clothed dancewear dress.  It's not

12 necessarily about showing skin.  It's just about wearing

13 something very, like, overly provocative.  Does that --

14 like dancewear, like a -- like a latex-type outfit, right.

15 Something you would buy from a dance store.

16     Q.  Okay.  I got it.

17         So it has to be something one would expect

18 you would see at a topless club, right?

19     A.  Yes.  Something you would see at a dancewear

20 store.

21     Q.  And by a dancewear store, do you mean like a

22 Cindie's?

23     A.  Yes.

24     Q.  Okay.  Does Centerfolds have a boutique inside?

25     A.  Yes, they do.

Page 90

1      Q.  Okay.  Where you could buy clothing, right?

2      A.  Yes, they do.

3      Q.  Did you ever buy attire from the in-store

4  boutique?

5      A.  Yes, I did.

6      Q.  How much do those clothes run?

7      A.  It depends on what you buy, but in general, the

8  last time I saw their selection, it was around -- it was

9  between 80 and $120.  The shoes are generally -- well, the

10 outfits can be pretty pricey, too, but the shoes are

11 generally the most expensive thing.  Those -- those range

12 from 100 to $200, depending on which brand you get, so --

13 I mean, that's anywhere you go, so...

14     Q.  I've heard that there are, in fact, different

15 brands of the stripper shoes, right?

16     A.  Yes, there are.

17     Q.  And that they have different levels of comfort,

18 too?

19     A.  Yes.  Absolutely.  You get what you pay for in --

20 in stripper shoes.

21     Q.  And that there are, in fact, certain brands where

22 the heal will snap off?

23     A.  Yes.

24     Q.  Or the belt will snap off or something like that?

25     A.  The quality makes all the difference.

Page 91

1      Q.  For a dancer, the shoe is as important as, like,

2  the kind of cleats you are buying if you are a track

3  athlete, right?

4      A.  Correct.  Yes, that's true.  You don't want to

5  walk around for 8 to 12 hours in an 8-inch pump and feet

6  hurt like the devil for the next week and you're trying to

7  work and you are just, like, oh.  Every time you take a

8  step, you know, you don't want that, right.  So you want

9  comfortable -- you want to spend that extra money for the

10 higher-end stuff definitely.

11     Q.  What about makeup?  How much were you out of

12 pocket on makeup directly in connection with your job?

13     A.  Oh, my gosh.  I went through a boatload of

14 makeup, and I didn't buy the most -- some of the girls

15 buy, like, the most top of the line stuff there is.  I

16 have a lot of allergies.  I mentioned that.  It's not just

17 food, it's overall everything.  So I have particular

18 things that I can use, and that's ironically the cheaper

19 stuff, so, hey, that works for me.

20     Q.  Yeah.

21     A.  But I would probably go through easily a hundred

22 dollars a month in makeup, easily, because when you are

23 there, you are reapplying, like, all -- you sweat and

24 it -- and it starts to look bad after -- you know, you are

25 constantly going back there and just reapplying.  So it's

Page 92

1  not like that in the -- like me, in a normal world, you

2  know, I might reapply my makeup maybe twice throughout the

3  day, you know.  Not in the club.  Many times over.

4      Q.  You've got to go back in the locker room and

5  touch yourself up --

6      A.  Yes.

7      Q.  -- maybe your eye shadow is running or whatever,

8  right?

9      A.  Yes, you do.  You spend a good bit buying extra

10 hair tools and things, also --

11     Q.  Did you --

12     A.  -- hair sprays and dry shampoos, you name it,

13 body sprays, perfumes.

14     Q.  Did you keep all those kind of things in a locker

15 at Centerfolds?

16     A.  Yes.

17     Q.  Okay.  Did you have, like, one locker that was

18 yours that no one else could touch?

19     A.  Yes, but it wasn't an assigned -- some girls had

20 assigned lockers.  I used a temporary locker.  So I always

21 took my stuff home with me at the end of the day

22 because Centerfolds had a thing about thievery.  So I just

23 took my stuff with me.

24     Q.  Do you mean that --

25     A.  Well, and I moved around, you know, so I didn't

Page 93

1  always stay there.  You know, I -- I might work there
2  three days out of the week and I might go down the road
3  to, you know, to visit for a couple of hours the next day.
4  So I just took it with me.  It was just convenient to
5  have.
6      Q.  I think you said that some dancers had assigned
7  lockers at Centerfolds?
8      A.  Yes.
9      Q.  How would you get an assigned locker?
10     A.  You had to pay Johan.  Johan was the cash cage
11 guy.  He's worked there as long as I -- I think he's been
12 there longer than -- gosh, he's been there forever.  God,
13 I'm old.
14     Q.  No, you're not.
15     A.  Yes.  Thank you for that.  I appreciate it.
16     Q.  It's all relative.  All right?
17     A.  Yes.
18              He's been there a very long time.  Johan,
19 the cash cage guy, he -- he issues the lockers.
20     Q.  When you arrive at Centerfolds, you have to sign
21 in on a piece of paper, right?
22     A.  Yes.
23     Q.  And on that piece of paper, you put your dancer
24 name and your dancer ID, right?
25     A.  Yeah.

Page 94

1      Q.  Does Centerfolds allow any dancer to show up to
2  perform without signing in on that sheet?
3      A.  Well, they are not supposed to, but I have.
4      Q.  Well, how did you do that?
5      A.  Sometimes they were not at the door to --
6  sometimes there was nobody around, and you just go in,
7  yeah, and nobody -- Johan says anything, you know.  So if
8  they say something, then you -- you take care of it.  If
9  not, you just --
10     Q.  Fair enough.
11              So there were occasions when you would go to
12 work at Centerfolds and maybe the door girl wasn't there
13 and you'd just go to the locker room and perform, or get
14 ready to perform, right?
15     A.  Sometimes.
16     Q.  And if a manager didn't say anything, it is what
17 it is, right?
18     A.  Sometimes.  It didn't happen that often.
19     Q.  Okay.  Just on a monthly basis, are you able to
20 estimate how often it might be that you'd go in and don't
21 sign in on sign-in sheet?
22     A.  Honestly, it didn't happen that often.  If you
23 got lucky, it happened.  It was usually on a weekend when
24 it happened.  Maybe once a month, once or twice a month,
25 if I -- yeah.  If I happen to go in on a Sunday, Saturday

Page 95

1  or Sunday.
2      Q.  Okay.  So it was a -- it was a policy that you
3  should sign in when you show up to perform.  Would you say
4  it was something that was strictly enforced or there is a
5  little leeway?
6      A.  I mean, when nobody is around to -- to enforce
7  it, you know...
8      Q.  Fair enough.
9              Did you ever get in trouble for showing up
10 to work and not signing in?
11     A.  No.
12     Q.  House fees.  Can you explain to people who don't
13 know, what is a house fee?
14     A.  A house fee is the equivalent to what they call a
15 tip-out, or it's also equivalent to what they call the
16 rent.  So basically, it is -- if you were to compare it to
17 any other type of job in the real word, it would be the
18 equivalent to a hairdresser renting their booth.
19     Q.  Do most clubs have a house fee?
20     A.  Yes.  All of them do.
21     Q.  All of them do.
22              Have you ever performed at a club that does
23 not have a house fee?
24     A.  No, I have not.
25     Q.  Are house fees -- the amount of the fee, are

Page 96

1  there industry standards for that or does it vary by club?
2      A.  It varies by club.
3      Q.  Are there clubs that have, like, really high
4  house fees?
5      A.  Yes.
6      Q.  Have you ever performed at one that has
7  super-high house fees?
8      A.  Yes.  Several.
9      Q.  What was the most recent one?
10     A.  PT's Dallas.
11     Q.  Okay.  How much was their house fee?
12     A.  Oh, gosh, I don't recall now, exactly, but I
13 remember, it was high, even for the -- for the daytime,
14 compared to other places that I've worked.  I remember
15 complaining that it was so high.  I want to say it was
16 around $40.  If you, like some clubs, if you -- they are
17 lenient with you, like, say you have kids you need to go
18 pick up at, you know, 6:00 or something, but you still
19 want to come back and, like, you got another little
20 customer that you want to see for another hour or whatever
21 and then go home, they'll let you do that, and they won't
22 make you repay.
23              PT's was real strict.  They would make you
24 repay.  So then when you come in a nighttime, like,
25 sometimes they would have a house fee of, like, $80.  It's

Page 97

1  crazy.  And the Colorado Bar and Grill, they are really
2  their tip-out is real expensive, too.
3      Q.  Where would you say that Centerfolds' house fee
4  schedule ranks?
5      A.  I would say in the mid -- middle.
6      Q.  Not the cheapest, but not the most expensive?
7      A.  Correct.
8      Q.  All right.  Did the amount of house fee that
9  you'd have to pay, did that factor into which shifts or
10 days you would perform at Centerfolds?
11     A.  Not necessarily.  It was more about I just wanted
12 to be -- it was cheaper on the dayshift, but it wasn't
13 really a factor as to whether or not I showed up to work.
14 I mean, if I could only work the nightshift, I would pay
15 the higher house fee just so I could work.  It really just
16 had to do with whether or not I felt good enough to show
17 up that day and -- and, you know, maybe if I had somebody
18 that I for sure wanted to hang out with or something like
19 that, you know, so...
20     Q.  Were there ever occasions in which you would go
21 to perform at Centerfolds and you just didn't have the
22 money on you to pay the house fee?
23     A.  Yes.
24     Q.  How did that work?
25     A.  Kurt vouched for me and said I could work and

Page 98

1  then I paid it later.
2      Q.  Kurt is at Vivid now, right?
3      A.  I don't know.  I have no idea.
4      Q.  Okay.  You are not currently --
5      A.  I heard that.
6      Q.  You are not currently performing as a dancer,
7  right?
8      A.  No.
9      Q.  Okay.  When was the last time that you performed
10 as a dancer?
11     A.  Right before -- right when COVID happened.
12     Q.  It was at Centerfolds, right?
13     A.  Yes, he was still there.  Chris Malusa was still
14 there, Thomas was still there.
15     Q.  You might have misheard my question.
16         I'm just trying to figure out, what was the
17 last club that you performed at as a dancer.  Was it
18 Centerfolds?
19     A.  I believe so.
20     Q.  Okay.  And since you left Centerfolds, you have
21 not performed at another club, right?
22     A.  I don't believe so, no.
23     Q.  So Kurt would vouch for you, basically?
24     A.  Yeah, if I didn't -- there was only one time that
25 it happened that I didn't have money.  Prior to --

Page 99

1  prior -- prior years, they would let you come in and you
2  didn't have to pay, and then the door girl would go around
3  and chase everybody down and say, Hey, you haven't paid,
4  you know, your floor fee.  But then they put a stop to
5  that, and so now -- and that's most places.  Now you pay
6  up front, so...
7      Q.  And if you don't, it's, well, come back tomorrow?
8      A.  Yeah.  Yeah.
9      Q.  Why would Kurt vouch for you?
10     A.  Well, I guess because he's known me for so long
11 because I've been there for so long.  Don't you think?
12     Q.  I mean, some dancers work at places for, like, a
13 week, others are like yourself and they work at a place
14 for 10 years.  I'm always just curious about the different
15 experiences that I hear about, because there are a lot of
16 different experiences, right?
17     A.  Yes.
18     Q.  Okay.  Were other managers like Kurt, would they
19 vouch for you?
20     A.  They probably would have.  I never had to ask any
21 of them, but they probably would have.
22     Q.  Dancing on stage, that's something you had to do,
23 right?
24     A.  Yes.
25     Q.  If you didn't want to dance on stage, tell me how

Page 100

1  that would work.
2      A.  You pay a skip fee for the whole day.
3      Q.  For the whole day?
4      A.  Yes.
5      Q.  Okay.  At some clubs, my understanding is that if
6  there is a skip stage fee, it's for every rotation that
7  you miss?
8      A.  No.  They were laid back.  It was just the one
9  time.
10     Q.  Okay.  So you only paid a skip stage fee once at
11 Centerfolds?
12     A.  To be honest, I can't really speak to that
13 question because I never paid it.  I always went on stage.
14     Q.  Okay.
15     A.  But I believe it was just for the -- I -- I could
16 be wrong, but I do believe it was just for the one -- for
17 the day.  Not for the one skip.
18     Q.  Okay.  But your understanding is that a skip
19 stage fee covers the whole shift?
20     A.  Correct.
21     Q.  Okay.  I've heard from some dancers that they
22 hated performing on stage, others who say, Oh, yeah, I
23 loved it; it's great.  Where do you fall on that spectrum?
24     A.  I didn't mind it.  You know, any -- any which way
25 I could pick up a couple of extra dollars.  Sometimes I'd

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 101

1  get a 20 or -- you know.  Sometimes I didn't make any
2  going up there, but it was publicity, right.  So, maybe
3  somebody saw me up there, maybe they didn't tip me, but I
4  might go sit with them later and still get dances out of
5  them, you know, so who knows, right.  I didn't mind.
6      Q.  Did you have any kind of routine that you
7  developed for on-stage performance?
8      A.  I mean, once you learn how to do what you do,
9  you -- it's -- it's just sort of like it comes natural to
10  you.  You know, I wouldn't call it a routine, per se, just
11  you get good at provocative dancing.  You get good at --
12  I'm not a twerker, but girls -- some girls are twerkers.
13  They get good at twerking.  You know, you get good at
14  floor work, you get -- Centerfolds doesn't -- it's not a
15  pole club -- they have a pole, but it's big and fat and it
16  doesn't rotate and it's not a good pole and everybody
17  hates it.  So it's not a pole club, but you can do a lot
18  of good floor work there.
19      Q.  This is something I have not heard before.  It's
20  not a pole club.
21      A.  No.
22      Q.  What is a pole club?
23      A.  A pole club is like Bucks Wild, or what's that --
24  what's that new club off 45?  I can't remember --
25      Q.  Penthouse?

Page 102

1      A.  Penthouse.  Yes.  Penthouse.  Penthouse is a pole
2  club, yes.
3      Q.  Okay.  Where the on-stage performance is very
4  pole centric?
5      A.  Yes.  You have to be a pole girl.  I'm not a pole
6  girl.  I never learned the pole.  Why?  Because I worked
7  at Centerfolds most of the time.
8      Q.  Okay.  So when you were on stage at Centerfolds,
9  you are not, like, spinning around on the pole or anything
10  like that, right?
11      A.  No.  You -- it -- it took a very talented person
12  to be able to spin around a pole that is -- I don't even
13  know if I have anything comparable around here to the size
14  of that pole, but I'm going to -- if you can imagine
15  roughly six or seven inches around and -- or across, you
16  know, it's not that big.  It's pretty thick, right, and
17  it doesn't spin.  All it does is light up.  So if you can
18  climb that thing and twirl around, hey, you are
19  talented.
20      Q.  Yeah.  More power to you.
21          Okay.  So you are saying that with stage
22  dancing it's really about kind of what you are emoting; is
23  that fair?
24      A.  I'm sorry.  I don't understand what the word
25  "emoting" means.

Page 103

1      Q.  It's less about the actual moves when you are on
2  stage, and more about what you are conveying to your
3  audience.
4      A.  Oh.  Yes.  Yes.  When I dance on stage, I try to
5  make eye contact with everyone out in the audience, you
6  know, I try to pay attention.  Are they paying attention
7  to me?  I try to put on a good show.  Maybe they'll tip
8  me, more oftentimes than not.
9      Q.  You mentioned floor work.  What do you mean by
10  "floor work"?
11      A.  So floor work is where you get down on the stage
12  and you get on your knees or you get on your back or
13  you -- yeah, you roll around, whatever you are doing,
14  right?  You are on the floor of the stage.
15      Q.  That makes sense.  Just like it sounds.
16      A.  Yes.
17      Q.  So there is not one particular way of performing
18  on stage, in other words?
19      A.  No.  No.  Some girls stand there and they just
20  hold on to the pole and they just wiggle a little and
21  that's it.  That's all they do the whole time they are up
22  there.
23      Q.  Do they make a lot of money just doing that?
24      A.  Not generally, no.
25      Q.  No, I didn't think so.

Page 104

1      A.  Some of them get up there with a mad-ugly face,
2  you know, just like a face and like I-hate-my-job face,
3  right, and I've got to be up here, and they get up there
4  with that, they don't make money.
5      Q.  Fair enough.
6          Performing on stage is not as a lucrative as
7  working on the floor, right?
8      A.  No.
9      Q.  Okay.  How many times during an average shift
10  would you be on stage?
11      A.  Well, it depended on which shift I worked.  So
12  dayshift, one, maybe two.
13      Q.  Yeah.
14      A.  And it would depend on what time.  So the
15  dayshift is a little different, because it also depends on
16  what time they actually start the stage, because if there
17  is no -- sometimes you have to wait for customers to even
18  arrive.  So it might be 3:00 or 4:00 in the afternoon
19  before you even see a soul walk in the door.  Other times,
20  you might go on the stage three or four times, and it also
21  depended on how many girls was there, too.  So, you know,
22  if there was only two girls working, the likelihood of me
23  going up more increased.
24      Q.  Sure.  If your name was called to go on stage and
25  you are with a customer, maybe a regular, could you tell

Page 105

1  the manager like, Hey, I need you to skip me?
2      A.  Yes.
3      Q.  Okay.  Centerfolds has VIP rooms, right?
4      A.  Yes.
5      Q.  Were you at all required to perform for customers
6  in the VIP area?
7      A.  Well, if you wanted to make good money.
8      Q.  Sure.  You didn't have like -- no one said, Hey,
9  Regan, go perform in the VIP area?
10     A.  No.  It was just common knowledge that -- if you
11 wanted to make -- you wanted to make good money, you go
12 upstairs.
13     Q.  Why was going upstairs more lucrative than
14 performing on the floor?
15     A.  Because you get one-on-one time and you get a
16 bottle of whatever choice they choose and when you go
17 upstairs, you know they are devoted to you at that point.
18 So that's when you make a friend, you can -- you know,
19 you can show your empathy to them, if that's what they are
20 looking for, or you can show them entertainment, if that's
21 what they are looking for or what -- you know, whatever it
22 is.  So -- and then at the end, you can negotiate and
23 that's where you make money.
24     Q.  Were you permitted to go up to the VIP area with
25 another dancer?

Page 106

1      A.  Yes.
2      Q.  So it wasn't like a one dancer per VIP room, that
3  deal?
4      A.  No.
5      Q.  Some clubs are like that, though, right?
6      A.  Not that I'm aware of.
7      Q.  Oh.  So tell me how the VIP room system works at
8  Centerfolds.
9      A.  Okay.  So to your -- to your point, they had two
10 VIP rooms.  So the VIP room, we'll call it Level 1, and
11 we'll call the other VIP room the penthouse.
12     Q.  Okay.
13     A.  So Level 1, any girl could walk up there at any
14 time and you could go with a customer -- if a customer
15 said, Hey, you and five of your closest girlfriends, let's
16 go party, you know, we could go, no problem.  Right?
17     Q.  Yeah.
18     A.  The penthouse is actually closed off during the
19 daytime, but if you had a good enough client and you
20 wanted extra privacy, you could go to the penthouse and
21 you could certainly take other girls with you, just that
22 nobody else was allowed to go into the penthouse, like,
23 randomly walk around.  Like, there was complete privacy.
24     Q.  Yeah.  Okay.
25          How much did you have to pay to get into the

Page 107

1  penthouse?
2      A.  The customer paid, and the requirement was to buy
3  a bottle.
4      Q.  What about the VIP Level 1?
5          Before you answer, let me thank you for
6  helping me make a clear record by labeling VIP Level 1.
7      A.  Yes.  You are welcome.
8      Q.  How much did it cost to get into Level 1?
9      A.  It was the same.  The requirement --
10         (Simultaneous speaking.)
11     Q.  (BY MR. KING)  The customer has to buy a bottle?
12     A.  Correct.
13     Q.  Was there a time limit on how long you could
14 spend with the customer in either the penthouse or VIP
15 Level 1?
16     A.  Not at Centerfolds.  At other clubs, yes.  Not
17 there.
18     Q.  Was there competition among dancers to use that
19 space?
20     A.  Yes.  At times it could become very busy and no
21 space would be available, but that's usually, you know,
22 later in the day, like a nightshift.
23     Q.  Yeah.  Did you ever work a nightshift when VIP
24 areas were just not available?
25     A.  Yes.

Page 108

1      Q.  Okay.  So in that event, what would you do with a
2  customer who was, like, Yeah, I want to go to the VIP
3  area?  You find out, oh, well, they are all booked up.
4      A.  What can you do?  You have to wait or you have to
5  let go of your money, so...
6      Q.  In that kind of circumstance, could you just say,
7  Hey, well, let's just go to a different club?
8      A.  You could.
9      Q.  Is that something that you ever found yourself
10 doing?
11     A.  I didn't really take my customer away from
12 Centerfolds, just because different rules, different
13 schedules, different -- I just -- I was comfortable at
14 Centerfolds.  So I didn't --
15         (Simultaneous speaking.)
16     A.  -- you know, I didn't -- I didn't really do that.
17 I would meet them to start off with.  If they asked me to
18 meet them at Vivid, I would say okay, but as far as, like,
19 meeting them at Centerfolds and recruiting to another
20 place, no, I didn't do that.
21     Q.  (BY MR. KING)  So it sounds like you would meet
22 your customers at different clubs and then eventually
23 migrate to Centerfolds?
24     A.  No.  No.  That's not what I said.
25     Q.  Okay.

Page 109

1    A.  What I said was, if I -- if they wanted me to
2  meet them at Vivid, I would.  That meant I would stay at
3  Vivid the whole time.
4    Q.  Got it.
5    A.  So if I wanted -- if I was at Centerfolds, I
6  would stay at Centerfolds.
7    Q.  Okay.  I apologize.  I misunderstood.
8    A.  No, that's okay.
9    Q.  Were there ever customers at Centerfolds who you
10 were just like, I'm not performing for that guy?
11   A.  Yes.
12   Q.  Okay.  Did that ever create issues between you
13 and management?
14   A.  No.
15   Q.  What were deal killers when it came to customer
16 section?
17   A.  Too drunk, too handsy, very rude, trying to get
18 something for nothing.  That was it pretty much.
19   Q.  Was that kind of customer common at Centerfolds?
20   A.  It's a bar.  You know, so you could -- you get
21 all kinds, right.  They were a handful.  You had some good
22 customers, too.
23   Q.  Do different clubs attract different kinds of
24 demographics?
25   A.  Yes.

Page 110

1    Q.  Can you explain to us what -- what kinds of
2  demographics, different clubs in the Houston area, at
3  least, that will attract?
4    A.  Yes.  So apples to apples, I would say, like,
5  Men's Club and used to be Centerfolds but not so much
6  these days, but they -- they used to attract higher-end
7  businessmen and had a higher caliber of woman that worked
8  there.  Bucks Wild, on the other hand, not so much.  It's
9  more of a party crowd.  You still made money there, but
10 just a different type of crowd.
11   Q.  Right.
12   A.  Centerfolds' crowd has also diminished
13 significantly, but -- when I was there.
14   Q.  Did the kind of clientele at Centerfolds change
15 in any way, say, when conventions were in town?
16   A.  Yes.
17   Q.  If there is an oil and gas convention at the
18 convention center --
19   A.  Yes.
20   Q.  -- would you see -- would you see an uptick in a
21 certain clientele?
22   A.  Yes.
23   Q.  Would you make a point of performing at
24 Centerfolds when conventions were in town?
25   A.  I would try, yes.

Page 111

1    Q.  Out of curiosity, did you ever meet any customers
2  or clients at Centerfolds, you know, in the oil and gas
3  industry and you would talk about other kinds of business
4  that you were engaged in?
5    A.  Yes.
6    Q.  Did you -- did you do dancing as a way of
7  networking with other -- other people for other business
8  purpose?
9    A.  Sometimes.
10   Q.  Was that frequent, infrequent?
11   A.  It just depended on the situation, honestly.  I
12 mean, it I wasn't too, too frequent, but, you know, I
13 would mention to them, like, Hey, I've got a marketing
14 background.  You know, you sort of get to know these
15 people over time, you know, and you learn about them and
16 you learn about their companies, what they do for a
17 living, things like that, and it just sort of comes up in
18 conversation, you know, that -- that I've got a background
19 in -- that I can assist them, you know, with projects,
20 just one of those projects.  If they have anything, sure,
21 you know.  It didn't happen very much, but -- but I did
22 pull one or two clients from there.
23   Q.  Did you have to ever pay to get on stage?
24   A.  No.  Not outside of the house fee tip-out.
25   Q.  Right.  Like, you didn't have to go to the D.J.

Page 112

1  and say, Hey, I want to get on stage, here is $28?
2    A.  Well, if there was reason to, I could.  I did,
3  once.
4    Q.  Tell me about that.
5    A.  So every now and again -- again, this is not very
6  often.  It's a one-off kind of situation.
7    Q.  Okay.
8    A.  Every now and again they would have a big baller
9  come in there.  When I say big baller, I mean someone who
10 comes in with, say, 50k large, cash in bricks, and he's
11 just, like, throwing it at everything that walks out on
12 stage.
13   Q.  Yeah.
14   A.  It doesn't happen very often, but when it does,
15 that's when you want to go say, Hey, put me on.  Here is a
16 little something.
17   Q.  It does make sense.
18       Did you ever get, like, I don't know,
19 rappers or NFL players or celebrities who would come into
20 Centerfolds and just make it rain?
21   A.  We did.  We had this one guy, he's pass -- rest
22 in peace, he's passed on now, but his name was Ian and he
23 would come in regularly and do that.  At least once a
24 month.  And he would do it not only there, but all of
25 the -- go around the whole city doing it.  I mean, that

Page 113

1  guy, wow.

2      Q.  He would make the circuit, huh?

3      A.  Yeah.

4      Q.  Would dancers follow Ian from club to club?

5      A.  Yes.  Yes, we would.  Yes, we would, because we

6  knew if we went on the stage -- because it wasn't -- like

7  sometimes he would gather us, like, 20 or 30 dancers at a

8  time on the stage, like at a penthouse, he gathered us up

9  on the stage and recorded video of us, made us all sign

10  releases and everything, and we all got, like, three grand

11  that night.

12      Q.  Wow.

13      A.  It's a one-off kind of -- yeah, it's a

14  one-off kind of -- you know, that doesn't happen on the

15  daily.  Just let me reiterate that.

16      Q.  Fair enough.  Fair enough.

17          THE REPORTER:  Counsel, when you're ready

18  for a break.

19          MR. KING:  Will five minutes be enough?

20          THE REPORTER:  Ten minutes.

21          (Recess taken from 4:46 p.m. to 4:58 p.m.)

22      Q.  (BY MR. KING)  Okay.  Earlier in the deposition,

23  you were telling me about the different clubs that you've

24  worked at.  Between 2018 and the time you left Centerfolds

25  in 2020, were you performing at other clubs at the same

Page 114

1  time?

2      A.  I would occasionally go to other clubs, like

3  sometimes I would work -- I didn't have a set schedule.

4  So that's what I was explaining earlier.  Sometimes I

5  would work two or three days at Centerfolds and then I

6  might work one day at another club, or I might work two

7  days at another club and two days at Centerfolds, you

8  know.

9      Q.  What would go into your selections of clubs?

10      A.  I'm sorry, I couldn't hear you.  What was that?

11      Q.  Sure.  What factors would play into your

12  selection of clubs?

13      A.  So I think I answered that previously.  It really

14  just depended on my customers and where they wanted to

15  meet and where I wanted to go for the day.  It was just a

16  random thing, but Centerfolds was primarily my home club.

17      Q.  Got it.

18          Did the ambiance or the atmosphere of these

19  different clubs play a role in which venue you decided to

20  perform at?

21      A.  Less -- to a small degree, but it was less

22  ambiance and more flexibility and price of tip-out.

23      Q.  Did Centerfolds in any way restrict you from

24  performing at other clubs?

25      A.  No.

Page 115

1      Q.  Did Centerfolds, to your knowledge, run any kinds

2  of advertising or promotion between 2018 and 2020?

3      A.  To my knowledge, I thought they had, like, a

4  website and a social media feed and they had a

5  photographer that would come to the club, Gary Fox, I

6  think was his name, and he would take the girls' photos

7  and he had a magazine that they advised in.  Night Moves

8  or something, I think it was called.

9      Q.  Were you ever photographed?

10      A.  No.

11      Q.  How did any promotional or advertising activity

12  that Centerfolds engaged in affect your ability to make

13  money?

14      A.  It's hard to say.  I don't really have an answer

15  to that question.  It's hard to judge that, based -- it's

16  hard to quantify that.

17      Q.  Do you think -- or in your experience, did you

18  find that Centerfolds engaging in promotional activities

19  generated more customer flow for you?

20      A.  Again, it's hard to quantify their marketing

21  methods.  I can't say one way or the other.  I just showed

22  up, and either there was people there or there were not

23  people there, you know.

24      Q.  Fair enough.

25          Obviously, the club owns things like the

Page 116

1  furniture and the stage and the lights, right?

2      A.  I'm sorry, what was that?

3      Q.  Centerfolds owns the furniture, the lights and

4  the audio system and all the infrastructure, right?

5      A.  They do.  And they had a -- they had a billboard

6  up at one time -- honestly, I would say -- going back to

7  your previous question, I would say that it did affect the

8  amount of people that came to the club, just because they

9  had a deal with the taxi drivers, like a commission-type

10  deal, so that was one of their marketing methods.  And so

11  if the people around the city say, Hey, you know, where is

12  the spot, right?  And so the taxi drivers would bring

13  them.  So I did have a couple of customers tell me like,

14  Oh, the taxi driver recommended this place.  Yeah.

15      Q.  Do you know if they were still using taxicabs for

16  promotion after 2018?

17      A.  I have no clue.

18      Q.  How did the club's infrastructure, things like

19  lighting, furniture, the decor, how did that affect your

20  ability to make money as a dancer at Centerfolds?

21      A.  A couple of ways.  So the furniture is not the

22  same in all clubs.  Let me just say that.  The ease of

23  which you can give a lap dance on a certain piece of

24  furniture and the quality of that lap dance depends on the

25  furniture, right?

Page 117

1   Q.  Yes.

2   A.  The cleanliness of that furniture also makes a

3 difference, because if the furniture is nasty, nobody

4 wants to sit on it.  The overall area of the furniture --

5 Centerfolds had nice, like, big couches.  So if I wanted

6 to do the splits on the couch, I could do that, right.

7 Some places, all they have is, like, a chair, right,

8 like -- well, not like that, not a rolling chair, but a

9 four-legged chair, you know.

10  Q.  Yeah.

11  A.  So their -- their furniture was nicer than -- it

12 was large enough to be comfortable; therefore, it

13 increased my ability to get another dance.

14  Q.  Got it.

15      So you would say that the furniture that

16 Centerfolds had was something that played into how much

17 money you could make?

18  A.  Yes.  Most definitely.

19  Q.  What about the lighting?

20  A.  The lighting was nice and dark, which also

21 helped, because who wants to see everybody's scars and

22 stretch marks and cellulite?  Nobody wants to see all

23 that.

24  Q.  I appreciate you being candid.

25      Do you know if customers came to Centerfolds

Page 118

1 because of its lighting?

2   A.  Oh, now, that, I can't speak to.  I think they

3 came to Centerfolds because of girls.

4   Q.  What about the audio system?

5   A.  Maybe they did.  Maybe, to your -- to your point

6 about the low lighting, maybe -- actually, to that -- to

7 that point, yes, I would say yes, to some degree they

8 would, for privacy reasons.

9   Q.  Centerfolds is, I take it, a darker club than

10 some other ones?

11  A.  Yes.  Yes, indeed.  Very private.

12  Q.  If you had to compare -- well, let me back up.

13      I think you said earlier that your

14 appearance is one of the things that affects how much

15 money you could make on any given shift, right?

16  A.  Yes.

17  Q.  Okay.  As well as personality, your finesse,

18 those intangible elements, right?

19  A.  Correct.

20  Q.  And you would agree with me that there are many

21 variables that affect how much money you could make on a

22 given night or not make, right?

23  A.  Oh, I've worked -- sometimes I have left there

24 negative.

25  Q.  So of those variables, if you had to place, you

Page 119

1 know, the club's furniture, lighting system, A/V, its

2 physical assets on a scale and compared it with what you

3 are bringing to the table, how would that scale tip?

4   A.  Oh, very heavily to -- their -- they -- the

5 way -- they outweigh me, big time.

6   Q.  Yeah.  In relation to the amount of money that

7 you could make?

8   A.  Yes.  Oh, yes.

9   Q.  Explain that for me, please.

10  A.  On a good, average -- not -- not overly great.

11 There were times when I made really great money, don't get

12 me wrong.  They are one-off kind of days.  Okay.  On an

13 average -- let me give you an average earnings day.  It's

14 not always, because sometimes I worked and I didn't make

15 anything.  I left out negative.  But on average, I make

16 200, 300, if I'm lucky.  Sometimes I make more than that.

17 Sometimes I make 700.  I've made more than that, you know,

18 but it's not on average.

19  Q.  I guess what I'm getting at is, to what extent is

20 the club's actual capital important to your job as a

21 dancer?

22  A.  Well, I would say that they have to own and

23 operate the bar.  They have to pay property taxes.  They

24 have to pay -- if they own the building, they have to pay

25 property taxes.  They have to pay city fees and -- and

Page 120

1 registration of all sorts.  They have to buy alcohol

2 to sell to the customers.  They have to pay employees.

3 They have to provide -- well, I don't know about health

4 insurance.  I think maybe.  Maybe on that one.  I'm not

5 real sure.  But they have to hire the cash cage guy, an

6 accountant to -- you know, they've got overhead.  They

7 have got an electric bill that I can only imagine how much

8 it is.  They have got a water bill.  They have got

9 overhead, serious overhead.

10  Q.  And how did all that overhead affect your profit

11 potential?

12  A.  Well, if -- if the rent -- if the water bill is

13 not paid or the electric bill is not paid, I can't go and

14 work.  Nobody is going to show up.  If there is no booze

15 in the bar, nobody is going to show up.  There's no

16 waitresses in the bar, no paid waitresses -- they paid the

17 waitresses not very much, but they paid them.  If they

18 don't show up, I have got no -- you know, waitress.  I've

19 got no bartender, if they don't pay the bartender.  I've

20 got no manager, if they don't pay the manager.  I've got

21 no D.J., if they don't pay the D.J.

22  Q.  Sure.  If Centerfolds stopped paying its rent or

23 property insurance and closed down, would you have just

24 then gone to a different club?

25  A.  Yes.

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 121

1   Q.  The club charged a cover charge to customers, I
2   assume, right?
3   A.  Yes, they did.
4   Q.  Did the amount of the cover charge in any way
5   affect your work as a dancer?
6   A.  That's hard to quantify.  Most men with money
7   don't necessarily pay too much attention to a 5 or $10
8   cover charge because they came there to spend however much
9   they came there to spend.  Some of them, to a small
10  degree, might be watching their budget, but I wouldn't say
11  it was a significant impact.
12  Q.  If you are willing to pay 10 or $15 to get into
13  the club, that amount is not really going to keep people
14  out who might wind up paying you, right?
15  A.  No.
16  Q.  Okay.  Did the club have a dress code?
17  A.  Well -- yes.  Customers, yes, they did.
18  Q.  What was that dress code?
19  A.  No hats, and had to be a collared shirt, if
20  memory serves.
21  Q.  Did the club's imposition of a dress code on
22  customers affect your ability to perform as a dancer?
23  A.  Well, if they don't let somebody in because they
24  are not wearing the right clothing, and they turn them
25  down and say, Bye, I can't dance for anybody.  So I would

Page 122

1   say yes.
2   Q.  Can you ever think of a time when maybe you had a
3   customer willing to pay you and they got kicked out
4   because of the dress code?
5   A.  They usually get kicked out before they even have
6   an opportunity to meet me.  So they -- they get told at
7   the door.  The door girl, that's something the door girl
8   handles.
9   Q.  Do you have any idea why there is a no-hats rule
10  for customers?
11  A.  No clue.
12  Q.  Okay.
13  A.  Unless it's a cowboy hat.  They allow cowboy
14  hats.
15  Q.  Just not ball caps.
16  A.  No ball caps.
17      They used to be -- many years ago, you used
18  to have to have a tie and a suit and -- you know, it used
19  to be really fancy.  But over the years, it's gotten
20  extraordinarily relaxed.
21  Q.  You are saying that the dress code got very
22  relaxed over the years?
23  A.  Yes.  Same with the girls.  The girls' dress code
24  used to be, like, a couple days a week we were only --
25  only certain days of the week were we allowed to wear,

Page 123

1   like, short skirts and, like, two-piece outfits.  It used
2   to be, like -- I think it was -- it's been so long now, I
3   can't remember, but I think it was Monday through
4   Thursday, we were required to wear, like, evening-type
5   gown dresses and -- oh, yeah, we were -- we were very
6   classy, back -- this was a long time ago that -- yeah,
7   nowadays, you just wear whatever.
8   Q.  I've heard that, that dancer dress codes at most
9   clubs, not just Centerfolds, has kind of relaxed over
10  time, right?
11  A.  Correct.
12  Q.  Okay.  Is that also true with respect to
13  behavioral types of rules?
14  A.  Yes.
15  Q.  It used to be, maybe ten years ago, that clubs
16  would be much more proactive about getting on dancers to
17  be more smiley or interact with customers in a certain
18  way; is that accurate?
19  A.  Yes.
20  Q.  Okay.  In your experience, how did the clubs'
21  interactions with dancers relative to their performing
22  their job, how did that change over time?
23  A.  I'm sorry, I need to plug in my -- bear with me a
24  minute.
25      Okay.  I'm sorry.  Ask me the question

Page 124

1   again.  I had to plug in my --
2   Q.  At Centerfolds, how did -- how did the degree of
3   involvement in the dancers' work change over time?
4   A.  How did the degree of the involvement of the
5   dancers' work change over time?
6   Q.  Yes.
7   A.  Without getting into too much detail, I can say
8   this.  When Nick -- and Nick is deceased.  When Nick was
9   the manager, Nick was an excellent manager.  Nick walked
10  around with a red light pen and he would -- you know, like
11  you play with a cat, right?  A little laser pen, and a
12  flashlight.  They would also frequent the VIP rooms and
13  they would sit in the VIP -- you would always have a
14  manager, wherever, you know.  If they saw something going
15  on, didn't matter what it was, that wasn't supposed to be
16  going on, you got red-lighted.  You got taken to the
17  office and you got suspended for three days.  So stuff
18  happened, people gave tips, they kept their job, but it
19  was on the -- it was contained.
20      Now, it's the wild, wild west, and there is
21  absolute privacy.  Meaning, no management when you go to
22  the VIP.  No other customers can go to the VIP.  No big
23  lighting, no darkness.  That's what it is, darkness and --
24  in the penthouse.  In VIP one, there's some you can --
25  that other people can -- there is not as much privacy, but

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

1 still privacy. You don't have people really around not
2 in the daytime, anyway. In the nighttime, yeah, a little
3 bit, but it's still very relaxed. No laser lights or --
4 or getting in trouble for anything, really.
5      Q. So I understand from your interrogatory answers
6 that the rules at Centerfolds included no sexual contact
7 with customers; is that accurate?
8      A. What was that -- ask that -- ask that question
9 again. I'm sorry.
10      Q. Sure. I'll just pull it up on my screen so you
11 can see what I'm referring to.
12      A. Yes.
13      Q. Here, in Interrogatory No. 6, we asked for a
14 description of the rules that Centerfolds required or
15 expected you to comply with while performing your work as
16 a dancer.
17      A. Yes.
18      Q. And here we've got -- can you see it?
19      A. Yes. Included no sexual contact, that's right.
20 No fighting. Stage dances were required.
21           Yes, that's correct, but other girls --
22 that's why I was -- you know, when situations are very
23 relaxed and there is nobody around to -- to discipline all
24 these other girls -- and there is a lot of them -- things
25 got relaxed.

1      Q. Right. I understand.
2           Are there other kinds of rules besides what
3 you provided here, that you can recall?
4      A. Show me the rules again that I -- that I said
5 before. I -- I don't think so, but...
6           I mean, the only other rule was you had to
7 pay to -- before you worked.
8      Q. Right.
9      A. You had to be 21 to drink.
10      Q. Right.
11      A. No drugs.
12      Q. Right.
13      A. No -- not supposed to be, anyway. That's all I
14 can think of that -- well, that and the outfits -- you
15 know, you have to wear dance attire.
16      Q. Sure.
17      A. You also had to wear hose at all times. You had
18 to keep your shoes on. I don't know if that was part of
19 the law, but at all times you had to keep your shoes on.
20      Q. Was there ever a time when you wanted to take
21 your shoes off?
22      A. Oh, yeah, plenty of times. And I -- and I would
23 get -- every now and again, somebody would say something
24 about that.
25      Q. On interrogatory No. 10, can you read that?

1      A. Yeah. I can read it.
2      Q. In your answer, you say: Determine the choice of
3 music.
4           Did you have any ability to ask for a play
5 list or type of music or anything like that?
6      A. So not really -- yes and no. That's -- that's a
7 loaded question. So you could tip the D.J. and they
8 might -- might play what you asked for, if they have it in
9 the library. The library was outdated and some of the
10 equipment was also outdated. They had their selection and
11 not your selection. Does that make sense? So if they
12 didn't have a song you wanted, you don't get it.
13      Q. Right.
14      A. Or if it was a song that maybe they had, but
15 maybe they didn't think was appropriate, they wouldn't let
16 you play it.
17      Q. What was your experience like with -- was it
18 Meekins?
19      A. Uh-huh.
20      Q. Did he let you play whatever music you asked for?
21      A. He had a different -- well, I -- I played -- I
22 was real easy on them about the music. I just sort of let
23 them choose, and I just got up and danced to it. Really,
24 I didn't really have -- I was not too picky. A couple of
25 times that I did ask for stuff, they just didn't have it,

1 the library was so limited, so -- and then there was
2 another D.J. there. Trey was the nightshift D.J. There
3 was a dayshift D.J., but I don't recall his name. He was
4 a big guy. Real big guy.
5      Q. Did you ever ask him for a particular kind of
6 music and he just said no?
7      A. Yes.
8      Q. What kind of music were you asking for?
9      A. Like a burlesque style. He would say, No. Dance
10 to AC/DC.
11      Q. Did you dance to AC/DC?
12      A. I did. I didn't want to tip him, so he didn't
13 want to play what I wanted -- you know what I mean?
14      Q. Yeah.
15      A. You don't tip people, they don't take care of
16 you. That's how it is.
17      Q. Okay. The rest of the answer under Interrogatory
18 No. 10 is: Club managers help dancers network with more
19 lucrative clients.
20           That's kind of what you were explaining to
21 me earlier today, right?
22      A. Correct.
23      Q. Okay. How often would managers help you network
24 with lucrative clients?
25      A. It wasn't that often, but they would, especially

Page 129

1  if you tipped them and tipped them often, they would favor
2  you more than others, you know, and they would talk to you
3  and be, like, Oh, yeah, that guy comes in here -- you
4  know, they are, like, in the know, right, so they put you
5  in the know.  So then you knew and then you could -- you
6  know, you could go attempt to say hello, and either they
7  like you or they don't, right.  So -- but -- but, yeah.
8  They -- if you took care of them, they would take care of
9  you.
10     Q.  Number 17, we asked -- and I'm paraphrasing, what
11 led to you leaving Centerfolds?
12     A.  So -- I'm sorry.  Go ahead.
13     Q.  Go ahead.  Explain to me what the circumstances
14 were that resulted in you leaving Centerfolds.
15     A.  Yeah.  There was an altercation with a girl, and
16 I had not been tipping as much as I should have been
17 because I just hadn't been making as much as I wanted to
18 be making.  I think at that point, mentally, I had already
19 decided I'm probably not going to do this much -- here,
20 much longer, you know, anyway.
21        So I got into a verbal altercation with this
22 girl, and the manager told me, you know, that I
23 shouldn't -- I should leave it alone, because that was the
24 GM's favorite girl and, you know, I was just trying to get
25 him to get her out of my face because she's, like, in my

Page 130

1  face, screaming at me and trying to -- to, like, really
2  come at me, you know.  I was just telling her, Leave me
3  alone, you know, and he would just -- he took her side
4  and -- so I was, like, Okay.  Well, that's that.  Thanks,
5  bye.
6      Q.  What was the altercation about?
7      A.  I had mentioned to someone that she had mentioned
8  to me that she had a pimp, and that was one of the reasons
9  that I had already sort of decided that I really wasn't
10 going to stay there much longer, because there were quite
11 a few girls there that seemed to follow that, and I was
12 not okay with that in any sort of way.
13        So I mentioned that to the guy that I was
14 sitting with -- and maybe I shouldn't have said anything
15 at all in retrospect, but I said it and he, for whatever
16 reason, said it to her, and she got in my face about it
17 and then she wouldn't get out of my face about it.  So
18 then I had to go get the manager to tell him to tell her
19 to chill out, you know, because she was trying to fight,
20 like, physically fight me.  That's when Kirk told me,
21 That's the GM's favorite girl.  And the GM was
22 Chris Malusa.
23     Q.  And then what happened?
24     A.  Then I left.  I went to Treasures.  I spoke to
25 one of the Davaris, the -- the -- I think he was the

Page 131

1  nephew.  I don't remember his name.  I asked him, you
2  know, Do I lose my job or whatever, you know?  And he
3  said, No.  No.  You still got your job.  Go back to work,
4  you know, just go back.  Everything is okay.
5         And I said -- I was kind of worried about
6  it, like, at that point, like -- you know, so he just said
7  to go back to work, but I -- I just didn't.  I didn't want
8  to be in that environment any more.
9      Q.  You were done with the industry at that point,
10 right?
11     A.  Yeah, pretty much.
12     Q.  Twenty years is a pretty long time for a dancer,
13 isn't it?
14     A.  Well, it is, but I had extenuating circumstances,
15 so I didn't want to be in there that long.  It just
16 provided for me, so...
17     Q.  It is what it is, right?
18     A.  It is what it is.
19     Q.  Would you ever go back?
20     A.  Hard to say.  If it were a club like Men's Club,
21 it's operated on the up-and-up and -- and everything is
22 nice and beautiful on the inside and -- or -- or even the
23 club PT's in -- in Dallas was a great place to work, the
24 management was great, I might, but I don't know.  I'm 42,
25 so -- and I have the cam now and I don't want to have to

Page 132

1  worry about COVID and -- you know, so I make just -- you
2  know, I make enough on the cam, so...
3      Q.  Is there anything else about this altercation
4  with this other dancer that made you feel it was unfair
5  that the club took her side?
6      A.  Not really.  Just, you know, like I said, he told
7  me that that was Chris Malusa's favorite girl.  I assume
8  because she tips him quite -- more often than -- than I
9  do, you know, so it's the only assumption I can make.
10     Q.  The amount that you were tipping managers you
11 mentioned had decreased.  Was there any standard amount?
12     A.  No.  It really just depended on how much I made.
13 If I made a lot, I was generous.  If I didn't make a lot,
14 I wasn't generous.
15     Q.  I've got it here that there was a house -- a
16 house parent named Carl Crenshaw.
17     A.  Correct.
18     Q.  I've actually never heard of a house parent.
19 I've heard of a house mom, but what's a house parent?
20     A.  Yeah.  He's our house dad.  Yeah.  So it's the
21 same thing as a house mom.  He does hair, makeup, provides
22 body sprays and feminine products and whatever you need,
23 you know, so...
24     Q.  Were you required to tip Carl Crenshaw?
25     A.  No, it was not a requirement.  I did, but it was

Page 133

1  not a requirement.

2      Q.  I've heard from some dancers that tipping the

3  house parent is a requirement --

4      A.  At certain clubs.

5      Q.  At certain clubs, it is?

6      A.  Yes.  At Bucks Wild, it's mandatory.  At PT's,

7  it's mandatory, on top of the house fee.

8      Q.  Even if they are not providing you with anything?

9      A.  Yes.  Even if you don't use their products.

10     Q.  But your experience at --

11     A.  And the D.J., too.  I'm sorry, go ahead.

12     Q.  But at Centerfolds it was not your experience

13 that you had to tip Carl?

14     A.  It was not mandatory.

15     Q.  Kirk was the manager that brought you on

16 initially, right?

17     A.  Yes.

18     Q.  Do you recall when it was?  Was that 2014?

19     A.  I really don't recall.  I just know he recruited

20 me from another place.

21     Q.  How did he recruit you?

22     A.  He got a lap dance, a couple of them.

23     Q.  Oh, yeah?

24     A.  Yeah.  He did that with several girls, not just

25 me.  That was how he recruited.  He would go to other

Page 134

1  clubs and he would buy lap dances and then he would talk

2  them into coming over and working for him.  Kind of smart,

3  if you think about it.

4      Q.  Well, tell me why that is, why that would be

5  smart.

6      A.  Well, he needs girls and they don't -- on -- he's

7  a dayshift manager.  They don't -- you don't get a lot of

8  day girls.  They want to work the nightshift when it's

9  hopping, you know, so you have to go find the girls.

10 Where do you find them at?  Other places.

11     Q.  What was his pitch?

12     A.  He just said, Hey, you ought to come work for me.

13 You know, the money is good on the dayshift over there.

14 It's not like -- like other clubs.

15         Some dayshifts is really not worth -- you

16 don't make money if they don't have customers.  There is

17 only a couple of clubs in town that you can make money on

18 a dayshift; Centerfolds is one of them.

19         But he -- he -- he's like, No, it's good

20 over there on the days.  Come over there.  I'll show you.

21 And I did, so...

22     Q.  Apparently he was not lying because you worked

23 there, what, six years?

24     A.  A long time.  Well, he didn't originally recruit

25 me.  He rehired me.  He was not the original person to

Page 135

1  hire me.  Nick was the original person to hire me, many

2  years ago.

3      Q.  Okay.  So at some point many years ago, Nick was

4  the first manager that you met?

5      A.  Correct.

6      Q.  You performed --

7      A.  Nick and Juan.  Juan was the dayshift guy, Nick

8  was the nightshift guy.  Actually, now that I think about

9  it, Juan hired me.  Juan is also deceased.  Juan hired me.

10 I had been there a while, I'm telling you.

11     Q.  That's also a lot of dead managers.  It's crazy.

12         Okay.  So you interacted with some other

13 managers, then you left Centerfolds for a while and then

14 Kirk brought you back, basically, right?

15     A.  Yes.

16     Q.  Do you recall what year --

17     A.  I really don't recall, honestly.  It all just --

18 just sort of -- yeah.

19     Q.  I was just curious.

20         (Exhibit B marked for identification.)

21     Q.  (BY MR. KING)  This is Exhibit B.  This is a

22 document labeled Centerfolds 21 through Centerfolds 53.

23 It's the 2019 agreement.  All right.  I'm showing you what

24 will be marked as Exhibit B.  I take it you've seen this

25 document before, right?

Page 136

1      A.  Yes.

2      Q.  Okay.  The dancer packet?

3      A.  Yes.

4      Q.  I just want to make sure that this is your

5  signature on Centerfolds 27, right?

6      A.  Yes.

7      Q.  Okay.  And that's also your signature on

8  Centerfolds 28, right?

9      A.  Yes.

10     Q.  Okay.  And that's your signature on Centerfolds

11 43, correct?

12     A.  Yes.

13     Q.  Okay.  On Centerfolds 40 -- well, let me back up.

14         How many different versions of this

15 agreement do you recall seeing during your time at

16 Centerfolds?

17     A.  Three to four.

18     Q.  Is Exhibit B, what we are looking at right now,

19 the latest version that you recall signing?

20     A.  No.

21     Q.  Did you sign another one in 2020?

22     A.  I believe so.  Well, I was already working --

23 like, I had been working there and I was in the dressing

24 room and they came around and said, All the dancers have

25 to re-sign them.  They made every girl in the place do it.

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 137

1    Q.  Okay.  Did you read it before you signed it?

2    A.  Yes.  Most of it.

3    Q.  It's pretty long.  It's longer than what a lot of
4  other clubs have, isn't it?

5    A.  (No response.)

6    Q.  These kind of agreements are fairly standard at
7  dance clubs, right?

8    A.  Yes.

9    Q.  Okay.  On Page Centerfolds 40, Paragraph 19
10  reads:  There is no mandatory tip-sharing arrangement
11  among management, dancers and employees.

12         Was that generally true in your experience?

13    A.  Yes.  That's what I said earlier.

14    Q.  Were you prohibited from soliciting drinks from
15  customers?

16    A.  Not that I'm aware of.  In fact, they wanted us
17  to increase business.  You know, they want -- they
18  encouraged us to sell bottles.  If you want to go to the
19  VIP, you've got to sell bottles.

20    Q.  But were you forbidden from saying, Hey, why
21  don't you buy me a drink?

22    A.  Not that I know of.

23    Q.  Okay.

24    A.  I mean, I always waited to be offered -- you
25  know, I guess I did ask a couple of people if they

Page 138

1  wouldn't mind buying me a drink.

2    Q.  Okay.  Paragraph 20 here:  The club is not a
3  collection agency for the dancers.

4         What did you interpret that to mean?

5    A.  It means if I had a dispute between my customer
6  and me regarding the amount of money that he owed me for,
7  say, my time.  Say we went to the VIP and I was up there
8  with him for, you know, two hours, and I only did one
9  dance, well, that's only $20.  But in my view, I spent a
10  lot of time with him, you know, so it -- generally, a -- a
11  gentleman would appreciate that and would give me a fair
12  amount, in his eyes.  Okay.  But if someone said, No, I
13  don't think so, you only did one dance, I don't care if
14  you were with me three hours, you know, if there was a
15  dispute like that, it means that they would not fight for
16  my money.

17    Q.  Did you ever have a situation like that?

18    A.  No, fortunately, but I have seen girls that have.

19    Q.  How do you handle those situations?  I'm curious.

20    A.  I just try to be real with people.  Just -- you
21  know, you just -- you just got to be you.  You can't be
22  upcharging people and you can't be going crazy with the --
23  with the negotiation, you know, so...

24    Q.  Just be up front?

25    A.  Yeah.  I wouldn't say up front.  You don't talk

Page 139

1  about it when you first go up there.  You talk about it
2  after, right, but you try to -- try to be realistic is a
3  better word.

4    Q.  Okay.  So you would talk about it after you are
5  done in the VIP area.  That's when you --

6    A.  Correct.  Correct.

7    Q.  In this Paragraph 2 -- Paragraph 3, and this is
8  on Page Centerfolds 30.  Is there anything in this
9  paragraph, Paragraph 3, that you felt was not true at
10  Centerfolds, in your experience, at any point after 2018?

11    A.  I'm sorry, what was that?

12    Q.  This Paragraph 3 begins with:  The dancer shall
13  determine the method, details and means of performing
14  entertainment services -- and it goes on.

15         In your experience working at Centerfolds
16  between 2018 and 2020, is there anything where you
17  thought, you know, this is not what I signed on for?

18    A.  Yeah.  I would say that there's a breach of
19  contract where it says that there is no penalty regarding
20  when I arrive and leave, because if I showed up at later
21  time, I have to pay a higher tip-out.

22    Q.  Okay.  What about when you left?

23    A.  There was -- in the last few years, there used to
24  be -- you used to have to sign a pass and you had to give
25  them a tip to leave or they would get aggravated at you,

Page 140

1  but the last few years they got relaxed about that and
2  they did away with the pass and you could just walk out.

3    Q.  Aside from what you've already explained to me,
4  did Centerfolds exercise control over your apparel or your
5  appearance in a way that you felt did not honor the terms
6  of Paragraph 3?

7    A.  Let me re-read this again.  I don't think so, but
8  let me just take a minute.

9    Q.  Please do.

10    A.  I would say that's accurate.  They did expect us
11  to be an industry standard.  Now, whether or not a teddy
12  and stockings is industry standard for a stripper is a
13  whole other question.  That's -- I don't know.  I don't
14  know about that.  Dancewear, certainly, but a teddy and
15  stockings, are we in a brothel or are we in a dance club?

16    Q.  It sounds like there's a lot of subjectivity
17  built into that.

18    A.  Yes.  I'm just stating.

19    Q.  Okay.  So in some of your discovery answers, you
20  reference managers like Kirk Ramirez tell you about
21  private parties that you could work.  Were those private
22  parties at the club or elsewhere?

23    A.  Elsewhere.  Sometimes at the club.  It depends.

24    Q.  Would you -- how often would you work private
25  parties?

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 141

1    A.  Not that often.  Every blue moon.

2    Q.  Okay.  Are private parties, like, a common thing

3 in the industry?

4    A.  Yes.

5    Q.  Okay.  Were they particularly lucrative or not?

6    A.  It depends, you know, there was no -- it's not

7 like you got paid up front with anything.  You went and

8 you hoped for the best, right.  Sometimes they were,

9 sometimes it was a bust and you had a good time, anyway,

10 you know, who cares, right.

11    Q.  Okay.  How many private parties would you say you

12 worked between 2018 and 2020?

13    A.  Oh, I really didn't go to that many private

14 parties, honestly.  A handful, maybe -- maybe six or

15 seven.

16    Q.  Six or seven.

17        About how much would you gross from one of

18 those parties?

19    A.  It really -- like I said, it really just would

20 depend on who it was and what -- what party -- like, two

21 of the parties, I didn't make anything.  At the other

22 parties, I made maybe 400 or $500, and then at one of the

23 parties I made, like, three grand.  Two or three grand.

24    Q.  So it would range from zero to a couple grand?

25    A.  Yes.  There's nothing consistent about dancing.

Page 142

1    Q.  I get that impression.  A lot of it is luck of

2 the draw, right?

3    A.  You could work two or three days in a row

4 sometimes and not make anything.

5    Q.  You've got to invest a lot of your time into the

6 work itself in order to --

7    A.  To meet the right one to make your day.

8    Q.  You wrote that Mr. Ramirez allowed or denied

9 access to the dressing rooms.

10    A.  He was allowed.

11    Q.  Pardon?

12    A.  He -- he was allowed.

13    Q.  No.  That Mr. Ramirez allowed or denied access to

14 the dressing rooms.

15    A.  Oh, I didn't hear you properly.  I'm sorry.

16    Q.  I apologize.

17    A.  Yes.  Yes.

18    Q.  Okay.  What does that mean?

19    A.  It means that as a manager, it was his

20 responsibility to ensure the safety of the -- the dancers

21 in the private areas.  So as -- as a manager, there were

22 no customers allowed in the -- or no boyfriends allowed,

23 no husbands allowed.

24    Q.  Okay.  So he was -- he was blocking the door for

25 any customers or boyfriends or significant others trying

Page 143

1 to get into the dressing room?

2    A.  Him and the door girl and the security guy and

3 the bouncer, yeah.

4    Q.  Okay.  I thought it meant in relation to you,

5 like, he wouldn't allow you to use the dressing room?

6    A.  No.  Of course not.

7    Q.  One of your answers was that Mr. Ramirez

8 regularly reminded dancers of the club rules and that you

9 were told to seek advice or help from Mr. Ramirez or other

10 managers if needed.

11    A.  Yes.

12    Q.  Okay.  What does that mean?

13    A.  Well, the only time he actually did that was when

14 I got into the altercation with the girl, and he said,

15 Chris is the GM, go talk to him.  That's his favorite

16 girl.

17    Q.  All right.  And then after that, you talked to a

18 relative of the Davaris?

19    A.  Yes.

20    Q.  Okay.  And was that relative, was he, like, a

21 floating manager at different clubs?

22    A.  I believe so.  But I think -- I think the GM was,

23 too.  I know he was, because I found him at Treasures,

24 so...

25    Q.  Did Kirk ever discipline or reprimand you for

Page 144

1 anything?

2    A.  The only thing that he ever -- he never

3 disciplined me, ever.  He did fuss at me one time, just

4 once, and that was for missing the stage.

5    Q.  Do you recall about when that was?

6    A.  I -- I have no idea.

7    Q.  Which manager was best at bringing in high-value

8 clients?

9    A.  Kirk.

10    Q.  Kirk?

11    A.  Kirk is a good manager.  I hope I haven't painted

12 him out to be a bad manager, per se.  Just in terms of a

13 business develop management, because other managers, no

14 good.

15    Q.  Managers kind of run the gamut, don't they, at

16 clubs?

17    A.  Yes.

18    Q.  Well, the only reason I'm asking all these

19 questions is because Kirk is one of the defendants in the

20 case.

21    A.  Correct.  I know.

22    Q.  Okay.

23    A.  You're probably shocked to hear me say he was a

24 good manager, but in terms of business development, I

25 thought he was.

Page 145

1    Q.   Fair enough.  I mean, your answers are your

2  answers.

3            Okay.  So you mentioned earlier that Kirk

4  didn't fuss at you -- or he did fuss at you for not

5  hitting a stage rotation.

6    A.   Yes.

7    Q.   Okay.  But I've got to ask you, your response to

8  Interrogatory No. 15 sounds like the opposite of that.

9    A.   No.  I think they had my answers confused with

10 Mr. -- with Thomas.  I noticed that in the -- I think that

11 was the lawyer that -- yeah, it was a miss -- a type -- an

12 error in the -- in the documenting when they were talking

13 to me.

14   Q.   Okay.  So the answer to No. 15 is not correct?

15   A.   It's not applicable to -- let's see, so Kirk is

16 not correct, no, because Kirk did say something to me

17 about missing the stage.

18   Q.   What about Malusa?

19   A.   Malusa never said anything to me about missing

20 the stage.

21   Q.   All right.  Did Malusa work dayshifts?

22   A.   No.

23   Q.   Okay.  Did you have a lot of interaction with

24 him?

25   A.   Not a whole, whole lot.  We had some phone

Page 146

1  conversations, and I would hang out and talk to him for

2  five or ten minutes, and give him a tip here and there,

3  just to stay in his good graces, you know, but not a whole

4  lot, because he was coming in when I was leaving, most of

5  the time.  Sometimes I would stay late.

6    Q.   What kinds of management duties would the

7  managers be doing?

8    A.   I'm sorry, I couldn't hear you.  What was that?

9    Q.   What kind of management duties would managers be

10 doing when you were there?

11   A.   Well, they oversaw the girls, make sure they are

12 showing up for stage.  They oversaw the girls, make sure

13 that they were dressed appropriately, in the correct

14 attire for the establishment.  They made sure there was no

15 fighting.  They handled disputes between customers, if

16 there was fighting between customers.  If there was no

17 bouncer, they became the bouncer.  They handled tab

18 disputes between the waitresses and the customers.  Like,

19 if there was a drink dispute -- you know, some guy came in

20 and ran up a $200 bar tab, you know, and said, I

21 only spent $20 -- you know, well, they would step in,

22 right.

23            He had to run the bar, make sure it was

24 fully stocked and he oversaw the barkeep and all the

25 waitresses and their duties and the cleaning staff and the

Page 147

1  D.J. and I don't know about the -- I think the valet might

2  have been a third-party company, but I don't know.  So,

3  yeah and -- and kitchen staff, too.

4    Q.   As those management duties related to your work,

5  where did you see the most interaction with managers?

6            MR. MASON:  Objection, form.

7    A.   I'm sorry, what was that?

8    Q.   (BY MR. KING)  You just described to me many

9  different kinds of management duties that managers like

10 Mr. Ramirez and Malusa and Thomas Venza had, right?

11   A.   Uh-huh.

12   Q.   I was wondering, if there are any more management

13 duties that they performed in relation to your work?

14   A.   Any additional ones?

15   Q.   Yeah.  So you mentioned making sure dancers are

16 not wearing street attire, for example, right?

17   A.   Right.

18   Q.   Resolving disputes between dancers, right, or

19 trying to?

20   A.   Yes.

21   Q.   Okay.  What else?

22   A.   I really can't think of any other ones, just --

23 just right in the bar, overall making sure it was

24 operating efficiently and everything was running smooth

25 and people were coming in and out, and doing what they

Page 148

1  were there to do, you know.

2            So he would meet and greet customers and

3  show customer support.  He would -- he would also go out

4  and recruit customers into the -- as well as dancers, but

5  he would -- he would go out and he was a great business

6  development guy.  He would go out and he would bring

7  business in, you know.  So I would see that.  I would see

8  him building relationships and things.  That was good for

9  my money, you know, because the more people that are in

10 that place, the more money I could make, so...

11   Q.   Okay.  You've never met Ali Davari, right?

12   A.   No, I don't think so.  Unless he was that guy

13 that I talked to at Treasures.  I don't recall his name,

14 so I -- I -- I may be confused, but I don't think so.

15   Q.   Was the guy that you talked to at Treasures an

16 older gentleman or a younger one?

17   A.   If by older, you mean my age.

18   Q.   No.  I mean, like, 60, with gray hair.

19   A.   No.  He was not older like that.  He was my age,

20 roughly.  Roughly, my age.

21   Q.   Okay.

22   A.   And he was short and he had short hair and he was

23 not heavy set.  He was just average build.

24   Q.   So in all the times that you've worked at

25 different Davari clubs, Gold Cup, Centerfolds, Cover

Page 149

1 Girls, Treasures, you've not had the occasion to actually

2 run into Ali Davari?

3    A.  I don't think so.  I've actually met David, like,

4 maybe twice, but it was briefly, very briefly.

5    Q.  Okay.  What was that interaction like?

6    A.  I came up and I gave him a hug and I said, It's

7 good to see you.  He just sort of brushed me off.  Okay,

8 honey, bye.

9    Q.  How did you know how to greet him if you had

10 never seen him before?

11   A.  No.  I had seen him.  I just had never really

12 interacted with him.

13   Q.  Oh, I got you.

14   A.  Everybody knows who they are.

15   Q.  Okay.  So what would he come into the club to do?

16   A.  He comes in the club and he just makes the

17 rounds.  It's not very often, maybe once every couple of

18 months, usually in the daytime.  Occasionally at

19 nighttime.  He watches, and he's there for maybe an hour.

20 He goes to the kitchen, where the offices are, the

21 accounting offices and things, and he goes back there and

22 I don't know what he does in there.  And he disappears.

23 And then when he's done, he leaves out the back door and

24 we don't even know he's gone.  I seen him on occasion

25 walking the parking lot, like, I'm assuming for general

Page 150

1 maintenance purposes.

2    Q.  All right.  So neither of the Davaris have ever

3 hired or fired you, right?

4    A.  Correct.

5    Q.  Okay.  And none of the Davaris have ever given

6 you any kind of schedule, right?

7    A.  Correct.

8    Q.  To your knowledge, have any of the Davaris,

9 either of the Davaris, ever dictated your working

10 conditions at Centerfolds?

11   A.  No.

12   Q.  Do you have personal knowledge of whether or not

13 the Davaris have maintained any personnel-type records for

14 yourself?

15   A.  I would assume that they do, because they are the

16 club owners, so I would assume that they are -- they

17 provided you with records of some sort, you know.

18   Q.  Sure.  I do have records.  Not from them, but --

19 what I'm wondering is, if you saw the Davaris in an office

20 with a bunch of dancer records.

21   A.  I've seen them in an office with the door open

22 where the accountant works.  I don't necessarily -- I

23 mean, I can't really answer your question as to say did

24 they control that or they were just there.  So it was in

25 passing.  I don't know what was going on.

Page 151

1    Q.  Okay.  That's fair enough.

2         Aside from what you've already told me, have

3 you seen other -- have you seen the -- either of the

4 Davaris ever perform any other kind of management duties

5 specifically at Centerfolds?

6    A.  No.

7    Q.  Do you know what functions either of the Davaris

8 perform relative to the operation of Centerfolds?

9    A.  Well, their name is on the door, so -- so to

10 speak, so I imagine they had to pay all the bills and --

11 and deal with all kinds of things to keep the place

12 operational and functional and they just oversaw

13 everything and then they dictated, you know, what needs to

14 be delegated out to -- to all the people beneath them, you

15 know, so...

16   Q.  Is what you just told me an inference from their

17 status as owners?

18   A.  Correct.

19   Q.  But aside from that inference, do you have any

20 firsthand knowledge of their involvement in the operation

21 of Centerfolds?

22   A.  Outside of seeing them just standing around

23 observing, no.

24   Q.  Okay.  Fair enough.

25         In one of your responses to our request for

Page 152

1 admission, specifically No. 10, the question was:  Admit

2 that Hassan Davari required you to dance on stage each

3 shift or else pay a skip fee of $20.

4         The answer was --

5    A.  No.  That's a -- that's a -- that's a typo from

6 the -- from the lawyer.

7    Q.  Okay.  I was just curious, because --

8    A.  No.  No.  No.  That was -- because there was --

9 how many people that they asked me about, you know, so it

10 was -- it's just an error.

11   Q.  Okay.  I just wanted to check.  It's my only

12 chance to get to ask you these questions.

13         I'm not sure what's going on here.  Maybe

14 one of the -- maybe the question was deleted.  I don't

15 know.

16         Okay.  So the response to No. 10 should be

17 denied, then?

18   A.  So -- correct.  He never personally did that, no.

19 Was it a general thing at the club?  Yes.

20         THE REPORTER:  Counsel, when you get to a

21 breaking point for another brief recess.

22         THE WITNESS:  That would be great.

23         MR. KING:  Sorry.

24   Q.  (BY MR. KING)  Same thing for No. 10, with

25 respect to Ali Davari.  Ali Davari never required you to

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

---

Page 153

1  dance on stage, right?

2      A.  Correct.

3          MR. KING:  Let's take a break.

4          (Recess taken from 6:05 p.m. to 6:15 p.m.)

5      Q.  (BY MR. KING)  All right.  Ms. Roberts, I'm

6  almost done.  I'm going to ask you about what you are

7  seeking in this lawsuit.  You will be asking a jury to

8  award you money damages in this case, true?

9      A.  Okay.

10     Q.  Your lawyers have provided me with a computation

11 of damages, and I'll share them with you.

12         Are you able to see this?

13     A.  Uh-huh.  I see it.

14     Q.  All right.  I'm showing you what are called

15 initial disclosures.  Under minimum wages, the computation

16 that I've been provided is that you are seeking $20,416 in

17 minimum wage damages.  If you divide that sum by 7.25 an

18 hour, which is the federal minimum wage, it comes out to

19 2,816 hours.  Is it your contention that you worked 2,816

20 hours at Centerfolds between June 28, 2018, and June 28 of

21 2021?

22         MR. MASON:  Objection, form.

23     A.  I'm sorry.  What was that?

24     Q.  (BY MR. KING)  Is it your contention --

25     A.  No.  I heard you.  What was my lawyer -- I'm

---

Page 154

1  sorry.  What did my lawyer say?

2          MR. MASON:  I objected to the question, but

3  you can answer it.

4          THE WITNESS:  Oh, okay.

5      A.  Then -- then I'm going to say, yes, going on the

6  advice of my lawyer, if he thinks that's fair, then, yes.

7          MR. MASON:  Just to be clear, I'm not

8  commenting on whether I believe the number is correct or

9  not.  So that's up to you to decide.  I'm just saying, I

10 don't think it's a great question.

11         MR. KING:  Fair enough.

12     Q.  (BY MR. KING)  Let me ask it like this.  Based on

13 your recollection, do you believe that 2,816 hours is a

14 fair approximation of the total number of hours that you

15 performed at Centerfolds between June 28 of 2018, and June

16 28 of 2021, when you filed suit?

17     A.  In my mind, that sounds fair, yes.

18     Q.  Okay.  I believe earlier you testified that your

19 average shift length was eight hours; is that true?

20     A.  On average, yes.  Sometimes I worked much longer.

21 Sometimes I worked 12 hours.

22     Q.  Okay.  But eight hours is an average, right?

23     A.  Correct.

24     Q.  Okay.  If we divide 2,816 by 8, that comes out to

25 352 shifts, on average.  Based on your recollection, do

---

Page 155

1  you feel that 352 shifts is a rough approximation of how

2  many total shifts you worked at Centerfolds between 2018

3  and 2020?

4          MR. MASON:  Objection, form.

5      A.  Based on the math that I just witnessed you do,

6  yes.

7      Q.  (BY MR. KING)  Okay.  But based on your own

8  recollection, without me showing you --

9      A.  Yes.

10     Q.  Is there anything that you referred to when you

11 were coming up with these numbers?  Any documents or

12 anything like that?

13     A.  No.

14     Q.  So these figures are based purely on your

15 recollection, right?

16     A.  Correct.

17     Q.  Okay.  Is it true that you paid approximately

18 $19,000 in tip-outs?

19     A.  Yes.  Not approximately, but I would say that's

20 an accurate estimate, yes.

21     Q.  Can you walk me through the calculation for that

22 number, 19,360?

23         MR. MASON:  Objection, form.

24         What does that mean, objection, form?

25         MR. MASON:  It's just a legal thing.  It

---

Page 156

1  means I'm objecting to the question.  Again, you can

2  answer it.  I'm not here to comment on what your answer

3  is or not.  It's strictly about the question itself.

4          THE WITNESS:  Okay.

5      Q.  (BY MR. KING)  Let me be clear, Ms. Roberts.

6  What I'm trying to figure out with these questions is how

7  these numbers are calculated.

8      A.  Right.  Well, we said 352 shifts, correct?

9      Q.  That's according to -- yeah, my calculations, if

10 you divide 20,000 by --

11     A.  Yes.

12     Q.  Well, let me ask you like this --

13     A.  Okay.  So tip -- tip -- tip-outs are -- we're

14 considering -- house fees are accurate, minimum wages are

15 accurate.  Tip-outs, I'm going to say yes, because I have

16 no records and tip-outs varied.  So if I made a thousand

17 dollars, I might tip out 150 of those dollars to one

18 person and $40 to another person and $40 to another

19 person.  It just varied, like, a lot across the board.

20 There is -- so I'm just going to say yes.

21     Q.  Okay.  Are you able to describe to me the math

22 behind that number?  Just the multiplication?

23     A.  No, because there is no way to do -- there's no

24 way to figure it out because it was a different -- it's

25 not like it was a house fee.  It was a random amount every

---

Deposition of Grace Roberts                                    Grace Roberts vs. A.H.D. Houston, Inc

Page 157

1  time.

2       Q.  I understand.

3       A.  I could do an average on what I -- I could -- I

4  could average it out.  I could do an average.  I would

5  say, on average, I probably handed out $40 tips to most,

6  so ...

7       Q.  Per shift?

8       A.  Per person, per shift.

9       Q.  And how many people would that be per shift?

10      A.  At a minimum, two.

11      Q.  Okay.  So that would be $80 per shift?

12      A.  Yes.

13      Q.  What -- what are the dance fees, $8,800?  What

14  are the dance fees, what is that item?

15      A.  I'm -- I'm unclear as to what that is for.

16      Q.  What about the VIP fees?

17      A.  I have not seen this document before, just to let

18  you know.

19      Q.  I understand.

20      A.  Yeah.

21      Q.  But it's the information that your lawyer has

22  provided me, so it's all I have to work with.

23      A.  Right.

24          So I'm not sure about what -- what the dance

25  fees are, but VIP fees, you know, if you -- and I was in

Page 158

1  the VIP room pretty often, sometimes two or three times in

2  a shift, if I was making good money, but not every shift.

3  Some shifts I worked, I didn't make any money, so VIP

4  fees --

5       Q.  Let me ask you like this.  What are the VIP fees?

6       A.  So it's really just the tip, like everything

7  else.  You make better money in the VIP.  It's not --

8  that's where the big tips get handed out.  So like --

9  because when you go to the VIP, that's when you make

10  money.  When you work the floor, you make okay money.

11  When you go to the VIP, generally speaking, you make real

12  good money.

13          So usually, if I go to the VIP, sometimes --

14  on average, I will usually hand out anywhere from, like,

15  60 to maybe $200, depending -- I had to make a lot to hand

16  out 200, but it was very rare.  So those fees were for

17  privacy.

18      Q.  Was it, like, a 10 percent amount that you would

19  tip?

20      A.  It's whatever you felt was fair enough to be able

21  to come back and work the next day with them knowing that

22  you made a certain amount.

23      Q.  Okay.  So the $35,200 figure, is just -- it's

24  basically, like, a ballpark, right?

25      A.  Yes.

Page 159

1       Q.  Okay.  Because there wasn't a set amount?

2       A.  No.

3       Q.  And there wasn't, like, a set percentage or

4  anything, right?

5       A.  No.

6       Q.  So we couldn't say, for example, assume that the

7  VIPs were 10 percent and you made $350,000 in VIP fees and

8  tip -- excuse me.

9          We couldn't assume that you made $350,000

10  working in the VIP and tip 10 percent of that and that's

11  how we arrive at $35,000, right?

12      A.  No.

13      Q.  Okay.  Do you feel like you made $350,000 in the

14  VIP area?

15      A.  No, I do not.  No, I do not.

16      Q.  I mean, maybe.

17      A.  I didn't make this -- I didn't do this chart,

18  either.  This is the first time I've laid eyes on it,

19  so...

20      Q.  Well, I'm asking you about it now because I don't

21  want to ambush you at trial.

22      A.  Yeah.

23      Q.  Same thing with tip-outs.  There wasn't, like, a

24  set percentage or anything, right?

25      A.  No.

Page 160

1       Q.  So it would not be fair to say, for example, that

2  you made $190,000 at Centerfolds between 2018 and 2020,

3  and various people took 19k out of that?

4       A.  I'm sorry.  I was -- I'm sorry.  Say that again.

5       Q.  So for the tip-out row, it's $19,000.  We cannot

6  presume, for instance, that various personal at the club

7  received basically 10 percent of the total amount that you

8  made and that's how we arrived at the $19,000?

9       A.  The VIP -- that's the tip-out.  That's not VIP.

10  The VIP is below that.  VIP fees.  So I'm assuming 352

11  shifts is a hundred dollars a shift.  I would say I didn't

12  do the VIP every single shift I was there; however, I did

13  the VIP multiple times in a day.  So as an average, I

14  would say that number is probably good.

15      Q.  The VIP fees?

16      A.  Yes.

17      Q.  All right.  And again, like you say, you have not

18  seen these numbers before, right?

19      A.  No.

20      Q.  Did you -- you haven't sat down and kind of

21  charted out, well, I think I probably tipped out X dollars

22  on average these weeks and that's how I'm coming up with

23  this number, right?

24      A.  No.  I never -- I never seen these -- I'm doing

25  them now in my -- in my mind.  Okay.  I remember -- this

Deposition of Grace Roberts                                    Grace Roberts vs. A.H.D. Houston, Inc

Page 161

1  is on average, this is what I did.  This is -- and I'm
2  putting this together, along with you.  Because your
3  questions are unfair in that -- in that respect,
4  currently, so I'm having to do it with you.
5     Q.  I understand.  I hope you don't feel my questions
6  are unfair.  The reason I have to ask you them is because
7  these are numbers that I have been given --
8     A.  I know.
9     Q.  -- about what you are claiming.  So I have to ask
10 you, well, how did you come up with these numbers, because
11 a jury may be asked one day to perform a calculation about
12 how much you are owed.  I want to understand what will be
13 told to the jury.  Not about what you talked about with
14 your lawyers, but based on your own personal knowledge,
15 the facts.
16    A.  I'm -- I'm going to agree with the tip-out, the
17 number, because that's based on a $60 tip, according to my
18 handy-dandy calculator.
19    Q.  Okay.  And I believe you testified earlier that
20 you have not received a bill or invoice from your
21 attorneys, right?
22    A.  No, I have not.
23    Q.  Okay.  It's your understanding that they are
24 working on a contingency fee?
25    A.  Yes.

Page 162

1     Q.  Do you know what that contingency fee amount is?
2     A.  No.
3     Q.  Again, I don't want you to tell me about what
4  you've discussed with your lawyers, but I would like to
5  know how often you've been in touch with your lawyers.
6     A.  A handful of times.
7     Q.  Less than six?
8     A.  Yeah, I would say around six.
9     Q.  Have you seen the sign-in sheets that have been
10 produced in this case?
11    A.  Yes.
12    Q.  Okay.  Is it your belief that those sign-in
13 sheets do not accurately reflect the number of days that
14 you appeared at Centerfolds?
15    A.  Correct.
16    Q.  Okay.  I'll just ask you one last time.  I
17 promise, last time.  Is there any other source of
18 information, aside from the sign-in sheets, that we could
19 look at that would give us an idea of when you performed
20 at Centerfolds, what days of the week or numbers -- number
21 of days per week or month that you performed there?
22    A.  No.
23    Q.  Do you have anybody, any friends or family
24 members or other dancers who might be able to corroborate
25 how often you performed at Centerfolds?

Page 163

1     A.  Maybe.  Possibly.
2     Q.  Okay.  Who might those individuals be?
3     A.  Some of the ones that I listed that you had
4  mentioned earlier.
5     Q.  They would be able to say, yeah, Regan was here
6  three days a week?
7     A.  I would think so.
8     Q.  Is it your contention that you worked every week
9  of every month at Centerfolds between 2018 and 2020?
10    A.  There were some weeks where I worked three or
11 four days, some weeks where I worked two days and I might
12 take, you know, six days off in between some of those.  So
13 I wouldn't say every single week, per se, but, yeah, but
14 as an average.
15    Q.  Okay.  And there were some --
16    A.  Because I worked weekends and -- yeah.
17    Q.  I get it.  There were some weeks where you didn't
18 show up at Centerfolds at all, right?
19    A.  Some, but not -- not often.
20    Q.  Were there ever any months where you didn't show
21 up at Centerfolds between 2018 and 2020?
22    A.  I don't recall.
23    Q.  Okay.  So you do believe that you at least worked
24 one day a month, every month, between 2018 and 2020 --
25    A.  Yes.

Page 164

1     Q.  Okay.  And you said sometimes you worked 12 hours
2  at a time, right?
3     A.  Sometimes.
4     Q.  Can you give me some sort of estimate of how
5  often that would occur, let's say on a weekly -- a weekly
6  basis?
7     A.  I would say maybe once or twice a month.  If the
8  money was good, I would say -- or if the money wasn't good
9  and I really needed to make some more, I would try to
10 stay, you know.
11    Q.  You are claiming in this lawsuit that you are
12 owed for time spent in the locker room preparing yourself
13 to go and perform?
14    A.  I spent a lot of time in the locker room.
15        That's what you asked me, right?  Did I hear
16 you correctly?
17    Q.  Is that -- that time that you spent in the locker
18 room preparing yourself to perform, do you believe that
19 you should be compensated for that time?
20        MR. MASON:  Objection, form.
21    A.  Yes.
22    Q.  (BY MR. KING)  Okay.  Why so?
23    A.  Because it takes time out of my -- my -- it's a
24 requirement to -- to look your best.  I couldn't go out on
25 the floor if my hair was a mess and I didn't have on all

Case 4:21-cv-02101   Document 44   Filed on 06/20/22 in TXSD   Page 43 of 44

Deposition of Grace Roberts                    Grace Roberts vs. A.H.D. Houston, Inc

Page 165

1  my makeup and have on all my outfits and be smelling good
2  and it's -- it's a -- it's a requirement.
3      Q.  Did you ever prepare yourself at home?
4      A.  Occasionally.  Most of the time I did it in the
5  dressing room, though.
6      Q.  Okay.  Did any manager ever require you to
7  prepare yourself in the dressing room at Centerfolds?
8      A.  No.
9      Q.  So you prepared yourself at Centerfolds based on
10 your preference?
11     A.  Yes.  The lighting at my house wasn't the best,
12 so I liked being in the dressing rooms because they had
13 the good lighting up on the top.
14     Q.  Okay.  My last set of questions.  These are just
15 recap.
16         You set your own schedule at Centerfolds?
17     A.  Yes.
18     Q.  Okay.  During your time at Centerfolds, you did
19 perform at other clubs, true?
20     A.  Yes.
21     Q.  As a general matter, you chose your own attire
22 and aesthetic at Centerfolds?
23         MR. MASON:  Objection, form.
24     A.  To industry standards.
25     Q.  (BY MR. KING)  Okay.  You kept the money that you

Page 166

1  earned as a dancer at Centerfolds?
2      A.  Not all of it.  I tipped a lot of it out.
3      Q.  Okay.  Aside from the tip-outs, you kept the
4  money that you earned, true?
5      A.  Yes.
6      Q.  Okay.  There was occasions in which you could
7  negotiate with customers about how much you could charge
8  them, true?
9      A.  Yes.
10     Q.  You had to pay for your attire and makeup, all
11 out of your own pocket, right?
12     A.  Yes.
13     Q.  Okay.  You were able to decide how and when you
14 would engage with customers at Centerfolds, right?
15     A.  I'm sorry, repeat that.
16     Q.  You had the ability to decide how and when you
17 chose to interact with customers at Centerfolds, true?
18     A.  No, I wouldn't say that, because there were rules
19 about how I could interact with them, first of all, and
20 second of all, the club is not open 24 hours a day.
21     Q.  Sure.
22         You couldn't engage in sexual contact with
23 customers, right?
24     A.  Correct.
25     Q.  You couldn't -- I'm not saying you did, but you

Page 167

1  couldn't sell drugs to customers?
2      A.  Correct.
3      Q.  So aside from illegal things, though, is what I'm
4  asking.  How you chose to engage with customers was left
5  up to you, right?
6      A.  Yes.
7      Q.  All right.  And I believe earlier you testified
8  that as a dancer, in order to be successful, yes, you do
9  have to take initiative in terms of your customer
10 interactions, true?
11     A.  Yes.
12     Q.  All right.  And you also have to take initiative
13 in terms of when you work, true?
14     A.  Yes.
15     Q.  And how long you work, true?
16     A.  Yes.
17         MR. KING:  I'll pass the witness.
18         MR. MASON:  I have no questions for the
19 witness.
20         MR. KING:  Ms. Roberts, thank you very,
21 very much for your time.  I hope you think I've been
22 polite.  I know that was long.
23         THE WITNESS:  You were very polite.  I
24 appreciate that.  I'm exhausted.
25         THE REPORTER:  Mr. Mason, how did you want

Page 168

1  to handle reading and signing?
2          MR. MASON:  We definitely want a read and
3  sign copy.  We want a copy of the transcript.
4          THE REPORTER:  So you want her to read and
5  sign.
6          (Deposition concluded at 6:39 p.m.)

Page 169

Changes and Signature

WITNESS NAME:  GRACE ROBERTS
DATE OF DEPOSITION:  FEBRUARY 18, 2022

| Page | Line | Change | Reason |
|------|------|--------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Page 170

I, GRACE ROBERTS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

                    _____
                    GRACE ROBERTS

THE STATE OF _____)

COUNTY OF _____)

    BEFORE ME, _____, on this day personally appeared GRACE ROBERTS, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _____ day of _____, 2022.

                    _____
                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____

Page 171

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GRACE ROBERTS, on Behalf   *
Of Herself and All Others*
Similarly Situated        *
                          *
VS.                       *  CIVIL ACTION NO. 4:21-CV-02101
                          *
A.H.D. HOUSTON, INC.,     *
D/B/A CENTERFOLDS         *
HOUSTON, et al.           *

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF GRACE ROBERTS
FEBRUARY 18, 2022
(Reported Remotely)

    I, Trista Jamail, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

    That the witness, GRACE ROBERTS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

    That the deposition transcript was submitted on the _____ day of _____, 2022, to the witness or to the attorney for the witness for examination, signature and returned to Infinity Reporting Group, LLC by the _____ day of _____, 2022;

    That pursuant to information given to the deposition officer at the time said testimony was taken, the

Page 172

following include counsel for all parties of record.

    Mr. Jerry Wayne Mason
    Attorney for Plaintiffs

    Mr. William X. King,
    Attorney for Defendants

    I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

    Certified to by me this _____ day of _____, 2022.

                    _____
                    TRISTA JAMAIL, Texas CSR No. 6329
                    Expiration Date:  10-31-2023
                    Infinity Reporting Group
                    Firm Registration No. 782
                    11200 Richmond Avenue, Suite 410
                    Houston, Texas  77082
                    Phone: (832) 930-4484
                    Fax:   (832) 930-4485